UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------X

GREENS AT CHESTER LLC,

                          Plaintiff,

     -against-

TOWN OF CHESTER, JAMES. M. FARR,
individually and as Building Inspector of the
Town of Chester, ROBERT VALENTINE,
individually and as Supervisor of the Town of
Chester, CYNTHIA SMITH, RYAN C. WENSLEY,
ORLANDO PEREZ, and VINCENT FINIZIA,
collectively, as Members of the Town Board of
The Town of Chester, ALEXANDER J. JAMIESON,
as former Supervisor of the Town of Chester,
STEVEN M. NEUHAUS, individually and as
County Executive of the County of Orange,
and THE COUNTY OF ORANGE,

                          Defendants.

---------------------------------------------------------------X

**COMPLAINT**

Docket No. 19-CV-6770

**PLAINTIFF, GREENS AT CHESTER LLC** ("Plaintiff"), as and for its Complaint

against the above-captioned Defendants, hereinafter alleges as follows:

## Nature of the Case

1.     This action arises from illegal, discriminatory conduct by the Town of Chester,

County of Orange, and their highest officials and agents to obstruct a fully approved housing

development in the Town of Chester.

2.     In 2017, Plaintiff acquired a 117-acre property located in the Town of Chester

with a fully approved subdivision plan allowing for the construction "as of right" of 431 single

family homes.

3.     Defendants have improvised a series of discriminatory policies to prevent

construction by Plaintiff of any of these 431 homes.

4.      Defendants have done so because, by their own account, they feared the homes would be purchased and occupied by Hasidic Jewish families, whom Defendants regard as "threats" to the "character" of the Town.

5.      Defendants' conduct in the service of this goal goes beyond the mere abuse of office to extremes like fabricating passages in official documents and inventing restrictions at variance with Plaintiff's approved plans.

6.      Defendants' discriminatory intent is evident not merely in the unmistakable pattern of their actions; Defendants have spoken publicly of their prejudice.

7.      Here are then-Town Supervisor Alex Jamieson and then-Deputy Town Supervisor (and current Town Supervisor) Robert Valentine responding to a resident's request that they act to "keep" the community "as is"—*i.e.*, without Hasidic Jews:

> JAMIESON: We're doing what we can to alleviate 432 *[sic]* Hasidic houses in the Town of Chester. We're trying.
>
> VALENTINE: Every day.
>
> JAMIESON: There're nobody on this Board, there's nobody on the Board, nobody that works in the Town, there's nobody that want this development to go through. There's nobody. There's nobody who wants the development to go through.

(May 9, 2018 Meeting at 1:30:30, bit.ly/Chester-01).[1]

8.      Here is Code Enforcement Officer MaryAnn McKenna, replying on Town email to a correspondent who had written to her about Plaintiff and Hasidic Jews in general, "Get rid of this [sic] little roaches. . . . They are so rude!!!!" Ms. McKenna's reply: "I definitely have to

---

[1] Here, and wherever possible throughout this Complaint, video reference is provided for quotations. Navigating in an internet browser to the address beginning with "bit.ly" will bring up video of a public meeting at the moment of the utterance in question.

4178131.v1

agree with you, they don't care about anyone but themselves." A copy of the complete communication dated October 31, 2018 is annexed hereto as Exhibit 1.

9.      Here is Orange County Executive Steven M. Neuhaus, himself a resident of Chester and formerly the Chester Town Supervisor, responding to an inquiry whether there was "a way financially to slow them [Plaintiff] down" because "they all or many of them [Hasidic Jews in general]" are on public assistance. Neuhaus articulates a policy rationale and the need to be discreet about it:

> I'm trying to slow things down because I don't think the school district can handle it. I don't think my accountant can handle it. . . . We don't have the sewer. Your question about welfare, I'm not going to get into it. Scott [Bonacic, Chester Town Attorney] is proud as hell that I'm not his client right now. But here's the deal: you live in Warwick, you go on welfare in Orange County, you need SNAP, you need any type of assistance, you got to come through me, and we are tight with you. We're tough. . . . The [Hasidic] village of Kiryas Joel, if that's what you're asking about—because I know you are, everybody in the room is doing it and Alex [Jamieson, Chester Town Supervisor] and the rest of us are being careful [not to mention the Hasidic/Kiryas Joel factor explicitly]—goes directly to Albany for their social service benefits. . . . It was set up that way because of cultural differences.

(April 25, 2018 Meeting at 2:40:08, bit.ly/Chester-03).

(Needless to say, only in the fervid imaginings of Steven M. Neuhaus do Hasidic Jews enjoy their own special welfare distribution system from the state.)

10.     Here, too, is Jamieson emphasizing the importance of guile:

> We are going to fight them and we're not rolling over, and, although, we, sometimes, in my situation I have to be careful what I say and what I can't say.

(April 25, 2018 Meeting at 2:03:34, bit.ly/Chester-04).

11.     Here is James Farr, Building Inspector and Acting Head of the Chester Building Department: "I cannot respond to you or anyone else's emails in regards to this matter. As you know, any formal correspondence can be FOIL'd."

12.     Here is Neuhaus "elaborating" on "ways that we could stop the development":

> First of all, we can pressure the developer. We have a lot of influence here. Gentleman talked about building permits, the County Health Department. I don't know when the water was tested. . . . There's a lot of stuff to revisit. . . . When was the traffic study done?. . . . But we can pressure them to either go commercial, which I think we should do, or we can buy it. . . . You could also take it by eminent domain for the purposes of economic development. . . . That's why I'm not talking about when they're gonna start building. . . . Alex [Jamieson, then-Town Supervisor], I know you're with me on this. I know you are too, Bobby [Valentine, then-Deputy Town Supervisor] and Ryan [Wensley, Town Board Member].

(April 25, 2018 Meeting at 2:36:30, bit.ly/Chester-05).

13.     Nor were these statements mere demagoguery.

14.     Early on, the Town Defendants had lamented their powerlessness to stop Plaintiff's fully approved project.

15.     As Valentine put it at an April 25, 2018 Town Board meeting:

> What are we supposed to do to stop him? Do you have an idea? Do you have something you can tell us because we're trying to do everything we can. . . . We can't require further testing . . . It's approved by every agency that is supposed to approve it. . . . So what do you expect us to do? Break somebody's kneecaps? I mean it's not that easy. . . . We can't stop it right now. They've done what they're supposed to do. We can't stop it.

(April 25, 2018 Meeting at 2:29:38, bit.ly/Chester-06).

16.     Two months earlier, Valentine had lamented the Town's inability to exclude Hasidic Jews or create new limits on the size of houses: "If there were any way that, like, you know, legally, we could, like, choose who could live there or pick who could live there or what

4

size house they could do, we would love to do that. But we can't do it." (February 28, 2018 Meeting at 37:28, bit.ly/Chester-07).

17.     Defendants therefore tried to address the "problem" by, *inter alia*, pressuring Plaintiff to build a "non-Hasidic community," pressuring Plaintiff to rezone its property for non-residential use, delaying Plaintiff's site improvements through bureaucratic jamming, extracting from Plaintiff unreasonable fees, compelling Plaintiff to perform wholly superfluous and unprecedented construction projects entirely outside of the requirements of the approved plans, seeking to force Plaintiff to sell its property to the Town, and enacting new taxes, legislation and zoning to make it difficult for an imagined Hasidic community to expand (or as the Town Supervisor is said to have put it, "to keep the Hasidic out").

18.     As Plaintiff continuously declined to surrender its rights, and as its site work progressed into 2018, Defendants desperately cast off all legal restraint in their efforts to stop The Greens and experimented with a number of ideas that had been raised and discussed at public meetings.

19.     Among other things, Defendants urged nonpolitical offices of government to revoke permits, and boasted in public about such efforts; attempted to introduce a series of restrictions in flagrant violation of the Approved Plans and the contractual obligations of the Town; fabricated passages in governing documents; and masked evidence of their bad faith.

20.     Each time Plaintiff has compromised and attempted to meet the Town's shifting requirements, the Town has come up with a new requirement.

21.     To date, the Town has not issued a single building permit and has made it plain that it will never do so absent a court order.

22.     Accordingly, Plaintiff brings this action to obtain permanent injunctive relief and such other relief deemed just and proper by the Court.

23.     Plaintiff also seeks damages from the Defendants under Section 1983 of the Civil Rights Act, with punitive damages from individual Defendants, for (i) denying Plaintiff due process and equal protection of the laws, (ii) violating Plaintiff's constitutional right to just compensation for the taking of Plaintiff's property, and (iii) violating the Fair Housing Act and other federal civil rights statutes.

24.     Finally, this action also seeks damages against the Town of Chester for breaching an agreement settling a prior action in this Court between itself and Plaintiff's predecessor in interest, as well as various forms of declaratory relief against the Town.

## Jurisdiction and Venue

25.     This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331, 1343, 1367, 1651(a) and 2201 and 42 U.S.C. §§ 1981, 1982, 1983, 1985, 3604, and 3617.

26.     The venue of this action is proper in the Southern District of New York, under 28 U.S.C. § 1391 (b) and (c).

27.     All parties either reside or transact business within the territorial bounds of this district.

28.     Designation of The Hon. Charles L. Brieant, Jr. United States Courthouse is proper as the claims asserted herein arose in whole or in major part in the Town of Chester, County of Orange and State of New York.

4178131.v1

## The Parties

29.     Plaintiff is a limited liability company duly organized and existing under the laws of the State of New York, having an office and place of business in the Town of Chester, County of Orange and State of New York.

30.     Defendant Town of Chester (the "Town") is a municipal corporation duly organized and existing under the laws of the State of New York having an office at Town Hall, Town of Chester, 1786 Kings Highway, Chester, New York 10918.

31.     Defendant James M. Farr ("Farr" or the "Building Inspector") is a New York resident and the Building Inspector of the Town.

32.     Defendant Robert Valentine ("Valentine") is a New York resident and the Town Supervisor of the Town.

33.     Defendants Valentine, Cynthia Smith ("Smith") and Ryan C. Wensley ("Wensley"), Orlando Perez ("Perez") and Vincent Vinizia ("Vinizia") are New York residents and members of the Town of Chester Town Board (the "Town Board").

34.     Defendant Alexander J. Jamieson ("Jamieson") is a New York resident and former Town Supervisor of the Town (2014-18) (collectively with the Town, Farr, Valentine, Smith, Perez, Vinizia, Wensley and Jamieson, the "Town Defendants"; each, a "Town Defendant").

35.     Defendant Steven M. Neuhaus ("Neuhaus"), is a New York resident, the County Executive of the County of Orange, and the former Town Supervisor (2008-13) of the Town.

36.     Defendant County of Orange (the "County"; collectively with Neuhaus, the "County Defendants"; each, a "County Defendant," and, together with Neuhaus and the Town Defendants, "Defendants"), is the county government for Orange County, New York having its

principal office at the Orange County Government Center, 255 Main Street, Goshen, New York 10924.

## Facts

### *Plaintiff*

37.    Plaintiff is a venture of experienced New York homebuilders and real estate professionals which was formed to serve consumer demand for housing in the County.

38.    Some of the members and managers of Plaintiff are visibly Hasidic Jews in their dress and appearance.

39.    Hasidism is a pietistic Jewish movement that arose in Eastern Europe in the eighteenth century and branched off into numerous sects and communities, several of which are located today in the United States.

### *The Property*

40.    On October 27, 2017, Plaintiff acquired the 117-acre development property (the "Property") in the Town fully approved for the residential development known as the Greens at Chester ("The Greens" or "The Project").

### *The Settlement Agreement*

41.    Pursuant to a 2010 settlement agreement resolving an action in this Court between Plaintiff's predecessor in interest and the Town, The Greens was fully entitled for the construction of 431 single family homes ("Settlement Agreement," a copy of which is annexed hereto as Exhibit 2).

42.    The Settlement Agreement also provided that, *inter alia*:

- "the Town Board may not rezone, or enact regulations affecting the Property";
- The Town "hereby agrees to guarantee municipal sewer capacity for the Greens at Chester"; and

8

- "the parties hereby agree to execute all documents and to do all things necessary to fully effectuate the terms of this Settlement Agreement."

***The Approved Plans***

43.     The Settlement Agreement also laid the ground for a final subdivision by incorporating 28 pages of detailed plans that the parties agreed to for The Greens.

44.     A final subdivision plan (the "Approved Plans") for The Greens consisting of the aforementioned 28 pages plus additional pages was duly adopted by the Town Planning Board in a Resolution of Final Subdivision and Site Plan Approval ("Final Approval"). (A copy of the Final Approval and the Approved Plans are annexed hereto as Exhibit 3 and Exhibit 4, respectively.)

***Final Plat***

45.     On July 7, 2014, the final plat for The Greens was signed by the Town Planning Board Chairman and duly filed in the County Clerk's Office (the "Final Plat").

***The November 13, 2017 Meeting ("Off the Record")***

46.     Immediately upon Plaintiff's purchase of the Property, Jamieson and Valentine, on behalf of the Town, summoned the owners of Plaintiff to a meeting.

47.     The meeting took place on November 13, 2017 (the "November 13, 2017 Meeting") and was attended by eight principal members of Plaintiff, Valentine and Jamieson, the Town Engineer, and Neuhaus, who unexpectedly joined toward the end of the meeting.

48.     The November 13, 2017 Meeting was held in the basement of the Chester Town Hall.

49.     Valentine, then Deputy Supervisor and now Town Supervisor, opened the meeting by stating that it was "off the record," and jokingly asked the members of Plaintiff if they were recording it.

4178131.v1

***"A non-Hasidic Community"***

50.     Valentine informed the members of Plaintiff that they had "rights" as property owners.

51.     Valentine went on to interrogate Plaintiff about its intended building program.

52.     Valentine asked what The Project "is going to be for"; "what is the target" audience; had Plaintiff "advertise[d] in [a] Jewish newspaper"; did Plaintiff intend to build houses for "their community"—*i.e.*, for Hasidic Jews.

53.     A member of Plaintiff explained that the partners were businessmen who between them had built thousands of residential units in New York for the general public, had never once engaged in any form of discrimination, and were not about to start doing so.

54.     Plaintiff also acknowledged the fact that Hasidic Jews represented a significant portion of the demand for housing in the County market.

55.     Plaintiff informed Valentine that it had done no advertising, direct or indirect, in any media outlet, Jewish or otherwise, and had issued no press release of any kind.

56.     Valentine instructed Plaintiff to inform him before ever taking out any advertisements about The Greens in Jewish newspapers.

57.     Valentine then urged Plaintiff specifically to "create a non-Hasidic community."

58.     Toward that end, Valentine offered to introduce Plaintiff to a friend and former Town Board member who had enjoyed success selling "non-Hasidic homes" in a second career as a real estate broker.

*"Big Guns"*

59.     Valentine's extraordinary browbeating of private property owners at the November 13, 2017 Meeting is memorialized in the Town Engineer's notes to the meeting, a copy of which is annexed hereto as Exhibit 5.

60.     Valentine's browbeating cannot be explained away as a gratuitous, patronizing lesson in civic behavior.

61.     Valentine made it clear to Plaintiff that the Town was unwelcome ground for Hasidic Jews when he added: "This isn't Brooklyn; people here have big guns."

62.     At the end of the November 13, 2017 Meeting, Neuhaus entered the basement room and communicated that the Town and County were generally aligned in their planning policies and their view of the Greens.

*"A Quid-Pro Quo Town"; Commercial Development; Legoland*

63.     The November 13, 2017 Meeting was a more ominous echo of a meeting held three days earlier for construction professionals of both Plaintiff and the Town (the "November 10, 2017 Meeting").

64.     The November 10, 2017 Meeting took place not in the basement but in the cafeteria of the Chester Town Hall.

65.     The November 10, 2017 Meeting was attended by, at a minimum, two excavation contractors, and two project managers along with Valentine, Jamieson, the Town Engineer, and the Highway Superintendent.

66.     The Town Engineer informed Plaintiff's professionals that the Town would be requesting a number of changes to the Approved Plans.

4178131.v1

67.     The Town Engineer advised Plaintiff not to be concerned about such changes because the Town was a "quid pro quo town."

68.     At the conclusion of the November 10, 2017 Meeting, Valentine pulled one of the project managers aside and advised that creating homes for Hasidic Jews would create a "huge headache" for Valentine and his fellow Town Board Members.

69.     Referring to the Legoland theme park scheduled to open nearby in 2020, Valentine cited the demand it would create for hotels and parking facilities and other commercial concerns.

70.     Valentine advised Plaintiff that he and his colleagues would ensure "expedited approval" for an application by Plaintiff to rezone the Property for commercial development centered around Legoland.

***The Hasidic "Problem"***

71.     Thus, within days of Plaintiff's acquisition of The Greens, both the Town and the County had entreated Plaintiff to abandon its business plan and vested rights.

72.     Many more such entreaties would follow.

73.     In pronouncements at public meetings, Defendants made clear that they perceived The Greens, in the hands of its Hasidic developers, as a "problem" for the Town of Chester.

74.     For Defendants, Hasidic homebuilders foretold an influx of Hasidic homeowners in the Town.

75.     Jamieson: "They're from Brooklyn. So they're gonna be developing it, and that's where they're gonna be marketing it is in Brooklyn." (March 14, 2018 Meeting at 28:15, bit.ly/Chester-08).

4178131.v1

76.     Valentine: "Honestly, it's really up to each individual person to make their assumption. I mean, I know what assumption I would." (February 28, 2018 Meeting at 46:39, bit.ly/Chester-09).

77.     Valentine: "Does either Clarkstown or Blooming Grove [neighboring towns of Chester] have a proposed large-scale segregated community coming into the Town? Like something of the magnitude of 500 units?" (April 25, 2018 Meeting at 41:42, bit.ly/Chester-10).

78.     For Defendants, a community of Hasidic homeowners threatened the "character" of the Town.

*"They"*

79.     Jamieson: "Listen, we all know that they don't care about the communities that they're in and everywhere else. So, you know, they're not gonna all of a sudden say, 'We really care about Chester; we'll make less money because we want to work with you guys.'" (May 9, 2018 Meeting at 1:29:30, bit.ly/Chester-12).

80.     Jamieson again: "There's always ways to work around the systems, and you know what, they'll find a way over the years to implement their way around the community." (April 25, 2018 Meeting at 2:12:57, bit.ly/Chester-13).

*"Special Requests"*

81.     As Plaintiff began initial site clearing shortly after its purchase of the Property, Town policy toward The Greens took the form of costly "special requests" imposed upon Plaintiff that were outside of what was required by the Approved Plans or any standard to which similarly situated developments are held.

82.     For example, with no legal basis or engineering necessity, the Town required Plaintiff to deviate from the Approved Plans and double the quantity of certain subgrade material in the road through The Greens that Plaintiff was building for eventual dedication to the Town.

83.     This imposition came at a substantial cost to Plaintiff.

84.     With no legal basis or engineering necessity, the Town required Plaintiff to deviate from the Approved Plans and move the road by ten feet after time-consuming and costly earth work had been completed pursuant to the Approved Plans.

85.     This imposition, too, came at a substantial cost to Plaintiff.

86.     With no legal basis or engineering necessity, the Town required Plaintiff to deviate from the Approved Plans and reroute the sewer waste line for The Greens from underneath the public roadway to underneath neighboring private property.

87.     This imposition required Plaintiff to purchase expensive easements from the neighboring property owners.

88.     In the end, it took six months to ransom a sewer permit that is usually granted in days to a builder with approved plans.

89.     The Town stationed an inspector at The Greens all hours of the day—even when the construction site was inactive and even as the inspector often sat napping in his car—and charged the cost to Plaintiff.  This too forms a part of the damage caused by the Town Defendants.

90.     Upon information and belief, this "24/7 supervision" (as Jamieson referred to it in a public meeting) is contrary to Town practice.

91.     The 24/7 supervision was occasioned by no construction practice of Plaintiff. To the contrary, Defendants acknowledged that Plaintiff's construction practice was exemplary.

92.     Upon information and belief, the 24/7 supervision was implemented solely to tax and harass Plaintiff.

93.     The Town Defendants took these actions as a matter of official policy toward Plaintiff and The Greens.

94.     The Town Defendants imposed extraordinary scrutiny and costly charges to Plaintiff as part of its selective and discriminatory treatment of Plaintiff.

***"Keep the Hasidic Out"***

95.     As site work continued at The Greens at the beginning of 2018, the Town's policy response to The Greens coalesced around a number of new initiatives and local laws aimed at containing the "Hasidic" problem.

96.     These initiatives included the Ward System, PDR Tax, F.A.R. Law, and No-Solicitation Law.

97.     Jamieson was reported in the newspaper—inaccurately, he later claimed—as saying that these initiatives were designed to "keep the Hasidic out." *See* Times Herald Record article dated September 13, 2018 entitled "Chester buying property to 'keep the Hasidic out,'" along with other articles, annexed hereto as Exhibit 6.

***Ward System***

98.     The Town introduced the idea of dividing the Town into wards for purposes of representation on the Town Board.

99.     The premise of this idea was that instead of each Board Member being elected by popular vote of the Town, each ward would vote for and seat a single member to the Board.

4178131.v1

100.     In this way, the influence of a well-organized, geographically concentrated group—like an imagined future Hasidic community at The Greens—could be contained within a single ward, and would not "take over" the Town.

101.     Jamieson discussed publicly the need to time the ward segmentations strategically: too "early" (*i.e.*, before the arrival of the Hasidim), and the Hasidim might end up being distributed in more than one ward; too "late" (*i.e.*, after the Hasidim achieved critical mass), and they would vote as a bloc against the implementation of wards.

*Property Development Rights (PDR) Tax*

102.     The Town also proposed a transfer tax of 0.75% that would be imposed on all real estate purchases therein ("PDR Tax"). Revenue from the PDR Tax would support the Town's purchase of private property (or "private development rights") to prevent it from ever being developed by private owners.

103.     Again, the Town explicitly promoted this measure as a solution to the problem represented by The Greens, namely the specter of Hasidic Jews moving into the Town.

104.     The PDR Tax was aimed at Hasidic Jews in two specific ways: first, as a cost or barrier to entry at The Greens for Hasidic Jews, who allegedly would be the greatest source of home sales if, as, and when Plaintiff might ever (with judicial intervention) break through the barriers continuously placed by Defendants.

105.     Second, upon information and belief, the Town intends to purchase properties adjacent to The Greens in order to isolate the imagined future Hasidic community there and confine it to the one parcel.

16

***Local Law No. 2 of 2018 (the "F.A.R. Law")***

106.    On March 15, 2018, The Town enacted a Floor Area Ration Law ("F.A.R. Law") to restrict the square footage of a new structure to a maximum percentage of the square footage of the lot on which it sits.

107.    The intent of the law was to limit the density said to be favored by Hasidic Jews and to keep houses in the Town smaller so as to render them inhospitable to Hasidic families with several children.

108.    As detailed below, although the Settlement Agreement exempted The Greens from the effect of the F.A.R. Law and any such additional regulations enacted ***after*** the Settlement Agreement, the Town nevertheless ordered Plaintiff to ensure that the houses at The Greens complied with the F.A.R. Law.

***The April 25, 2018 Meeting***

109.    Thus, up until the spring of 2018, the Town's concrete actions consisted largely of quasi-extortionate special requests, fee inflation, bureaucratic foot-dragging, and new legislation.

110.    In early 2018, as Plaintiff continued setting down infrastructure at the Property and The Greens looked as though it was becoming a reality, the Town placed The Greens on the agenda of several public meetings for reports to the community and public discussion.

111.    The Town placed The Greens on the agenda of public meetings even when neither Plaintiff nor The Greens had any application pending before the Town.

112.    With the PDR Tax and Ward System on the agenda for the Town Meeting of April 25, 2018 (the "April 25, 2018 Meeting"), residents, sympathetic neighbors, activists, and politicians came out in unprecedented numbers for a broad discussion of Town policy in the face of The Greens.

113.    The public session lasted almost three hours and was given over extensively to comments from the audience, which unanimously denounced The Greens.

114.    Jamieson, Valentine, and Neuhaus echoed the crowd in denouncing The Greens.

115.    One suggestion after another was presented about how to stop The Greens.

116.    Included among the ideas floated were, "pressure," "coercion," "fire power," use of the "eminent domain" power, forcing a commercial rezoning, extra-ordinary scrutiny, application of new, costly "rules" and "tests" and "requirements" outside of the Approved Plans, economic "leverage," withholding of permits, re-opening of prior approvals, and (upon successful reopening) Town involvement with independent outside agency review.

117.    Since this was already a fully approved Project—with Plaintiff's rights protected by federal and state law, a Settlement Agreement with material guarantees from the Town and a strong grandfather clause, Final Approval, Approved Plans, and Final Plat duly filed years before, and site improvements underway—and since there was no application by Plaintiff for The Greens before any Town body, the Town Board had no lawful jurisdiction to entertain ideas on how to stop The Greens.

*Neuhaus: "We can get aggressive"*

118.    As a government executive charged with carrying out laws and as a former local lawmaker—*i.e.*, someone well-informed as to what constitutes appropriate and inappropriate behavior—Neuhaus told the crowd that it was imperative to use the offices of government to stop Plaintiff from exercising its rights.

119.    Neuhaus, who is indeed well informed, pointed out several times that the County attorneys present were undoubtedly displeased with his rhetoric, and that Town Attorney Scott

Bonacic was undoubtedly relieved to be no longer tasked with "defending" the former

Supervisor.

120.     Citing the likely Hasidic makeup of the future residents of The Greens and the

effect they would have on the public school system, Neuhaus said:

> I'm here to say we have to say no to Greens of Chester. . . . It will
> cripple the Chester school district. . . . I think there's a lot of
> options: we can get aggressive. . . . We should in my opinion push
> the developer to develop commercial. . . . We use the reason for
> not having sewer capacity. . . . You guys are out of sewer right
> now. . . . I am here to pledge every resource we have in this
> County to work with you guys to explore all these options, and I'm
> telling you I'm not giving up on it. . . . I think we have a lot of fire
> power behind us still.

(April 25, 2018 Meeting at 1:20:55, bit.ly/Chester-14).

121.     The demagoguery of this screed is heightened by the fact that it was Neuhaus

himself during his tenure as Town Supervisor who had signed the Settlement Agreement that he

was now announcing his intention to undermine.

### Skoufis: "A Hasidic Development"

122.     Then Assemblyman, now State Senator, Skoufis, who sponsored the bill for the

PDR Tax in the legislature, elicited cheers when he announced: "I've already put the Attorney

General on notice that in many ways this development is being billed as a Hasidic development."

(April 25, 2018 Meeting at 1:13:46, bit.ly/Chester-15).

123.     Skoufis cited no evidence—because there is none—for his defamatory insinuation

that Plaintiff had run or might one day run afoul of laws prohibiting discrimination in housing.

### Striking Anti-Semitism from the Record

124.     Several openly anti-Semitic comments were expressed by members of the public

who were given the floor:

I get that they [Hasidic Jews] won but my God, it doesn't mean they have to rape us. (April 25, 2018 Meeting at 1:53:15, bit.ly/Chester-16).

They're not gonna use their Medicaid cards for us to pay for them [to plow their snow]? I don't understand how they get away with not telling the state that they're married, so that they're all single moms. And they all get Medicaid. And we pay for them. (April 25, 2018 Meeting at 1:39:08, bit.ly/Chester-17).

Forget about just Chester because let's say we stop this [here]. That's great. [But] they're just gonna move on to the next [town]. They've got all this money. They've got all these attorneys. Every attorney is Jewish nowadays. (April 25, 2018 Meeting at 2:32:18, bit.ly/Chester-18)

125. Although the first comment was greeted with applause and the second comment with both titters and applause, only the third drew groans of protest.

126. A few minutes later, Assemblyman Skoufis took the floor to suggest that the third comment be condemned lest it be used as evidence of improper motives for Town policies: "This is a public meeting with a public record, and I've seen time after time, court cases that cite people who get up at a podium, residents, and it's used against the municipality." (April 25, 2018 Meeting at 2:35:23, bit.ly/Chester-19).

127. Jamieson proceeded to condemn the incriminating comment and instruct that it be "stricken from the record" of the meeting. (April 25, 2018 Meeting at 2:36:06, bit.ly/Chester-20).

*Jamieson & Valentine*

128. Although Jamieson and Valentine joined the ritual denunciation of The Greens with several contributions of their own, they found themselves on the defensive numerous times as audience members accused them of not doing enough to stop The Greens.

4178131.v1

129.    One way they responded was to contend that there was nothing under the law that they could legally do to stop a project like The Greens that was "approved by every agency" (and whose entitlements were established during Neuhaus's administration as Town Supervisor).

130.    But Jamieson and Valentine also protested that they had not been pushovers in allowing the development of The Greens to proceed, and were still exploring other ideas.

131.    Jamieson insisted: "I never said I wasn't gonna stop them"; "we are doing that ["looking into" "further things" to slow down the development]"; "stay[ing] on top of these developers to try to prevent an overgrowth." (April 25, 2018 Meeting at 2:26:26, bit.ly/Chester-21).

132.    Valentine implored: "If you can come up with a plan to stop it, we are all ears. We would love to hear it."  (April 25, 2018 Meeting at 2:30:44, bit.ly/Chester-22).

133.    In the days that followed, the Town Defendants evidently overcame any misgivings and pursued a number of the avenues discussed at the April 25, 2018 Meeting.

*Buyout*

134.    The day after the April 25, 2018 Meeting, the Town informed Plaintiff that it wished to buy the Property from Plaintiff for $20 million, nearly $8 million more than Plaintiff had paid for the land six months earlier.

135.    This would have been far and away the largest land purchase by the Town with a population of approximately 12,000, a 2018 budget of $12.3 million, and 2018 revenue of $11.2 million.

136.    The $20 million price was more than double the size of an ***entire*** fund for land purchases created by the larger neighboring town of Warwick and specifically cited by Valentine as much larger than what a smaller town like Chester could muster.

137.     The Town had recently issued a bond and paid $1.8 million to acquire the Sugar Loaf Performing Arts Center, a transaction that was only narrowly approved in a ballot referendum.

138.     The Greens, by contrast, was a construction site into which a large amount of infrastructure had already been installed and that would require millions of dollars in investment to convert back into completely open space.

139.     Given that The Greens was planned as a "cluster development" in which over half of the acreage was already slated for preservation, the Town's willingness to pay to maintain *all* of the site as open space revealed again exactly what the Town considered its problem to be—namely, the prospect of Hasidic Jews in its midst.

140.     After Plaintiff turned down the Town's offer, Jamieson sent a text message to Plaintiff on May 2, 2018 raising the Town's bid to $30 million.

141.     Upon information and belief, this bid was a sign of Defendants' great desperation to keep Hasidic Jews out of Chester.

142.     Plaintiff rejected the Town's offer.

*County Intervention: Sewer*

143.     On May 9, 2018, another Town Board meeting was held to address The Greens (the "May 9, 2018 Meeting").

144.     At the May 9, 2018 Meeting, Neuhaus, at first purporting to speak solely in his capacity as a concerned resident of the Town and Village of Chester, made it clear that the County Health Department (a nonpolitical office that he spoke of using the first person) would not issue a sewer permit for The Greens: "This is about sustainability. You guys don't have extra

sewer. I don't care what your lawyer . . . tells you . . . you're not getting a sewer permit from me. . . . I'm not giving you a permit." (May 9, 2018 Meeting at 1:19:28, bit.ly/Chester-23).

145.     When told by the Town Attorney that, unlike other municipalities who were using more than their allocation of County sewer capacity, the Town was using less than its allocation and could absorb The Greens, Neuhaus responded, "I think that's BS."

146.     When Valentine then commented that the Town would "love" to receive a statement from the County concerning its lack of sewer capacity (presumably to provide the Town with some basis upon which to block The Greens), Neuhaus replied: "I'm telling you right now. I'm the County. I'm telling you, you don't have the capacity."

*County Intervention: Water*

147.     On June 11, 2018 the Orange County Department of Health petitioned the New York State Department of Health's Bureau of Water Supply Protection to require retesting of the wells at The Greens for adequate water availability and quality. A copy of the County's letter, signed by Deputy Commissioner of Health Christopher Ericson, is annexed hereto as Exhibit 7.

148.      "Given Orange County's growth over the past two decades," the letter stated, "we believe such a study is in order and would be appropriate." Moreover, the County "would like to be involved in monitoring any testing that is to be done pursuant to this request." *Id*.

149.     Upon information and belief, the letter from the County's nonpolitical Department of Health was written at the instruction of Neuhaus making good on one of his publicly stated ideas for thwarting The Greens.

150.     Jamieson cited the water test as a tactic the Town was coordinating with the County, but questioned aloud whether it had a sound legal basis: "We're gonna do the water test.

I mean, I don't know how much that will hold up in court." (May 9, 2018 Meeting at 1:35:30, bit.ly/Chester-26).

151.    Ironically, by letter dated May 7, 2018, Greg A. Moore P.E., the County's Senior Public Health Engineer, had informed Plaintiff that the County had granted a five (5) year extension of the water permit issued in connection with The Greens, with the permit now to expire on July 17, 2023.  A copy of the County's May 7, 2018 letter is annexed hereto as Exhibit 8.

152.    Upon information and belief, it was Neuhaus's intervention that caused the about-face in the County's position in the interval between Mr. Moore's letter and Mr. Ericson's letter.

153.    By letter to Plaintiff dated August 3, 2018, NYS DOH informed Plaintiff that it "will be requiring a resubmittal" of plans concerning the water supply for The Greens.  A copy of the August 3, 2018 letter is annexed hereto as Exhibit 9.

154.    By letter dated September 28, 2018, Defendant Farr in his capacity as Town Water Engineer, with the explicit authorization of the Town Supervisor, requested that the Town "be actively involved and have input in regard [to] the New York State Health Department's re-opening of The Greens at Chester water supply, treatment, distribution and storage application." A copy of the September 28, 2018 letter is annexed hereto as Exhibit 10.

155.    As, upon information and belief, another mechanism to obstruct the development of The Greens, Farr further added that "[i]t's the Town's position that the updated water supply application scoping should be jointly agreed upon by the applicant, Town, and the permitting agencies."

156.    Farr also "ruled" that Plaintiff would be responsible for establishing an escrow account for the Town to retain consultants as the Town deemed necessary.

157.    By this maneuver, the Town and County have openly and boldly again signaled to Plaintiff that they will do everything in their power to bring Plaintiff to heel.

***County Intervention: Population Control Policy***

158.    Neuhaus's speech at the May 9, 2018 Meeting called for a "realistic" new approach to municipal planning that took ethnicity and group traits into account in policy decision making, as Neuhaus articulated a rationale for controlling the population of Hasidic Jews:

> But when you have the development that changed and only a few months ago said that it's going to be in the Hasidic community, where the . . . average family is between four, six or eight, and . . . they're not going to go to Chester elementary school, those kids. They're not going to go to Chester High School. They get bussed somewhere else. . . . [T]his isn't a Town Board being prejudiced or anything like that. . . . I care about what happens to this town. . . . What is this impact for the school district? . . . Are we going to get sacked as taxpayers? . . . I'm just saying this is a realistic cost.
>
> And my other suggestion—and I just came up with this standing here—I think we should have two people from the town board, two people from the village board . . . and two people from the school board meeting with me. . . . We should start coming up with a plan because this is about sustainability. . . .
>
> That's the bottom line. That's how this whole system works. That's how the democracy in New York State [works]. You have a couple of households, you have a couple of businesses. Collectively they contribute taxes. . . . [T]his [Hasidic population] changes the formula. . . . I think we need to have an independent analysis now that they come out and openly tell the Supervisor this is not   going to be your typical neighborhood; this is going to be a new Hasidic community.

(May 9, 2018 Meeting at 1:17:49, bit.ly/Chester-02).

159.    State and federal law do not sanction such actions and, indeed, plainly prohibit them and make them punishable by severe sanction and punitive damages as are sought herein.

*County Intervention: Commercial/Industrial/Pharmaceutical/Warehouse/Hospitality*

160.    At a meeting convened by Neuhaus's office on May 16, 2018, County Director of Real Property John I. McCarey advised Plaintiff one last time to rezone the Property for "big box," "industrial," "pharmaceutical," "warehouse," or "hospitality."

161.     These alternative uses would have done nothing to preserve the often touted "rural character" of the Town that would supposedly be disturbed by Hasidic Jews residing at The Greens.

162.    County Attorney Langdon C. Chapman acknowledged to Plaintiff that The Greens "is very shovel ready" as a housing development, but "if you want to also be part of the community and have the community welcome your project," Plaintiff should consider a commercial rezoning.

163.    Chapman and McCarey explained that many corporations were looking for "shovel ready" commercial sites, and if Plaintiff (with the County's assistance) were to obtain expedited approval for commercial rezoning, it might be able to sell the Property for a quick profit.

164.    Chapman went on to suggest that even if Plaintiff was intent on building houses, it should go through the motions of adding a commercial zoning option to the Property to placate public hostility: "Let's say you really wanted to be Machiavellian about this. Well, at the end of the day, you tell the locals, hey, look, we tried, we even went, we rezoned it, we marketed it, we couldn't get a reasonable price, we tried."

165.    Chapman reiterated the advantage of a quick profit from a sale to a commercial buyer over the more difficult path of seeking greater profit from building and selling homes: "It's

26

the reality. To me, sometimes you want to hold out and get everything you can. Sometimes you want to say, ok, I'm not wanted here. That's my advice."

*New House Size Restriction: F.A.R. Law*

166.    On April 27, 2018—two days after the April 25, 2018 Meeting—Farr, the Town's Building Inspector, informed Plaintiff by letter (the "Size Restriction Letter") that all plans accompanying any building permit application for The Greens had to conform to the newly enacted F.A.R. Law. The Size Restriction Letter is annexed hereto as Exhibit 11.

167.    The F.A.R. Law amended the Town zoning code to cap "floor area ratio" or restrict the allowable floor area of a new structure based on the size of the lot on which it is built.

168.    The Town's attempt by the Size Restriction Letter to apply the F.A.R. Law to The Greens was false and disingenuous and absurd and malign all at once.

169.    The Size Restriction Letter was false because, as Plaintiff's engineer pointed out in a reply letter dated April 30, 2018, The Greens was exempt from the F.A.R. Law under the grandfather clause of the Settlement Agreement, which stated that:

> the Town Board may not rezone, or enact additional regulations
> affecting, the property containing The Greens at Chester project,
> unless The Greens at Chester project is exempted from the effects
> of such rezoning and/or additional regulations.

A copy of Plaintiff's engineer's April 30, 2018 letter is annexed hereto as Exhibit 12.

170.    The Size Restriction Letter was disingenuous because, first, it strains credulity to suggest that the top line of Town officials working on The Greens, especially the Town Supervisor, Building Inspector, Town Board, and Town Attorney, were unaware that The Greens was expressly exempted from the F.A.R. Law.

171.    The Size Restriction Letter was disingenuous because, second, prior to the raucous April 25 Town Meeting, Farr had given detailed written feedback to Plaintiff's architect

4178131.v1

and engineer on plans for a model home at The Greens—and said not a word about any need to comply with the F.A.R. Law or any special conditions precedent or specific size restrictions.  A copy of Farr's comment letter, dated April 6, 2018 (the "April 6, 2018 Letter") on the house plans, is annexed hereto as Exhibit 13.

172.    The Size Restriction Letter was absurd because, as applied by Farr and the Town, the F.A.R. Law would shrink the size of the houses at The Greens to the point of being unmarketable and uninhabitable.

173.    Applying the F.A.R. Law to a "cluster subdivision" like The Greens, whose individual lots were concentrated on less than half the acreage of the Property, meant that almost half the "houses" would be no larger than 566 square feet--slightly smaller than a standard two-car garage—and space that the inhabitants would have to share with utility, plumbing, and HVAC fixtures.

174.    The Size Restriction Letter was malign because it targeted Hasidic Jews under the guise of legitimate policy.

175.    It was precisely because the Town figured that Hasidic Jews favor larger dwellings to house large families that the Town chose to attack The Greens on the issue of house size.

176.    The Size Restriction Letter was clearly a direct outcome of the demands expressed at the April 25, 2018 Meeting to stop The Greens.

177.    The Size Restriction Letter was a patently illegal act by Farr in furtherance of the Town's policy to stop The Greens and keep Hasidic Jews out, by pressure, economic injury, delay, and similar tactics.

4178131.v1

178.     To this day, the Town has not formally acknowledged that the F.A.R. Law does not apply to The Greens.

179.     But Valentine remarked to Plaintiff's engineer with a shrug that the Size Restriction Letter was a "nice try" on the part of the Town—that is, a gambit undertaken in bad faith.

***Second New House Size Restriction: Fabrications in the 'Findings'***

180.     After the transparent failure of the Size Restriction Letter, the Town soon conceived an entirely new pretense for restricting the size of the houses at The Greens beyond the parameters of the Approved Plans.

181.     On November 20, 2018 Plaintiff applied for a building permit for two houses (the "2018 Building Permit Application").

182.     Ten days later, on November 30, 2018, by letter from Building Inspector Farr, the Town denied Plaintiff's 2018 Building Permit Application (the "2018 Building Permit Denial"). A copy of the 2018 Building Permit Denial is annexed hereto as Exhibit 14.

183.     Like the Size Restriction Letter, the 2018 Building Permit Denial is false and disingenuous and absurd and malign all at once.

184.     The 2018 Building Permit Denial is false because it grossly misconstrues the documents that it cites.

185.     The 2018 Building Permit Denial is false because it fabricates quotations in documents that it cites.

186.     The 2018 Building Permit Denial is disingenuous because its new restrictive theories were clearly improvised after earlier efforts to thwart The Greens were unsuccessful.

187.    The 2018 Building Permit Denial is absurd because it presumes the existence of fundamental restrictions on The Greens that were omitted from the Approved Plans, the Settlement Agreement, and Final Approval.

188.    To understand the scandal and malignancy of the 2018 Building Permit Denial, some background is in order.

189.    As the Town and Farr are well-aware, the allowable size of the houses at The Greens is governed by the bulk parameters prescribed in the Approved Plans ("Bulk Table," so called because the parameters are laid out in a table).

190.    The Bulk Table lays out various setback requirements: the footprint of the detached homes must be "set back" specified distances from the front, side and rear of the property lines, and from the sidewalk or pavement, utility easements, and neighboring buildings.

191.    A house that conforms to the parameters of the Bulk Table may be built "as of right" and is entitled to the ministerial issuance of a building permit.

192.    The 2018 Building Permit Denial states that per the Settlement Agreement, all house plans must conform to additional size restrictions that were allegedly mandated by a document preceding the Approved Plans, namely, the 1998 Statement of Findings ("Statement of Findings") concerning the environmental impact of The Greens.

193.    The State Environmental Quality Review Act ("SEQRA") mandates that before undertaking any action, an agency must consider its environmental impact.

194.    The Town Planning Board as lead agency adopted the Statement of Findings in 1998 as a guide to its decisionmaking. The Statement of Findings is annexed hereto as Exhibit 15.

4178131.v1

195.     The 2018 Building Permit Denial asserts that the Settlement Agreement "dictated that all final subdivision and site plan approval was to be made in accordance with the preliminary subdivision and site plan approval Statement of Findings."

196.     The preceding assertion is false.

197.     In fact, the Settlement Agreement does not include *any* reference whatsoever to the Statement of Findings.

198.     The 2018 Building Permit Denial purports to quote the following excerpt from the Statement of Findings: "(i) one-unit dwellings ***shall be limited*** to 1,700 - 2,500 square feet in a two-story structure and (ii) two-unit dwellings ***shall be limited*** to 1,500 - 2,300 square feet in a two-story structure." Exhibit 14.

199.     The preceding quote is false. The excerpted language does not exist in the Statement of Findings or anywhere else in any document related to The Greens.

200.     Specifically, the words in bold, "shall be limited" do not appear in the Statement of Findings, and are completely fabricated by the 2018 Building Permit Denial.

201.     Even correctly quoted, the descriptive paragraph in the Statement of Findings does not come close to meaning what the 2018 Building Permit Denial construes it to mean, and, at all events, does not restrict the size of homes at The Greens in any way.

202.     The correct quote is:

> The typical lot size depicted for one-unit dwellings is 3,600 square feet with a building floor area of 1,700 to 2,500 square feet in a two story structure. The two-unit dwellings will each be located on lots of approximately 1,750 square feet and will have a typical building square footage of between 1,500 and 2,300 square feet in a two story structure.

203.     Further belying the Town's fabricated size restriction is the fact that during the transcribed public hearing on The Final Environmental Impact Statement ("FEIS") for The

31

Greens, on February 21, 1996 at p. 41, Lines 3—11, the developer's engineer addressed the

Town Engineer's specific question about sizing:

> MR. SALERNO:  You must have some order of magnitude for the house sizing.
>
> MR. YOUNGBLOOD:  ***Probably 1700 to 2500 square feet*** for the single family home on a lot 3600 square feet **as *a minimum.* *They go up larger than that***. The builder where you have 2 families in one building, even though they are single family, those lots or a minimum of 750 square feet. ***They range up higher than that. Those are the minimum.***

A copy of this key portion of the FEIS Public Hearing testimony is annexed hereto as <u>Exhibit 16</u>

(emphasis added).

204.    Thus, the Town has transformed the minimum estimated size into a maximum.

205.    The transcript went on to detail that the ultimate size of the houses would be

determined by the developer based on market conditions.

206.    Because nothing having to do with this discussion was ever intended to be

prescriptive, the Approved Plans did not incorporate any restriction on size outside of the Bulk

Table.

207.    The Town Engineer at the time has provided a letter utterly refuting the Town's

new posture. A copy of this October 31, 2018 letter is annexed hereto as <u>Exhibit 17</u>.

208.    Upon information and belief, the 2018 Building Permit Denial was knowingly

instigated by the Town Board and/or Valentine in bad faith to hinder Plaintiff and target The

Greens in order to exclude Hasidic Jews from the Town.

4178131.v1

*More New Conditions: Infrastructure*

209.     As an additional purported reason for denial, the 2018 Building Permit Denial

added another obstacle to building permits, this time requiring that prior to issuance of a building

permit for any housing unit at The Greens, Plaintiff would first have to complete all public

infrastructure for all five (5) phases of The Greens.

210.     In adding this "requirement" first alluded to in the summer of 2018, Farr relied on

the following language from page 47 of the Statement of Findings:

> [I]f the Applicant chooses to seek Final Subdivision Plat/Site Plan
> approval for the entire project at one time [] [s]uch a full Final
> Approval would require, per the Town of Chester Code, that all
> public improvements were constructed and accepted by the Town
> as satisfactory prior to the issuance of a single building permit for
> the proposed dwelling units. This would essentially eliminate the
> Phasing Plan.

This additional Farr "requirement" is hereinafter called the "Purported Infrastructure Condition."

(Brackets added.)

211.     The Purported Infrastructure Condition is nowhere to be found in the Settlement

Agreement, Final Approval, Approved Plans, Final Plat or April 6, 2018 Letter.

212.     For numerous reasons, the Purported Infrastructure Condition is equally as absurd

as the attempts to restrict house size at The Greens.

213.     First, even assuming, *arguendo*, the Purported Infrastructure Condition was valid,

which it is not, it was superseded by the first condition in the Final Approval—also issued by the

Planning Board as lead agency after the Settlement Agreement—which provided that prior to the

signing of the Final Plat, Plaintiff need only furnish a bond securing public improvements at The

Greens. The Final Approval did not impose the Purported Infrastructure Condition.

4178131.v1

214.     In satisfaction of that condition, Plaintiff's predecessor filed with the Town an "Irrevocable Standby Letter of Credit" (the "First Security") in favor of the Town in the sum of $1,676,979.66. A copy of the First Security is annexed hereto as <u>Exhibit 18</u>.

215.     The First Security secured the Town's interest in the completion of the public improvements as required by the Final Approval, with those public improvements itemized and approved by the Town's Consulting Engineer McGoey, Hauser and Edsall Consulting Engineers, P.C., the Town Board, the Planning Board, and the Town Attorney.

216.     In this regard, at the time of the issuance of the Final Approval and subsequent sign-off on and filing of the Final Plat, both the Town Engineer and Town Attorney approved the First Security that was in the amount deemed required to complete the public infrastructure.

217.     The amount of the First Security was fixed and accepted because there ***never*** was any requirement that the developer (now Plaintiff) complete all five phases of public improvements as a condition of receiving building permits for residential units for the first phase of The Greens ("Phase One").

218.     In fact, the same page of the Statement of Findings from which the Town plucks the Purported Infrastructure Condition provides that its application to The Greens is not mandatory and, instead, is discretionary. (The Planning Board "will be able to place" it as a condition on "Final Subdivision/Site Plan Approval.") As evidenced by the Settlement Agreement, Final Approval, and Approved Plans, the Public Infrastructure Condition was not applied to The Greens.

219.     Also, under the Town's flawed reasoning contained in the 2018 Building Permit Denial, in order for Plaintiff to receive a building permit, the developer would have to (a) post security for public improvements as required by the Final Approval, ***and*** (b) complete all the

4178131.v1

public improvements for all five phases of The Greens—an unheard of and nonsensical proposition that would multiply the developer's costs and likely accomplish the Town/County plan to try to drive Plaintiff into bankruptcy or surrender.

220.    Furthermore, the Purported Infrastructure Condition is preempted by the NY Town Law and contradicted by the Town Code, both of which provide an applicant/developer (here, Plaintiff) the choice of either completing public infrastructure *or* posting a bond for such infrastructure prior to issuance of a building permit.

221.    Specifically, the Purported Infrastructure Condition is preempted by Town Law § 277(2)(c), which provides that prior to approving a plat, the planning board shall require the applicant to complete all public improvements "***or alternatively that a performance bond or other security be furnished to the town***." (Emphasis added.)

222.    Town Law § 277(9)(a) further acknowledges bonding as a mandatory alternative to completing public infrastructure.

223.    The Purported Infrastructure Condition thus contravenes Town Law § 277 which expressly permits the applicant/developer to elect whether to complete the public infrastructure or file a bond (commonly known as "bond or build").

224.    The Purported Infrastructure Condition is further irreconcilable with Town Code § 83-12.B.(4) which provides that "the subdivider shall complete all required improvements ***or post the required performance security***, or both, to the satisfaction of the Town Board before any building permits will be issued." (Emphasis added.) *See also* Town Code § 83-12.B.(2), providing the procedure for bonding public improvements and mandating that any such bond conform with the requirements of Town Law § 277.

4178131.v1

225.     Here, Plaintiff and its predecessor have posted the public improvement performance security required by the Final Approval.

226.     Furthermore, Farr exceeded his authority in his capacity as Building Inspector by requiring compliance with the Purported Infrastructure Condition—an alleged "condition" not found in the Settlement Agreement, Final Approval, Approved Plans, or Final Plat.

227.     Under the Town Code, in his capacity as Building Inspector, Farr was permitted to review only the Final Approval and Approved Plans concerning any preconditions to a building permit—and neither of those governing documents contained the Purported Infrastructure Condition.

228.     Even assuming, *arguendo*, the Purported Infrastructure Condition applied to Plaintiff's 2018 Building Permit Application (which it did not), Farr was not authorized to predicate denial upon another agency's SEQRA Findings.

229.     Farr's reliance on the Purported Infrastructure Condition is further belied by the current Town Engineer's notes of meeting minutes wherein he acknowledged that a bond for Phase One public improvements—as opposed to completion of all public improvements—allows for the commencement of construction.

230.     The Town Engineer's November 10, 2017 meeting minutes state: "Can bond Town Road to start construction with Bonds. Approved by Alfred A. Fusco and John Petrocelli [sic] and Town Attorney." A copy of these minutes are annexed hereto as Exhibit 19.

231.     Further, the Town Engineer's notes from a meeting conducted on May 22, 2018 read as follows: "Building Permit Bond Phase 1 82 units." A copy of these notes is annexed hereto as Exhibit 20.

232.    Thus, the entire notion of mandatory completion of all public improvements prior to receiving a building permit for Phase One conflicts with the record from the SEQRA process, and more importantly, was never made an approval condition by the Planning Board as Lead Agency in its Final Approval or in the Settlement Agreement, Approved Plans or Final Plat.

233.    No doubt, this is why in responding to FOIL requests seeking the production of any records from any other occasion where an application for a building permit in a phased development has ever been denied based on an alleged failure to first complete public infrastructure for the entire development, the Town Clerk has twice responded that there are **no** records responsive to such FOIL search, *i.e.*, The Greens appears to be the only development on which this alleged "requirement" has ever been imposed.

234.    In total, the baseless reasons advanced in the 2018 Building Permit Denial were pretexts for the racial and religious discrimination inflicted by the Town and Farr.

235.    Given the legal requirement that land use restrictions by a municipal board must be stated with precision and incorporated in the official decision, the fact that both of these "conditions" are absent from the Final Approval is dispositive.

236.    In light of the Town Defendants' numerous and continuous actions in breach of the Settlement Agreement, culminating with the 2018 Building Permit Denial, on April 30, 2019, Plaintiff served the Town with a Notice of Claim.  A copy of the Notice of Claim is annexed hereto as Exhibit 21.

**The Town's Most Recent Refusal to Issue a Building Permit**

237.    On May 14, 2019, entirely without prejudice, Plaintiff yet again applied for a building permit to construct a "Model 2500" home (the "2019 Building Permit Application" and, together with the 2018 Building Permit Application, the "Building Permit Applications").

238.    The size of the home applied for was exactly 2,500 square feet—and hence within the size range upon which the 2018 Building Permit Denial was partially based.

239.    Nevertheless, Farr again invoked the Purported Infrastructure Condition, denying the 2019 Building Permit Application partially on that basis by letter dated June 10, 2019 (the "2019 Building Permit Denial" and, together with the 2018 Building Permit Denial, the "Building Permit Denials").  A copy of the 2019 Building Permit Denial is annexed hereto as Exhibit 22.

240.    Following the 2019 Building Permit Denial, on July 18, 2019 Plaintiff filed with the Town a cash deposit in the sum of $1,676,979.66 as performance security for the completion of all public improvements for Phase One. A copy of the check deposited as "Renewal Security" together with the accompanying cover letter again requesting issuance of the building permit applied for on May 14, 2019 is annexed hereto as Exhibit 23.

241.    The Renewal Security was in the same dollar amount as the First Security—which was accepted by the Town, its attorney, and its Planning Board in satisfaction of the first condition in the Final Approval that Plaintiff post performance security prior to the Planning Board Chairman's execution of the Final Plat.

242.    In fact, because as of the time of filing of the Renewal Security Plaintiff had already completed more than half of the originally secured public improvements for The Greens (including the public road) as estimated by the Town's Engineer, the Town is oversecured by at least $1 million.

243.    At all relevant times, while Plaintiff constructed the public improvements, Plaintiff stood ready to post the Renewal Security if building permits would be forthcoming.

244.    It is now clear that only two days after the April 25, 2018 Meeting that there was nothing Plaintiff did could ever shake building permits loose given the Town's policy to stop The Greens.

245.    At all times Farr had no discretion to deny building permits based upon ethnic, racial and religious discrimination.

246.    The Town also denied the 2019 Building Permit Application based on the Town's baseless claim—conspicuously omitted from the April 6, 2018 Letter that provided comments on The Greens' plans before the April 25, 2018 Meeting and first raised in the summer of 2018— that the proposed unit must contain a garage, and that the model home applied for in the 2019 Building Permit Application did not contain same.

247.    Again, the Town Code requires only that each Phase One unit have access to two parking spots—whether, for example, in driveways on individual lots, garages, on roads outside the travel lanes, or in small parking lot configurations off the courts at The Greens.

248.    The Town's insistence that each unit in Phase One have a "garage" is yet another in a long line of obstacles (*e.g.*, F.A.R, Law, invented size restrictions, the Purported Infrastructure Condition) the Town is placing in The Greens' path to building permits.

249.    The Town is well-aware that The Greens exceeds by a substantial margin the number of parking spaces required by the Town Code for the Project.

250.    Upon information and belief, but for the Town's bad faith and selective treatment of Plaintiff, it would never involve itself in the manner in which the developer met the parking obligations under the Town Code—which Plaintiff's plans accompanying the 2019 Building Permit Application exceed by hundreds of spaces.

251.    Also, if the Town had ever informed Plaintiff that building permits would be forthcoming if every unit in Phase One contained a garage, Plaintiff would have readily agreed to build up to 237 parking garages at The Greens.

252.    Parking garages are a pretense.

253.    Without judicial intervention, Plaintiff will never obtain the building permits that any other secular developer not composed of Hasidic Jewish principals would have obtained under identical circumstances upon the Town determining that such developer's project did not pose the threat of an influx of Hasidic Jews.

254.    Accordingly, to date Plaintiff remains without a building permit and with its property rights completely abridged as a result of Defendants' racial and ethnic animus.

255.    In summary, and as detailed in this Complaint, among the many actions taken by various of the Defendants against Plaintiff to prevent construction of *any* of the 431 fully approved residences at The Greens to preclude Hasidic Jews from residing at The Greens or drive Plaintiff into bankruptcy, or both, are the following:

    a.  Pressuring Plaintiff to convert The Greens to a commercial development and create a non-Hasidic community;

    b.  Threatening difficulties with permits for the fully approved residential Project;

    c.  Pressuring Plaintiff to sell The Greens to the Town and/or County so the Town could "keep the Hasidic out";

    d.  Warning Plaintiff that they could "get aggressive" and take Plaintiff's property by eminent domain if Plaintiff would not sell the land to the Town and/or County;

    e.  Obstructing The Project by enlisting the assistance of NYS DOH to impose further water testing upon Plaintiff, with the County and Town seeking an active role in monitoring such testing to further impede development;

    f.  Adopting a "floor area ratio" law and unlawfully imposing same upon The Greens to destroy the economics of the already-approved Project despite the

Town's knowledge of Plaintiff's exemption therefrom under the Settlement Agreement;

g.  Stationing a "watchman" at the property 24-7, while outrageously charging the cost thereof to Plaintiff;

h.  Requiring Plaintiff to install double the amount of stone required by the Approved Plans under the main road at The Greens;

i.  Directing Plaintiff to move the main public road over by ten feet *after* Plaintiff had already completed time-consuming and costly earth work under the Approved Plans;

j.  Imposing upon Plaintiff exorbitant consultant fees and related extra costs concerning infrastructure with a level of frequency, scrutiny, and "requirements" not applied to similarly situated developers and property owners;

k.  Routinely discriminating against Plaintiff with abusive treatment of its Hasidic principals and agents;

l.  Imposing extensive, irrational, costly, and arbitrary requirements or restrictions for various public infrastructure improvements which exceed the customary requirements, practices, and normal costs of the Approved Plans;

m.  Unilaterally rewriting the Statement of Findings and with no precedent "interpreting" the rewritten text as an unfounded "cap" on the as of right square footage of The Greens' already approved 431 housing units;

n.  Mischaracterizing and distorting (despite unassailable evidence to the contrary) a non-binding description of the Project in the Statement of Findings as a purported basis to deny Plaintiff a building permit;

o.  Irrationally asserting without precedent and in contravention of the Final Approval, Settlement Agreement, Approved Plans, and Final Plat that Plaintiff must complete all public improvements for all five phases of The Greens prior to the ministerial issuance of building permits for residences within only Phase One;

p.  Creating pretextual square footage restrictions intended to act as a "Hasidic Population Cap" not contained in the Settlement Agreement, Final Approval, Approved Plans, New York's Town Law or the Town's Zoning Code;

q.  County Executive Neuhaus's pledging at a Town Board meeting that The Greens would *never* receive a sewer permit from him and invoking religious and racial stereotypes in connection with Hasidic Jews;

r.   Twice denying Plaintiff's applications for a building permit on unfounded grounds;

s.   Building Inspector actions which exceeded his limited jurisdiction while also claiming that it was either the Town Board or the Planning Board that was making and/or had just made the decision to deny the building permit at issue; and

t.   Inventing "procedures" and "requirements" outside of codified laws and the ordinary treatment of similarly situated developer/owners who are not composed of Hasidic Jews and openly Jewish orthodox principals and agents.

The above actions are collectively, and, without limitation, referred to as the "Discriminatory Acts."

## COUNT ONE

## Violation of Plaintiff's Substantive Due Process Rights under 42 U.S.C. § 1983

### (Against the Town and Farr)

256.   Plaintiff repeats and realleges all of the allegations set forth above of the Complaint with equal force and effect as if set forth at length and verbatim herein.

257.   Plaintiff has and had a constitutionally protected property right to the building permits for which it applied in the Building Permit Applications.

258.   Plaintiff's Building Permit Applications fully complied with the Town Law, Town Code, Settlement Agreement, Final Approval, Final Plat, and Approved Plans, all of which provide the applicable requirements for development of The Greens and issuance of building permits.

259.   The Town and Farr were well-aware that Plaintiff had a fully protected expectation interest in the ministerial issuance of building permits for Phase One building permits.

260.    The Town and Farr were further well aware at all relevant times that Plaintiff stood ready, willing and able to satisfy any and all bonafide requirements of permit issuance, to the extent any outstanding requirements existed.

261.    Upon information and belief, the Town by Valentine (and likely other Town officials to be identified in discovery) worked with Farr to provide him with direction, instruction and guidance as to the pretextual bases for withholding of building permits.

262.    Farr and the Town denied the Building Permit Applications to accommodate widespread and vocal community opposition to any Hasidic Jews purchasing or residing at homes at The Greens.

263.    Based on the Town Law, Town Code, Settlement Agreement, Final Approval, and Approved Plans, the filing of the First Security and Renewal Security, and Plaintiff's compliance with all the conditions of the foregoing, Farr lacked any discretion to deny the Building Permit Applications.

264.    The Town and Farr knew long before Farr's denial of the Building Permit Applications that Farr had no discretion to deny building permits to Plaintiff.

265.    The Town and Farr wrongfully denied the Building Permit Applications based on a purposefully contrived, pretextual and predetermined outcome with the selection and purported unilateral rewriting of a descriptive paragraph in the Statement of Findings and a superseded and invalid Purported Infrastructure Condition as merely camouflage for the exclusion of Hasidic Jews from The Greens.

266.    In denying the Building Permit Applications, as set forth above, Farr acted in bad faith and, upon information and belief, at the direction of the highest Town officials, all acting pursuant to the Town policy to "Keep the Hasidic Out."

267.     In so acting, Farr exceeded his authority as Building Inspector under New York State law and in violation of federal and state law, the Town Code, Final Approval, Settlement Agreement and Approved Plans.

268.     In denying the Building Permit Applications, Farr exercised his power under the law to grant or deny building permits in bad faith for illegitimate and discriminatory purposes.

269.     But for the Town's and Farr's unlawful, irrational, and arbitrary denial of the Building Permit Applications, Plaintiff would have been duly issued long ago a large number of building permits to which it was entitled under the law to construct and sell homes at The Greens.

270.     In addition, through the Town's and Farr's Discriminatory Acts, Plaintiff has been denied due process of law and deprived of:

(i)      Its right to reasonably use and develop The Greens;

(ii)     Its investment-backed expectations regarding the permissible use and development of The Greens; and

(iii)    A property interest via the diminution in the value of its investment in The Greens caused by the financial injury sustained from the delays in constructing and closing on sales of homes at The Greens.

271.     There was no legitimate basis for, *inter alia*, denying the Building Permit Applications, including any bona fide health, safety or public welfare basis.

272.     Plaintiff committed substantial assets to the development of The Greens in accordance with all prior approvals (including the Settlement Agreement, Final Approval and Approved Plans) and also undertook substantial improvements approved by the Town, *e.g.*,

infrastructure development, thereby further evidencing its reasonable expectation of its entitlement to building permits in the ordinary course.

273.    In fact, Town records in the form of notes from early construction meetings reflect the Town's recognition that issuance of up to 82 Phase One building permits were ripe and imminent.

274.    The Town's denial of the Building Permit Applications, and its many other Discriminatory Acts, have been improperly and maliciously motivated, involving an intentional plan to permanently deprive Plaintiff of its ability to reasonably use the Property in an economically viable manner pursuant to the Settlement Agreement, Final Approval and Approved Plans.

275.    The method and manner of the Town's and Farr's actions are so outrageously arbitrary as to be a gross abuse of governmental authority.

276.    The Town's and Farr's interference in the lawful permitting process for The Greens was entirely motivated by racial, ethnic and religious bias, bad faith and discrimination completely unrelated to the merits of Plaintiff's Building Permit Applications.

277.    But for the substantive due process violation alleged herein against the Town and Farr, the building permits for which Plaintiff applied and a majority of all 82 Phase One building permits would have already been issued in the ordinary, normal and routine course.

278.    By the allegations set forth in this Complaint, Plaintiff has demonstrated the personal involvement of Farr and, upon information and belief, other Town officials including Valentine acting under color of State law and Town policy in the continuous discrimination against Plaintiff and Hasidic Jews, including through the wrongful denial of the Building Permit Applications.

4178131.v1

279.     Through the individual actions of Farr, and, upon information and belief, other Town Defendants providing him with instruction, such as Valentine, said Defendants violated the Constitution and Plaintiff's constitutional rights, including Plaintiff's substantive due process rights.

280.     The approval of the Building Permit Applications and issuance of building permits thereunder were purely ministerial, and Farr exceeded his legal authority in purporting to rely upon contrived and pretextual "interpretations" of the Statement of Findings to deny the Building Permit Applications.

281.     Even if the issuance of the building permits applied for were deemed to be discretionary, which they were not here, Farr's and Valentine's conduct violated clearly established statutory and constitutional rights of which a reasonable person would have known.

282.     The denial of the Building Permit Applications violated clearly established statutory or constitutional rights of which a reasonable person would have known and Farr as well as Valentine, himself a builder, well knew.

283.     The prohibition against discrimination based on race or religion is a clearly established constitutional and statutory right.

284.     None of the Discriminatory Acts undertaken by Farr and Valentine, including the denial of the Building Permit Applications, was objectively reasonable in light of the legal rules that were clearly established at the time each of those Acts was undertaken.

285.     Farr's and Valentine's denial of the Building Permit Applications constituted a misuse of power that they possessed by virtue of state and local law and, *inter alia*, powerful governmental positions.

46

286.     Farr and Valentine intentionally violated Plaintiff's constitutional rights, including the right to substantive due process by, *inter alia*, denying the Building Permit Applications, and thus unlawfully preventing Plaintiff's development of The Greens as already approved and entitled.

287.     As a result of the Town's and Farr's wrongful denial of Plaintiff's Building Permit Applications, Plaintiff has been deprived of constitutionally protected property rights in violation of Plaintiff's substantive due process rights secured under the United States Constitution and 42 U.S.C. § 1983.

288.     Accordingly, Plaintiff asks that the Building Permit Denials be vacated and declared null and void and the Court enter an Order directing the Town and its agents, employees, and representatives to grant in the ordinary course building permit applications submitted by Plaintiff which are complete, accompanied by all required fees, and conform to the Approved Plans, and prohibiting the Town and its agents, employees, and representatives from denying any such building permit application on the grounds of the Purported Infrastructure Condition, Chapter 59, Article I of the Town Code, the F.A.R. Law, any alleged size limitation not included in the Bulk Table within the Approved Plans, or any other reason.

289.     That Plaintiff further be awarded damages against the Town and Farr, jointly and severally, for violation of Plaintiff's substantive due process rights in the amount of not less than Eighty Million ($80,000,000.00) Dollars, together with interest, and punitive damages against Valentine and Farr in the sum of not less than Twenty Million ($20,000,000.00) Dollars, together with Plaintiff's attorney's fees and costs incurred in the prosecution of this action under the provisions of 42 U.S.C. § 1988(b) and such other relief that the Court deems equitable and just.

4178131.v1

## COUNT TWO

## Denial of Equal Protection under 42 U.S.C. § 1983

### (Against all Defendants)

290.     Plaintiff repeats and realleges all of the allegations set forth above of the Complaint with equal force and effect as if set forth at length and verbatim herein.

291.     The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution provides that "[n]o state shall make or enforce any law which shall . . . deny to any person within its jurisdiction the equal protection of the laws."

292.     Defendants' Discriminatory Acts and other misconduct alleged here, including the Town's and Farr's denial of the Building Permit Applications, deprived and continue to deprive Plaintiff of its right to equal protection of the laws.

293.     Defendants have acted with discriminatory animus against Plaintiff.

294.     Defendants were openly opposed to Hasidic Jewish individuals moving to the Town and The Greens and the Town's actions which have totally accomplished that illegal objective accelerated immediately after the anti- Jewish "mob" April 25, 2018 Meeting.

295.     The Town Defendants' actions were at all times aimed at (a) avoiding their obligations under the Settlement Agreement, Final Approval, Approved Plans, and applicable state and local law and (b) preventing construction of any homes at The Greens lest Hasidic Jews be able to purchase such a home and thereby move into the Town.

296.     Plaintiff's efforts to commence home construction at The Greens became futile as a matter of law as the Town and Farr have continuously changed the pretextual reasons advanced in support of the pre-determined decision to deny the as of right building permits to which

Plaintiff is entitled.  Indeed, none of the reasons alleged in the Building Permit Denials were raised by Farr in the April 6, 2018 Letter.

297.    The Town and Farr have applied what appear to be facially neutral laws or policies (*e.g.* contents of the Statement of Findings, Settlement Agreement and Town Code) concerning the issuance of a building permit in a discriminatory manner so as to deny Plaintiff's Building Permit Applications.

298.    The Town (including the Town Engineer and Town Highway Superintendent) and Farr have applied what appear to be facially neutral laws or policies concerning infrastructure, water, and the square footage of homes (*e.g.*, the F.A.R. Law and Building Permit Denials) in a discriminatory manner in an attempt to prevent or, at the bare minimum, significantly delay and make far more costly, the development of The Greens if Plaintiff can financially withstand the continuous onslaught of the Town and ever break through its planned years of delay.

299.    Defendants are well-aware that a less financially capitalized plaintiff without access to the capital needed to sustain Defendants' endless fusillade would have already had to surrender its constitutional rights with Defendants escaping their accountability for equal protection and other violations alleged in this Complaint.

300.    Alternatively, or in addition, the Town Defendants' facially neutral statutes or policies concerning, *inter alia*, infrastructure, water, and square footage of homes (*e.g.*, the F.A.R. Law and completely invented "cap" of 2,300 to 2,500 square feet depending on the type of structure) have an adverse effect on Plaintiff and its ability to develop The Greens and have been motivated by discriminatory animus, as established in this Complaint.

301.    Defendants' Discriminatory Acts deny Plaintiff its right to equal protection under the law.

4178131.v1

302.     Defendants' Discriminatory Acts have infringed upon the rights secured by the Fourteenth Amendment, by (1) discriminating against and targeting Plaintiff for disfavor; (2) enforcing inapplicable land use regulations and rewriting inapplicable portions of the Statement of Findings to change the plain meaning in bad faith to support a pretextual pre-determined denial of Plaintiff's Building Permit Applications; (3) applying land use regulations and the Statement of Findings in an unlawful and discriminatory manner; and (4) applying land use regulations and then unilaterally "modified" passages from the Statement of Findings in a manner that has an adverse effect on Plaintiff's constitutionally protected property rights, all because of said Town Defendants' malicious and discriminatory animus.

303.     With respect to the Building Permit Applications, the Town and Farr arbitrarily denied same based on the official Town policy to "keep the Hasidic out," an impermissible consideration under, *inter alia*, Town Code §§ 98-32 ("Building permits") and 98-34 ("Building Inspector") and the terms of the Settlement Agreement, Final Approval, and Approved Plans.

304.     Furthermore, with respect to their denial of the Building Permit Applications, the Town and Farr improperly relied upon portions of the Statement of Findings that Farr distorted, misquoted, misapplied or mischaracterized or all of the foregoing, or that were superseded or unlawful, as described in this Complaint, in violation of Town Code §§ 98-32 ("Building permits") and 98-34 ("Building Inspector") and the Settlement Agreement, Final Approval, and Approved Plans.

305.     Plaintiff was selectively treated differently from other developers within the Town based on the racial and religious composition of its members and representatives and the racial and religious composition of the market Defendants view as the most ready, willing and able prospective purchasers at The Greens.

306.    Upon information and belief, the Town has not deprived any other developer of building permits where it has complied with all requirements and conditions of its final site plan and subdivision approval and approved plans as Plaintiff has here.

307.    Upon information and belief, according to the Town's responses to Plaintiff's FOIL searches, Plaintiff is the only applicant for a building permit in the entire history of the Town going back at least 20 years (to 1999) whose Building Permit Applications were denied because of:

> (a) A failure to first complete all public infrastructure for all phases of a phased development; and
>
> (b) An alleged failure to satisfy any alleged condition of the Statement of Findings not contained in the Final Approval documents.

308.    Indeed, in response to one of Plaintiff's FOIL searches seeking any documents concerning a denial of a building permit on either of the above-grounds in any other development project in the Town, the Town Clerk responded as follows:

> In reply to your request under Freedom of Information Law, please be advised that after diligent search, ***no such records can be found***.

309.    In addition or in the alternative, Defendants have intentionally treated Plaintiff differently from others similarly situated, and there is no rational basis for the difference in treatment.

310.    Plaintiff has no adequate remedy at law for the harm and damage caused by Defendants' violation of its constitutional rights.

311.    Defendants have caused Plaintiff to suffer, and to continue to suffer, irreparable harm, damage and injury.

4178131.v1

312.     Plaintiff will continue to suffer such damages unless Defendants' acts and conduct, including the Discriminatory Acts, complained of are permanently enjoined.

313.     All the Defendants acting under color of law have treated Plaintiff differently than other, similarly situated property owners and there is no rational, lawful basis for the palpably different treatment.

314.     Defendants' conduct toward Plaintiff has been maliciously and willfully motivated by spite and ill will toward Plaintiff with the clear intent, in bad faith, to injure Plaintiff and target Hasidic Jews as assumed prospective purchasers of housing at The Greens.

315.     Defendants singled out Plaintiff for unequal, disparate and selective treatment and in the process denied to Plaintiff the equal protection of the laws guaranteed to Plaintiff under the U.S. and State Constitutions.

316.     The Town has not previously attempted to impose upon any other developer a non-existent "cap" on floor area not contained in a final site plan, subdivision approval, or approved plans as a condition to issuance of building permits, nor have other developers been subjected to the Discriminatory Acts.

317.     Defendants know that their treatment of Plaintiff was and is without basis in law, fact, or precedent.

318.     Defendants' unequal treatment of Plaintiff was developed, *inter alia*, to assuage community opposition fueled by vocal expressions of prejudice and anti-Semitism to purchase of real property in the Town by Hasidic Jews.

319.     Some of the Town Defendants have openly stated to Plaintiff that they know that there is no legitimacy to the withholding of building permits.

320.    Some of the Town Defendants have, in sum and substance, informed Plaintiff that for political reasons they prefer that the Court order the issuance of building permits.

321.    Upon information and belief, the Town Defendants know (and some have openly and directly expressed) that if they treated Plaintiff in the same manner they treat other similarly situated property owners, they would forfeit their electability in the Town.

322.    At all relevant times, Defendants' selective treatment of Plaintiff was based upon improper considerations and improper motives; to wit: the religion, race and ethnicity of the principals of Plaintiff and religious practices of Defendants' perceived buyer's market for housing units at The Greens.

323.    At all relevant times, Plaintiff had a vested, protected property interest in the non-discretionary issuance of building permits without a contrived restriction limiting the size of every house to a maximum of 2,300 or 2,500 square feet and the unlawful Public Infrastructure Condition.

324.    Plaintiff's Building Permit Applications were already benefitted by all necessary approvals.

325.    The Town knew that because of the express terms of, *inter alia*, the Settlement Agreement, Final Approval and Approved Plans, Plaintiff possessed a vested entitlement to building permits.

326.    The Town knew that issuing building permits to Plaintiff would likely bring Hasidic Jewish purchasers to the Town, an occurrence the Town resolved to avoid at all costs including its anticipated exposure to this very litigation.

327.    Incredibly, so transparent were the Town's constitutional violations that at one point the Town Supervisor warned that continuation down the transparent path of blatant

4178131.v1

discrimination and illegal and selective mistreatment of Plaintiff would likely cause the Town to suffer exposure to millions of dollars in damages.

328.    Nonetheless, despite such a lucid moment by the Town Supervisor, it has since become clear that Valentine is beholden to the community opposition movement to "Preserve Chester" and stop Hasidic Jews from moving to The Greens.

329.    By the allegations set forth in this Complaint, Plaintiff has demonstrated the personal involvement of Farr, Neuhaus, and Valentine in the bad faith discrimination against Plaintiff and Hasidic Jews, including through those Discriminatory Acts with which they were involved.

330.    The Discriminatory Acts undertaken by Farr, Neuhaus, and Valentine were undertaken while acting under color of state law pursuant to the official policies of the Town and the County as openly espoused by Jamieson and Valentine on behalf of the Town and Neuhaus on behalf of the County.

331.    Through the individual actions of Farr, Neuhaus, and Valentine, each of those individual Defendants violated the Constitution and Plaintiff's constitutional rights, including Plaintiff's equal protection rights.

332.    Under, *inter alia*, the Settlement Agreement, Final Approval and Approved Plans, and applicable law, the Town and Farr were required, as a ministerial act, to issue the building permits under the Building Permit Applications filed by Plaintiff herein and all other Phase One building permit applications which would otherwise have been filed in the ordinary course but for the prior denials herein, and were not entitled to deny those permits based on a purported and non-existent size restriction outside of the Bulk Table or based on the Purported Infrastructure Condition.

4178131.v1

333.    At all times Plaintiff stood ready to satisfy any legitimate requirement or request of the Building Inspector for issuance of Building Permits.

334.    No legitimate requests—unaccompanied by incurable restrictions which were and are unlawful, unconstitutional, null and void—were ever made to The Greens by Farr.

335.    Nevertheless, even if the issuance of the building permit is deemed to be discretionary, which it was not here, Farr's and Valentine's conduct violated clearly established statutory and constitutional rights of which a reasonable person would have known.

336.    All of the Discriminatory Acts in which Farr, Neuhaus and Valentine engaged as described in this Complaint violated clearly established statutory or constitutional rights of which a reasonable person would have known.

337.    The prohibition against discrimination based on race, ethnicity or religion is a clearly established constitutional and statutory right.

338.    None of the Discriminatory Acts undertaken by Farr, Neuhaus and Valentine was objectively reasonable in light of the legal rules that were clearly established at the time each of those Discriminatory Acts was undertaken.

339.    Farr, Neuhaus and Valentine engaged in Discriminatory Acts and other intentionally discriminatory misconduct that constituted a misuse of power that each possessed by virtue of law.

340.    Farr, Neuhaus and Valentine intentionally violated Plaintiff's constitutional rights, including Plaintiff's rights to equal protection of the laws, by, *inter alia*, engaging in the Discriminatory Acts with which they were involved and, to date, preventing Plaintiff's development of The Greens.

341.    The actions of Defendants affect the public at large.

55

342.    Defendants' misconduct is quasi-extortionate.

343.    Protection of the important rights of Plaintiff involved in this action is a matter of public importance.

344.    Deterrence of Defendants' misconduct is also in the public interest.

345.    Accordingly, Plaintiff asks that the Building Permit Denials be vacated and declared null and void and the Court enter an Order directing the Town and its agents, employees, and representatives to grant in the ordinary course building permit applications for any phase of The Greens submitted by Plaintiff which are complete, accompanied by all required fees, and conform to the Approved Plans, and prohibiting the Town and its agents, employees, and representatives from denying any such building permit application for any phase of The Greens on the grounds of the Purported Infrastructure Condition, Chapter 59, Article I of the Town Code, the F.A.R. Law, any alleged size limitation not included in the Bulk Table within the Approved Plans, or any other reason.

346.    Plaintiff is entitled to recover from Defendants compensatory damages in the amount of no less than Eighty Million ($80,000,000.00) Dollars, together with interest, and punitive damages against Farr, Neuhaus and Valentine in the sum of not less than Twenty Million ($20,000,000.00) Dollars, all together with attorneys' fees under 42 U.S.C § 1988(b), costs, and disbursements and such other and further relief as the Court deems just and proper.

**COUNT THREE**

**<u>Permanent Injunction</u>**

**(Against all Defendants)**

347.    Plaintiff repeats and realleges all of the allegations set forth above of the Complaint with equal force and effect as if set forth at length and verbatim herein.

4178131.v1

348.    Defendants, individually and collectively, through, *inter alia*, their Discriminatory Acts, have wrongfully and illegally prohibited Plaintiff from developing The Greens, and also made it more costly for Plaintiff to do so.

349.    Alternatively, because of Defendants' wrongful preclusion of development of The Greens through its Discriminatory Acts, Plaintiff has suffered an irreparable injury because of the uniqueness of the property.

350.    The remedies available at law, such as monetary damages, are inadequate to compensate Plaintiff for that injury.

351.    Considering the hardships between Plaintiff (substantial) and Defendants (none), a remedy in equity is warranted.

352.    Because of the reason for Defendants' Discriminatory Acts—unabashed anti-Semitism and racial discrimination—the public interest would not be disserved by a permanent injunction.

353.    Accordingly, Plaintiff requests that the Court issue a permanent injunction barring Defendants, individually and collectively, from taking any further steps to preclude development of The Greens as approved in the Settlement Agreement, Final Approval, and Approved Plans, and ordering that Defendants cease and desist from all the Discriminatory Acts or any further acts of discrimination aimed at delaying or preventing development of The Greens and exclusion therefrom of Hasidic Jews, and such other, further and different relief as to the Court may seem just and proper.

354.    Additionally, Plaintiff requests that the Court permanently enjoin the Town and its agents, representatives, and employees from denying any of Plaintiff's building permit applications for any phase of The Greens that comply with the Final Approval and Approved

Plans and denying any such building permit application on the grounds of the Purported

Infrastructure Condition, Chapter 59, Article I of the Town Code, the F.A.R. Law, any alleged

size limitation not included in the Bulk Table within the Approved Plans, or any other reason.

## COUNT FOUR

### Violation of Plaintiff's rights under 42 U.S.C. § 1981

### (Against all Defendants)

355.    Plaintiff repeats and realleges all prior allegations of the Complaint with the same

full force and effect as if set forth at length and verbatim below.

356.    Defendants, individually and collectively, based on racial animus and

discrimination, have violated Plaintiff's rights under 42 U.S.C. § 1981 by impairing Plaintiff's

right to make and enforce contracts.

357.    Several of Plaintiff's principals are of the Jewish faith, whether Hasidic or

otherwise.

358.    Accordingly, on that basis alone, Plaintiff has standing to bring this claim for

violation of its civil rights under 42 U.S.C. § 1981.

359.    Moreover, Defendants, individually and collectively, have discriminated against

Hasidic Jews on the basis that Defendants do not want such individuals to purchase homes

within The Greens and reside in the Town or County.

360.    In furtherance of their effort to preclude Hasidic Jews from developing, moving to

and residing in the Town and County, Defendants have engaged in the Discriminatory Acts and

other discriminatory misconduct to prevent the already fully approved development of The

Greens.

4178131.v1

361.    Accordingly, Plaintiff also has standing to bring this claim for violation of 42 U.S.C. § 1981 on the basis of substantiated allegations of personal injury derivative of Defendants' discriminatory actions (including the Discriminatory Acts) against Hasidic Jews.

362.    Defendants, individually and collectively, have intended to discriminate against Plaintiff and Hasidic Jews predicated on their race.

363.    Such intent is evident from, *inter alia*, the following statements made by or on behalf of several of the Defendants—and several additional statements set forth in this Complaint:

- "The idea is to keep the Hasidic out";

- "This isn't Brooklyn; people here have big guns";

- Informing Plaintiff that permits would be easier to secure for commercial uses of the property like retail, hospitality, and parking;

- Cautioning Plaintiff not to advertise The Greens to the Hasidic Community;

- Encouraging Plaintiff to create a non-Hasidic community;

- "I am here to pledge every resource we have in this County to work with you guys to explore all these options and I'm telling you I'm not giving up on it . . . I think we have a lot of fire power . . . We have to clean this up";

- "We can pressure the developer. We have a lot of influence. We can test the water . . . We can pressure them to go commercial or buy it . . . We can also take it by eminent domain for the purpose of economic development";

- "I love this town and I don't want to be the person who lost this town . . . We are going to fight them and we're not rolling over";

- "If this development is being exclusively marketed to, you know, one set of religious people or one type of people that is illegal and I've already put the Attorney General on notice that in many ways this development is being billed as a Hassidic development";

- "The [Hasidic] village of Kiryas Joel, because that's what you're asking about; Alex and I are being careful [not to reveal that Kiryas Joel figures in our thinking] (Emphasis added.); and

- Identification of the record owner of The Greens as "Jewish" and a "Hasidic Jew from Brooklyn."

The above statements are collectively referred to as the "Anti-Semitic Statements."

364.    The Discriminatory Acts and Anti-Semitic Statements concern—and have prevented—Plaintiff from making and enforcing contracts, including such contracts for the sale of homes that, but for the Discriminatory Acts, would have already been constructed at The Greens, or, at the bare minimum, well underway long ago.

365.    Defendants, individually and collectively, have acted and impaired Plaintiff's rights to make and enforce contracts under color of state law.

366.    Defendants, individually and collectively, have treated similarly-situated developers and property owners differently than Plaintiff, on the bases that: (a) Plaintiff's principals are Jewish/Hasidic and (b) the assumed prospective purchasers of homes at The Greens are Jewish/Hasidic.

367.    The Discriminatory Acts were performed under the municipal and/or governmental policies of the Town and County, respectively, in that, *inter alia*, discriminatory practices of municipal officials were so persistent or widespread as to constitute a custom or usage with the force of law, and, alternatively or in addition, a discriminatory practice of subordinate employees was so manifest as to imply the constructive acquiescence of senior policymaking officials.

368.    By the allegations set forth in this Complaint, Plaintiff has demonstrated the personal involvement of Farr, Valentine and Neuhaus in the continuous and bad faith discrimination against Plaintiff and Hasidic Jews, including through the Discriminatory Acts and Anti-Semitic Statements, that were undertaken or uttered by Farr, Valentine, and Neuhaus acting under color of state law.

369.    Through the individual actions of Farr, Valentine, and Neuhaus, each of those individual Defendants violated the Constitution and Plaintiff's constitutional and statutory rights.

370.    Under, *inter alia*, the Settlement Agreement, Final Approval, Final Plat, Approved Plans, and applicable law, the Town and Farr were required, as a ministerial act, to grant the Building Permit Applications and issue the building permits applied for therein.

371.    Alternatively, even if the issuance of the building permits applied for is deemed to be discretionary, Farr's conduct violated clearly established statutory and constitutional rights of which a reasonable person would have known.

372.    All the Discriminatory Acts and Anti-Semitic Statements and conduct and other discriminatory statements with which Farr, Neuhaus and Valentine were involved as described in this Complaint violated clearly established statutory or constitutional rights of which a reasonable person would have known.

373.    The prohibition against discrimination based on race with respect to making and enforcing contracts is a clearly established statutory right.

374.    None of the Discriminatory Acts and Anti-Semitic Statements and conduct and other discriminatory statements undertaken or uttered by Farr, Valentine and Neuhaus was objectively reasonable in light of the legal rules that were clearly established at the time each of those acts or statements was undertaken or made.

375.    Farr, Neuhaus and Valentine engaged in Discriminatory Acts, Anti-Semitic Statements and conduct and other intentionally discriminatory misconduct that constituted a misuse of power that each possessed by virtue of local and state law.

376.    Farr, Neuhaus and Valentine intentionally violated Plaintiff's statutory rights, including the right not to be discriminated against on the basis of race, religion and ethnicity in

the making and enforcement of contracts, by, *inter alia*, engaging in many of the Discriminatory Acts and making the Anti-Semitic Statements and hence preventing Plaintiff's development and sale of houses at The Greens.

377.     The actions of Defendants affect the public at large.

378.     Defendants' misconduct is quasi-extortionate.

379.     Protection of the important rights of Plaintiff involved in this action is a matter of public importance.

380.     Deterrence of Defendants' misconduct is also in the public interest.

381.     Accordingly, Plaintiff asks that the Building Permit Denials be vacated and declared null and void and the Court enter an Order directing the Town and its agents, employees, and representatives to grant in the ordinary course building permit applications for any phase of The Greens submitted by Plaintiff which are complete, accompanied by all required fees, and conform to the Approved Plans, and prohibiting the Town and its agents, representatives, and employees from denying any such building permit application on the grounds of the Purported Infrastructure Condition, Chapter 59, Article I of the Town Code, the F.A.R. Law, any alleged size limitation not included in the Bulk Table within the Approved Plans, or any other reason.

382.     Plaintiff is entitled to recover from Defendants damages in the amount of no less than Eighty Million ($80,000,000.00) Dollars, together with interest, and punitive damages against Farr, Neuhaus and Valentine in the sum of not less than Twenty Million ($20,000,000.00) Dollars, all together with attorneys' fees under 42 U.S.C § 1988(b), costs, and disbursements and such other and further relief as the Court deems just and proper.

62

4178131.v1

## COUNT FIVE

## <u>Violation of Plaintiff's rights under 42 U.S.C. § 1982</u>

### (Against all Defendants)

383.    Plaintiff repeats and realleges all of the allegations set forth above of the Complaint with equal force and effect as if set forth at length and verbatim herein.

384.    42 U.S.C. § 1982 guarantees to all citizens of the United States the same right, in every State and Territory, as is enjoyed by white citizens thereof, to, *inter alia*, purchase, sell, hold, and convey real property.

385.    Defendants, individually and collectively, based on racial animus and discrimination, have violated Plaintiff's rights under 42 U.S.C. § 1982 by impairing Plaintiff's right to, *inter alia*, purchase, sell, hold, and convey houses at The Greens.

386.    Several of Plaintiff's principals are of the Jewish faith, whether Hasidic or otherwise.

387.    Accordingly, on that basis alone, Plaintiff has standing to bring this claim for violation of its rights under 42 U.S.C. § 1982.

388.    Moreover, Defendants, individually and collectively, have discriminated against Plaintiff and Hasidic Jews as Defendants have acknowledged that construction of houses available for purchase by Hasidic Jews at The Greens is against both Town and County policy.

389.    In furtherance of their respective efforts to preclude Hasidic Jews from moving to and residing in the Town and County, Defendants have engaged in the Discriminatory Acts and other racially-motivated misconduct to prevent the construction of houses at The Greens, and, hence, the sale of any home developed thereat to Hasidic Jews.

4178131.v1

390.    Acco§rdingly, Plaintiff also has standing to bring this claim for violation of 42 U.S.C. § 1982 on the basis of substantiated allegations of personal injury derivative of Defendants' discriminatory actions including the Discriminatory Acts against Hasidic Jews.

391.    Defendants, individually and collectively, have intended to discriminate against Plaintiff and Jewish/Hasidic developers and purchasers predicated on their race.

392.    Such intent is evident from, *inter alia*, the Anti-Semitic Statements and additional statements and actions referenced in this Complaint.

393.    The Discriminatory Acts and Anti-Semitic Statements concern—and have prevented—Plaintiff from building and selling real property, including entering into and consummating such contracts for the sale of houses developed at The Greens pursuant to the Settlement Agreement, Final Approval, Approved Plans and applicable law.

394.    But for the Discriminatory Acts motivated by racial animus, Plaintiff would have been able to contract, sell and convey lots and houses at The Greens, and other Hasidic Jews would have been able to purchase such lots and houses.

395.    Defendants, individually and collectively, acting under the color of law, have impaired Plaintiff's rights to contract, sell and convey houses at The Greens, and impaired the ability of Hasidic Jews to purchase same.

396.    Defendants, individually and collectively, have treated similarly-situated developers and property owners differently than Plaintiff, on the sole bases that: (a) Plaintiff's principals are Jewish/Hasidic and (b) the assumed prospective purchasers of homes at The Greens are Jewish/Hasidic.

397.    Defendants, individually and collectively, have treated similarly-situated sellers and prospective purchasers of property within the Town and County differently than Plaintiff on

the grounds that: (a) Plaintiff's principals are Jewish/Hasidic and (b) the assumed prospective purchasers of homes at The Greens are Jewish/Hasidic.

398.    The Discriminatory Acts were performed under the municipal and/or governmental policies of the Town and County, respectively, in that, *inter alia*, discriminatory practices of municipal officials of the Town and County were so open, public, vocal, persistent or widespread as to constitute a custom or usage with the force of law, and, alternatively or in addition, a discriminatory practice of subordinate employees was so manifest as to imply the constructive acquiescence of senior policymaking officials.

399.    By the allegations set forth in this Complaint, Plaintiff has demonstrated the personal involvement of Farr, Valentine and Neuhaus in the continuous and bad faith discrimination against Plaintiff and Hasidic Jews, including through the Discriminatory Acts undertaken by Farr, Valentine and Neuhaus acting under color of state law.

400.    Through the individual actions of Farr, Valentine, and Neuhaus, each of those individual Defendants violated the Constitution and Plaintiff's constitutional and statutory rights.

401.    Under, *inter alia*, the Settlement Agreement, Final Approval, Approved Plans, and applicable law, the Town and Farr were required to grant the Building Permit Applications and issue the building permits applied for therein, a ministerial act.

402.    Nevertheless, even if the issuance of the building permits is deemed to be discretionary, the Town's and Farr's conduct violated clearly established statutory and constitutional rights of which a reasonable person would have known.

403.    All the Discriminatory Acts with which Farr, Neuhaus and Valentine were involved as described in this Complaint violated clearly established statutory or constitutional rights of which a reasonable person would have known.

4178131.v1

404.     The prohibition against discrimination based on race with respect to purchasing, contracting, developing, building, selling, holding, and conveying real property is clear.

405.     None of the Discriminatory Acts undertaken by Farr, Neuhaus and Valentine was objectively reasonable in light of the legal rules that were clearly established at the time each of those Acts was undertaken.

406.     Farr, Neuhaus and Valentine engaged in Discriminatory Acts and other intentionally discriminatory misconduct that constituted a misuse of power that each possessed by virtue of local, county and state law.

407.     Farr, Neuhaus and Valentine intentionally violated Plaintiff's statutory rights, including the right not to be discriminated against on the basis of race in purchasing, contracting, constructing, selling, holding, and conveying real property, by, *inter alia*, engaging in the Discriminatory Acts or making the Anti-Semitic Statements, or both, and hence trying to prevent Plaintiff's development of The Greens.

408.     The actions of Defendants affect the public at large.

409.     Defendants' misconduct was and is quasi-extortionate.

410.     Protection of the important rights of Plaintiff involved in this action is a matter of public importance.

411.     Deterrence of Defendants' misconduct is also in the public interest.

412.     Accordingly, Plaintiff asks that the Building Permit Denials be vacated and declared null and void and the Court enter an Order directing the Town and its agents, employees, and representatives to grant in the ordinary course building permit applications for any phase of The Greens submitted by Plaintiff which are complete, accompanied by all required fees, and conform to the Approved Plans, and prohibiting the Town and its agents,

66

representatives, and employees from denying any such building permit application on the grounds of the Purported Infrastructure Condition, Chapter 59, Article I of the Town Code, the F.A.R. Law, any alleged size limitation not included in the Bulk Table within the Approved Plans, or any other reason.

413.    Plaintiff is entitled to recover from Defendants damages in the amount of no less than Eighty Million ($80,000,000.00) Dollars, together with interest, and punitive damages against Farr, Neuhaus and Valentine, in the sum of not less than Twenty Million ($20,000,000.00) Dollars, all together with attorneys' fees under 42 U.S.C § 1988(b), costs, and disbursements and such other and further relief as the Court deems just and proper.

**COUNT SIX**

**Fair Housing Act 42 U.S.C. § 3604**

**(Against all Defendants)**

414.    Plaintiff repeats and realleges all of the allegations set forth above of the Complaint with equal force and effect as if set forth at length and verbatim herein.

415.    Defendants, by, *inter alia*, their Discriminatory Acts and continuing conduct, have intentionally discriminated against Plaintiff by making housing unavailable within the Town and County on the basis of religion in violation of 42 U.S.C. § 3604.

416.    The Town animus toward Hasidic Jews moving into the Town and The Greens was the significant factor in the Town's and its agents, employees, and representatives' Discriminatory Acts and disparate treatment of The Greens and Plaintiff.

417.    The animus against Hasidic Jews by the Town and its agents, employees, and representatives was the significant factor in the Town's failed attempt to impose the F.A.R. Law

4178131.v1

upon The Greens as well as the Town and Farr's denial of the Building Permit Applications on contrived and unlawful grounds.

418.    Plaintiff is an aggrieved person as that term is defined in the Fair Housing Act, 42 U.S.C. § 3602(i), and has suffered harm, damage and injury as a result of Defendants' conduct.

419.    Plaintiff has suffered distinct and palpable injuries that are traceable to Defendants' actions and Discriminatory Acts, including the deprivation of Plaintiff's ability to economically benefit from the Property due to the inability to build any homes thereon, because of, *inter alia*, the wrongful and illegal Building Permit Denials and other delay damages and costs incurred as a result.

420.    The Discriminatory Acts were and are motivated by discriminatory animus against Hasidic Jews.

421.    The Discriminatory Acts and other Town and County misconduct undertaken pursuant to the Town's and County's discriminatory motive had and has a disparate treatment and impact upon Hasidic Jews and The Greens.

422.    In and by the Discriminatory Acts, Defendants, individually and/or collectively, have precluded Hasidic Jewish individuals from moving into the Town and County, by virtue of, *inter alia*, preventing the construction of homes at The Greens.

423.    Defendants, in and by the Discriminatory Acts and other misconduct alleged in this Complaint, have openly discriminated against Plaintiff and the Hasidic Jewish community on account of their religion by prohibiting the development of The Greens as housing available to members of the Hasidic community.

424.    The election and support of Town and County officials who openly oppose development of The Greens shows a tacit approval of discrimination on the basis of religion

within the community, and that Town and County officials are now acting on behalf of their constituents to block Hasidic Jews from building or moving into The Greens housing development in the Town and County.

425.    Among other comments and statements, vituperative comments at public hearings and in emails further evince the express approval of religious discrimination within the community, with Town and County officials now acting on behalf of their constituents to block Hasidic Jews from building houses or moving into The Greens.

426.    Despite (a) Plaintiff's receipt of all necessary approvals from the Town and full compliance therewith; (b) the Town's execution of the Settlement Agreement; (c) Plaintiff's vested and protected property rights (i) in the Property by purchasing the Property and beginning construction on the public road and other public improvements in reliance on lawfully granted permits and approvals and (ii) clear entitlement to the ministerial issuance of building permits to construct homes thereon, the Town and Farr have denied the Building Permit Applications based solely on their desire to prevent Hasidic Jews from building in and moving to the Town and thus prevented construction of homes at The Greens lest they be available to Hasidic Jews.

427.    Further, several of the Defendants' overtly discriminatory motive, declarations, admissions and actions—including the Anti-Semitic Statements—evidence Defendants' violation of the FHA.

428.    The overwhelming animus towards the Hasidic Jewish community by Town and County officials, employees, and agents and a vocal community opposition has resulted in the disparate treatment of Plaintiff and Hasidic Jews by Defendants.

429.    Defendants' actions effectively prevent Hasidic Jews from moving into the Town and County at The Greens.

4178131.v1

430.     Plaintiff has suffered actual injury as a result of Defendants' Fair Housing Act violations committed against both Plaintiff and Hasidic Jews.

431.     Plaintiff is entitled to recover from Defendants damages in the amount of no less than Eighty Million ($80,000,000.00) Dollars, all together with attorneys' fees under 42 U.S.C § 1988(b), costs, and disbursements and such other and further relief as the Court deems just and proper.

432.     Alternatively, Plaintiff has no adequate remedy at law for such harm, damage and injury caused by Defendants' conduct.

433.     Defendants have caused Plaintiff to suffer, and continue to suffer, irreparable harm, damage and injury, and Plaintiff will continue to suffer such harm unless Defendants' acts and conduct complained of herein, including the Discriminatory Acts, are permanently enjoined.

434.     Accordingly, Plaintiff asks that the Building Permit Denials be vacated and declared null and void and the Court enter an Order directing the Town and its agents, employees, and representatives to grant in the ordinary course building permit applications submitted by Plaintiff which are complete, accompanied by all required fees, and conform to the Approved Plans, and prohibiting and enjoining the Town and its agents, representatives, and employees from denying any such building permit application on the grounds of the Purported Infrastructure Condition, Chapter 59, Article I of the Town Code, the F.A.R. Law, any alleged size limitation not included in the Bulk Table within the Approved Plans, or any other reason.

4178131.v1

## COUNT SEVEN

### Fair Housing Act 42 U.S.C. § 3617

#### (Against all Defendants)

435.     Plaintiff repeats and realleges all of the allegations set forth above of the Complaint with equal force and effect as if set forth at length and verbatim herein.

436.     Defendants, by their Discriminatory Acts and other misconduct detailed in this Complaint, have intentionally discriminated against Plaintiff on account of having exercised its rights, or having aided or encouraged other persons to engage in the exercise or enjoyment of rights, that are granted or protected by 42 U.S.C. § 3604 in violation of 42 U.S.C. § 3617.

437.     Through their Discriminatory Acts, Defendants, individually and/or collectively, have repeatedly discriminated against Plaintiff and thereby have intentionally interfered with the Hasidic Jewish community's right to available housing and Plaintiff's right to build and sell houses to Hasidic Jews and any prospective purchaser regardless of race, religion or ethnic origin. Defendants have further sought to coerce and intimidate Plaintiff ("people here have big guns") and those who support the Hasidic Jewish community in the hopes of preventing the development of appropriate housing for sale to Hasidic Jews at The Greens.

438.     As described in detail hereinabove in this Complaint, by the Discriminatory Acts and otherwise Defendants have taken numerous steps to interfere with Plaintiff's exercise and enjoyment of fundamental rights.

439.     Further, several of Defendants' overtly discriminatory actions, declarations and admissions, including the Anti-Semitic Statements, evince and support their violation of the FHA.

440.     The overwhelming animus towards the Hasidic Jewish community has resulted in the disparate treatment of Plaintiff by Defendants.

441.     Plaintiff is an aggrieved person as that term is defined in the Fair Housing Act, 42 U.S.C. § 3602(i) and has suffered harm, damage and injury as a result of Defendants' conduct.

442.     Plaintiff is entitled to recover from Defendants damages in the amount of no less than Eighty Million ($80,000,000.00) Dollars, all together with attorneys' fees under 42 U.S.C § 1988(b), costs, and disbursements and such other and further relief as the Court deems just and proper.

443.     Alternatively, Plaintiff has no adequate remedy at law for such harm, damage and injury caused by Defendants' conduct. As a result, Defendants have caused Plaintiff to suffer, and continue to suffer, irreparable harm, damage and injury, and Plaintiff will continue to suffer such harm unless Defendants' acts and conduct complained of, including the Discriminatory Acts, are permanently enjoined.

444.     In addition and specifically, Plaintiff asks that the Building Permit Denials be vacated and declared null and void and the Court enter an Order directing the Town and its agents, employees, and representatives to grant in the ordinary course building permit applications submitted by Plaintiff which are complete, accompanied by all required fees, and conform to the Approved Plans, and prohibiting and enjoining the Town and its agents, representatives, and employees from denying any such building permit application on the grounds of the Purported Infrastructure Condition, Chapter 59, Article I of the Town Code, the F.A.R. Law, any alleged size limitation not included in the Bulk Table within the Approved Plans, or any other reason.

## COUNT EIGHT

### Taking of Private Property in Violation of The
### Fifth Amendment of The United States Constitution

### (Against the Town Defendants)

445.    Plaintiff repeats and realleges all of the allegations set forth above of the Complaint with equal force and effect as if set forth at length and verbatim herein.

446.    The Town Defendants, acting under color of law, have taken and deprived Plaintiff of its significant property rights without a sufficient legal or factual basis, and without due process, in violation of the Fifth and Fourteenth Amendments to the United States Constitution, and Article I, § 6 of the New York State Constitution.

447.    The Town Defendants' actions have singled out Plaintiff to provide a public benefit at Plaintiff's expense by forced preservation of the entire 117 acre Property on which The Greens is located as open space for public benefit.

448.    As a result of the intentional infliction of harm by the Town Defendants, Plaintiff should be compensated for its loss.

449.    The Town Defendants' actions have burdened Plaintiff's Property by the imposition of unlawful and unfair land use procedures.

450.    The Town Defendants' actions violate the public concern for fundamental fairness in land use matters.

451.    The attempt by the Town Defendants to permanently prevent the development of The Greens entailed the use of means not applied to others, and has rendered the Property economically unusable for the purpose for which it is zoned and already fully approved for development.

4178131.v1

452.    The efforts by the Town Defendants, vis a vis, the F.A.R. Law and Building Permit Denials and Catch 22 procedures that the Town is experienced and proficient in as recognized by the Second Circuit in <u>Sherman v. Town of Chester</u>, 752 F.3d 554 (2d Cir. 2014), and the attempt to require Plaintiff to comply with the purported Public Infrastructure Condition, constitute an attempt to keep Plaintiff from developing The Greens pursuant to its legal rights.

453.    Plaintiff should be compensated for its loss as a result of the Town Defendants' unlawful refusal to issue building permits in accordance with the Settlement Agreement, Final Approval, Approved Plans, and Plaintiff's entitlement thereto, which thereby wholly prevents Plaintiff from using and developing its Property.

454.    The Discriminatory Acts of the Town Defendants as aforementioned have caused Plaintiff to be deprived of all but a bare residual economic use of the Property, and Plaintiff should be compensated for its loss.

455.    The actions of the Town Defendants have limited the use of the Property to such a large extent that a taking has occurred.

456.    By reason of the foregoing, Plaintiff's claim to just compensation under the Fifth Amendment to the United States Constitution should be granted against the Town because Plaintiff's Property has been taken for public purpose without just compensation.

457.    The Town Defendants' actions have converted the Property to open space effectively preserved by Plaintiff at its expense for public purposes for which Plaintiff is constitutionally entitled to just compensation for the taking of all of the Property.

458.    The "reasons" for the Town Defendants' continued refusal to issue Plaintiff building permits cannot be constitutionally imposed as conditions on the Property, as the same would be and are violations of Plaintiff constitutional rights.

459. Said "reasons" are unreasonable and intended to pressure Plaintiff into forfeiting all of its constitutional rights.

460. The conditions which the Town Defendants seek to impose upon Plaintiff violate the "unconstitutional conditions" doctrine and impermissibly burden Plaintiff's right not to have its Property taken without just compensation.

461. As a result of the foregoing, Plaintiff has been damaged.

## COUNT NINE

## Declaratory Judgment

## (Against the Town Defendants)

462. Plaintiff repeats and realleges all of the allegations set forth above of the Complaint with equal force and effect as if set forth at length and verbatim herein.

463. There is an actual, justiciable controversy between the parties.

464. On the one hand, it is Plaintiff's position that Chapter 59, Article I of the Town Code is in derogation of the New York State Town Law (the "Town Law") and inconsistent with the public infrastructure security requirements imposed upon The Greens by the Planning Board in its Final Approval and Approved Plans, and, therefore, invalid, null and void, and inapplicable to Plaintiff's Building Permit Applications.

465. The validity of Plaintiff's position is confirmed by the language of the aforementioned New York State and Town statutes and the language of the Final Approval and Approved Plans.

466. First, Town Law Section 277(2)(c) provides that prior to approving a plat, the Planning Board shall require the applicant to complete all public improvements "***or alternatively***

*that a performance bond or other security be furnished to the town*." (Emphasis added.)  In

other words, the Town Law provides the developer with the option to "bond or build."

> 467.    In turn, Town Law Section 277(9) codifies that option, as follows:

> > Performance bond or other security. (a) Furnishing of performance bond or other security. *As an alternative to the installation of infrastructure and improvements*, as above provided, prior to planning board approval, a performance bond or other security sufficient to cover the full cost of the same, as estimated by the planning board or a town department designated by the planning board to make such estimate, where such departmental estimate is deemed acceptable by the planning board, shall be furnished to the town by the owner.

*Id*.  (Emphasis added.)

> 468.    In contrast to (and conflict with) Town Law Section 277, Town Code Section 59-

1 purports to mandate that a developer must complete all public infrastructure within a

subdivision prior to issuance of a building permit for any residential structure.

> 469.    Specifically:

> > *The Town Board of the Town of Chester hereby determines that it is in the best interest of the Town of Chester to require the completion of the installation of all public improvements in all subdivisions in the Town of Chester prior to the issuance of any building permits in subdivisions rather than to rely upon performance bonds to ensure the installation and completion of the public improvements*. It has been the experience of the Town Board that performance bonds do not adequately or sufficiently protect the Town of Chester, and the Board has therefore determined to require the installation of all public improvements prior to the issuance of building permits after the Planning Board has granted final approval to any subdivision plat. *The effect of this article will be to supersede those provisions of the Town Law of the State of New York which permit a subdivider to present a performance bond to the Planning Board of the Town of Chester in lieu of completion of the required public improvements on any subdivision plat.*

(Emphasis added.)

470.     In addition, and in further conflict with Town Law Section 277, Town Code

Section 59-2 provides:

> Notwithstanding any contrary provision in the Town Law or the
> subdivision regulations of the Town of Chester, the Planning Board
> shall grant final approval and authorize the Chairman of the
> Planning Board to sign any approved subdivision plat once the
> subdivider has complied with all requirements of state, county and
> local laws, rules, statutes and regulations governing subdivision
> approvals. ***However, and notwithstanding any contrary provisions
> in the Town Law or any other state or local regulations, until all
> highway and other public improvements, including but not limited
> to sanitary systems, water supply systems and drainage as may be
> specified and required by the Planning Board to be installed in any
> subdivision have been completed and the Planning Board has
> received written notification of the approval of the installation of
> the improvements from the Superintendent of Highways and the
> Town Engineer, no building permits for structures within the
> subdivision shall be issued.***

(Emphasis added.)

471.     Under the plain and unambiguous terms of Town Law Section 277, Plaintiff was

and is entitled to building permits for Phase One upon the filing a "performance bond or other

security" deemed acceptable by the Planning Board.

472.     Previously, the Town and the Planning Board determined that Plaintiff's

predecessor's posting of the First Security would be sufficient so as to allow Plaintiff to proceed

with construction of houses within Phase One of The Greens in lieu of the prior completion of

public infrastructure.

473.     Ultimately, the Town was provided with the First Security in exact conformity

with what the Planning Board and the Town had determined was sufficient.

474.     Although the First Security lapsed prior to Plaintiff's filing of the 2018 Building

Permit Application, the Town knew that the replacement of the First Security was a pro-forma

step which Plaintiff stood ready at all times to perform.

475.    The Town had previously never denied any building permit in connection with any other development because of a temporary lapse performance security.

476.    Notwithstanding the foregoing, and in disregard of both Town Law Section 277 and the Planning Board's determination in the Final Approval to permit posting of adequate performance security for public improvements in lieu of the prior completion thereof before issuance of a building permit, Farr denied Plaintiff's 2018 Building Permit Application.

477.    In so doing, Farr relied on a portion of the Statement of Findings and claimed that prior to issuance of a building permit for a Phase One model home, Plaintiff must first complete the public infrastructure for all five phases of The Greens; *i.e.*, the Purported Infrastructure Condition.

478.    Farr and the Town also wrongfully premised, in part, the denial of the 2019 Building Permit Application on the Purported Infrastructure Condition.

479.    They also refused to grant Plaintiff a building permit after Plaintiff filed the Renewal Security, therefore adopting the position that the condition in the Final Approval expressly requiring bonding and Town Law 277 are irrelevant and non-controlling.

480.    The Purported Infrastructure Condition and Sections 59-1 to 59-4 of the Town Code are inapplicable and null and void.

481.    Farr was not entitled to rely thereon in denying the Building Permit Applications.

482.    First, the Purported Infrastructure Condition was superseded by the first condition in the Final Approval issued and approved after and under the Settlement Agreement—also issued by the Planning Board as lead agency—which provided that prior to the signing of the Final Plat, Plaintiff must "furnish[] proper performance security [bonding of all public improvements] to the satisfaction of the Town Attorney . . . prior to the signing of the plat."

483.     As it is the Final Approval and Approved Plans that set forth the conditions of development approval, the Building Inspector's erroneous reference to the Purported Infrastructure Condition contained in the Statement of Findings was erroneous as a matter of law and null and void.

484.     Of note, 6 NYCRR 617.11(d)(5) provides that it is the province of the Planning Board, as lead agency, to decide to incorporate as conditions in any final approval "those mitigative measures" in a Statement of Findings "that were identified as practicable."

485.     Here, the Planning Board did *not* incorporate as a condition to its Final Approval the Purported Infrastructure Condition.

486.     This is consistent with the provision in the Statement of Findings that states that the Purported Infrastructure Condition's application to The Greens is not mandatory and, instead, is discretionary. (The Planning Board "will be able to place" it as a condition on "Final Subdivision/Site Plan Approval.") As evidenced by the Settlement Agreement, Final Approval, and Approved Plans, the Public Infrastructure Condition was not applied to The Greens and was superseded by the Final Approval, Approved Plans, and Settlement Agreement.

487.     As aforementioned, when Plaintiff vigorously objected to the rank discrimination inflicted upon it by the Town and Farr in invoking the Purported Infrastructure Condition, Farr claimed that either the Town Board or Planning Board would decide whether to continue to wrongfully apply it to The Greens. *See* email from Farr to Plaintiff's Engineer dated August 3, 2018, annexed hereto as Exhibit 24.

488.     Neither the Town Board nor the Planning Board has any authority to review, approve, or deny building permit applications.

489.    Farr thereby confirmed for Plaintiff that which it already suspected; to wit:  Farr was and is a mere puppet here with his strings being pulled by Valentine and the Town Board.

490.    Also, the Settlement Agreement provided that the Final Approval was to be issued in accordance with the preliminary approvals, ***as modified by the Approved Plans***.

491.    Nowhere in the Approved Plans (or in the Final Approval or Settlement Agreement) is completion of all public infrastructure mentioned as a prerequisite to issuance of building permits.

492.    The Settlement Agreement would never have been entered into subject to such a condition.

493.    In fact, the Final Approval provides for the exact opposite, *i.e.*, the posting of performance security in lieu of the prior completion of public improvements, which is exactly what the Town accepted for The Greens years before it was purchased by a "Jewish" owner allegedly from "Brooklyn."

494.    Moreover, not only did the Planning Board—the same agency that issued the Findings—not require completion of public improvements prior to signing of the Final Plat (which would have been in violation of law), but in interpreting the condition contained in its own Final Approval the Town Attorney and all involved officials at the Town including the Building Inspector deemed the First Security as sufficient to sign the Final Plat and commence all construction pursuant to building permits.

495.    Therefore, bonding (or a letter of credit or cash deposit securing) the public improvements identified and approved by the Town and its agents, employees, and representatives at all times was and is sufficient for issuance of Phase One building permits— with rollover of bonds for the successive phases.

496.     Also, the Purported Infrastructure Condition unilaterally and unlawfully imposed by the Building Inspector contravenes Town Law Section 277, the statute that expressly permits the applicant/developer, Plaintiff herein, to elect whether to complete the public infrastructure or file a bond prior to issuance of a building permit.

497.     Moreover, the Purported Infrastructure Condition is in conflict with other portions of the Town Code itself.  *See* Town Code Section 83-12.B.(4) "the subdivider shall complete all required improvements *or post the required performance security*, or both, to the satisfaction of the Town Board before any building permits will be issued." (Emphasis added.)

498.     In light of Town Law Section 277 and the Town's and Planning Board's acceptance of the First Security, the Town Building Inspector acted in violation of New York law in denying the Building Permit Applications on the basis of the Purported Infrastructure Condition.

499.     As a matter of law, a town code provision authorizing the town building inspector to withhold issuance of building permits for lots within a subdivision until the prior completion of all public infrastructure and other improvements is invalid on the basis that such provision is inconsistent with the clear plain language of Town Law Section 277(9).

500.     As a matter of law, Town Code Sections 59-1 to 59-4 are in derogation of Town Law Section 277, and thus invalid and null and void.

501.     As a matter of law, Town Code Sections 59-1 to 59-4 are preempted by Town Law Section 277.

502.     Given the internally conflicting terms between Town Code Sections  59-1 and 59-2, and Town Code §83-12.B(4), as well as the conflict between Town Law Section 277 and Town Code Sections 59-1 and 59-2 , the strict construction principle applicable to zoning

ordinances requires that the irreconcilable ambiguity created by Town Code Sections 59-1 and 59-2 be resolved against the Town.

503.    Town Code Chapter 59, Article I is a local law affecting the regulation of land use and development which is not supported by Town Law Section 277 or any other New York State Statute.

504.    The Town's adoption of Town Code Chapter 59, Article I, was ultra vires and ineffective.

505.    Notwithstanding all the foregoing, it is the Town Defendants' position that Town Code Sections 59-1 to 59-4 are valid and that the Building Inspector acted appropriately in denying the Building Permit Applications on the basis of the Purported Infrastructure Condition apparently predicated thereon regardless of whether Plaintiff posted performance security for the public improvements as provided under Town Law Section 277 and the Final Approval.

506.    Plaintiff cannot appeal (and need not appeal) the Building Permit Denials to the ZBA inasmuch as, *inter alia*, the ZBA is without power to issue a declaratory judgment of any kind, including that Sections 59-1 and 59-2 of the Town Code are in derogation of the New York Town Law and, therefore, null and void.

507.    In addition to the foregoing, the Settlement Agreement, Final Approval, Approved Plans and Final Plat did not incorporate the Purported Infrastructure Condition or alleged requirements of Town Code Chapter 59, Article I, as evidenced by the plain terms of such documents and the Town Defendants' and Planning Board's clear failure under Town Code Section 59-4 to: (a) require the developer to place an appropriate note on the Final Plat indicating that the Purported Infrastructure Condition applies to the Property, or (b) require the developer to

4178131.v1

record a declaration in the County Clerk's Office setting forth the applicability of the Purported Infrastructure Condition to the Property.

508.     Moreover, assuming, *arguendo*, Town Code Sections 59-1 to 59-4 are valid, because The Greens was approved in phases (*see* Approved Plans and Final Plat), at most, Plaintiff is required to complete Phase One public improvements prior to issuance of a Phase One building permit—and not the public improvements for all five phases.

509.     Chapter 59, Article I of the Town Code does not require all public improvements for all phases of a multi-phase development to be completed before issuance of a building permit for a single phase.

510.     Accordingly, a determination is required by this Court resolving the instant controversy and, specifically, decreeing and declaring that: (a) the Purported Infrastructure Condition and any requirement, whether under Chapter 59, Article I of the Town Code or otherwise, that Plaintiff complete all public improvements for all phases of The Greens prior to the issuance of any building permit for a Phase One residential unit or a residential unit for any other phase of The Greens are superseded by the Settlement Agreement, Final Approval, Approved Plans, and Final Plat, and hence are inapplicable to the Property or The Greens; (b) Town Code Sections 59-1 to 59-4 (Chapter 59, Article I) are in derogation of and preempted by Town Law Section 277 and, therefore, null and void; (c) the Renewal Security is sufficient for purposes of satisfying the requirements of Town Law Section 277 and the first condition of the Final Approval; (d) Plaintiff is not required to complete all public improvements for all phases of The Greens prior to the issuance of Phase One building permits or issuance of building permits for a residential unit for any other phase of The Greens on the basis of the Purported Infrastructure Condition, Chapter 59, Article I of the Town Code, or otherwise; and (e) upon

4178131.v1

filing a building permit application for a Phase One residential unit that conforms to the Final

Approval and Approved Plans, the Town by its building inspector or any other appropriate agent,

employee, or representative shall issue a building permit for such unit; or, alternatively, if the

Court finds that the Purported Infrastructure Condition applies to The Greens or that Sections 59-

1 to 59-4 of the Town Code are valid and not preempted by Town Law 277, or both, that (f)

Plaintiff is required to complete only the Phase One public improvements prior to issuance of

building permits for Phase One residential units, and upon completion of such public

improvements and filing of building permit applications that conform with the Final Approval

and Approved Plans, the Town, by its building inspector or other appropriate agent, employee, or

representative, shall issue to Plaintiff building permits for any Phase One residential unit, with

the same applying for every other phase of The Greens, *i.e.*, that Plaintiff must complete only the

public infrastructure for the particular phase for which it is seeking building permits prior to

issuance of such building permits upon filing of compliant building permit applications.

## COUNT TEN

### Declaratory Judgment

### (Against the Town Defendants)

511.     Plaintiff repeats and realleges all of the allegations set forth above of the

Complaint with equal force and effect as if set forth at length and verbatim herein.

512.     There is an actual, justiciable controversy between the parties.

513.     On the one hand, it is Plaintiff's position that the Building Inspector exceeded his

authority in denying the Building Permit Applications.

514.     Specifically, by claiming that prior to issuance of a building permit Plaintiff was

required to satisfy the Purported Infrastructure Condition, the Building Inspector purposefully

ignored the unambiguous provisions of the Town Law and the Town Code that mandate issuance of a building permit upon filing of adequate performance security.

515.    In addition, however, under Town Code Chapter 98, the Building Inspector exceeded his authority by requiring compliance with the Purported Infrastructure Condition—an alleged "condition" not found in the Final Approval, Approved Plans, or Settlement Agreement.

516.    Town Code Section 98-32 provides that no building permit shall be issued by the Building Inspector "unless the proposed construction or use is in full conformity with all provisions of" Chapter 98 of the Town Code, "Zoning."

517.    Town Code Section 98-32.C. states that where site plan approval is required by the Planning Board, a building permit will be issued only "in conformity with the plans approved by said Board."

518.    Under the Town's own Code, the Building Inspector was permitted to review *only* the Final Approval and Approved Plans concerning any preconditions to a building permit.

519.    Neither the Final Approval nor the Approved Plans contained the Purported Infrastructure Condition.

520.    The Final Approval and Approved Plans require only that Plaintiff furnish "proper performance security [bonding of all public improvements] to the satisfaction of the Town attorney . . .prior to the signing of the plat."

521.    The Town Building Inspector was "bound by the provisions" of Town Code Section 98-32, which direct him to review only Chapter 98 of the Town Code and the Approved Plans.

522.    Neither Chapter 98 of the Town Code nor the Approved Plans contained the Purported Infrastructure Condition.

4178131.v1

523.    Notably, Town Code Section 59-4 provides:

> In order to inform and advise purchasers of property within any subdivision approved in accordance with this article, the Planning Board shall require that the subdivider place an appropriate note on the subdivision plat to be filed in the Orange County Clerk's office confirming the fact that no building permit for any structure to be erected on any lot in the subdivision will be issued until the installation of all improvements or appropriate cash bond for road top course installation as per § 59-3, Exceptions, has been completed and written approval of the same received from the Superintendent of Highways and the Town Engineer. In addition, the Planning Board shall require the subdivider to record a declaration in the Orange County Clerk's office setting forth substantially the same terms as contained in the legend to be placed on the file map in order to better inform and advise purchasers of lots on the map.

524.    Tellingly, neither the Final Approval, Final Plat, nor the Approved Plans impose any obligation upon Plaintiff to first complete the public infrastructure prior to the issuance of building permits pertaining to The Greens.

525.    In addition, recognizing that only performance security was required in an amount fixed by the Town Engineer, the Planning Board approved the signing and filing of the Final Plat for recording without requiring or even requesting that any Declaration meeting the purported terms of Section 59-4 of the Town Code be prepared and recorded, whereas the Settlement Agreement expressly required the recording of a Declaration addressing another subject matter altogether.

526.    In light of the foregoing, Plaintiff contends that the Building Inspector had no basis—legally or factually—to deny Plaintiff's Building Permit Applications on the basis of the Purported Infrastructure Condition.

527.    In contrast, it is the Town Defendants' position that the Building Inspector properly denied Plaintiff's Building Permit Applications on the basis of the Purported Infrastructure Condition.

86

528.     Accordingly, a determination is required by this Court resolving the instant controversy and, specifically, declaring that: (a) the Building Inspector had no legal or factual basis or authority to deny Plaintiff's Building Permit Applications on the basis of the Purported Infrastructure Condition; (b) Plaintiff is not required to complete all public improvements for all phases of The Greens prior to the issuance of a building permit for a Phase One residential unit or for a building permit for any other phase of The Greens; (c) the Renewal Security is sufficient for purposes of satisfying the requirements of Town Law Section 277 and the Final Approval; (d) the Town and its building department may not deny any building permit application for any phase of The Greens filed by Plaintiff on the basis of the Purported Infrastructure Condition; and (e) under the first condition in the Final Approval Plaintiff is entitled to the issuance of building permits for Phase One residential units upon filing of proper applications and payment of the requisite fees therefor and for the balance of the phases as well, upon filing of an application conforming to the Approved Plans.

## COUNT ELEVEN

### Breach of Contract

### (Against the Town)

529.     Plaintiff repeats and realleges all of the allegations set forth above of the Complaint with equal force and effect as if set forth at length and verbatim herein.

530.     In 2010, Plaintiff's predecessor-in-interest and the Town entered into the Settlement Agreement to permanently conclude, *inter alia*, the Town's prior 24 *years* of delay and obstruction of development of The Greens.

531.     Plaintiff is the holder of all right, title, interest, and benefits accruing to Plaintiff's predecessor under the Settlement Agreement.

532.     In recognizing that its purpose was to ensure the expeditious development of The Greens without any further delay or obstruction from the Town, paragraph 1 of the Settlement Agreement provided that:

> The Town of Chester Planning Board shall, ***within 90 days*** of the submission of a final subdivision plat in accordance with the filing requirements of the Town of Chester Code (but without the payment of further fees other than escrow monies to cover the Planning Board consultants' review of such submission), ***grant final subdivision and site plan approval to the Greens at Chester project as a cluster subdivision project for 431 units***, in accordance with the preliminary subdivision and site plan approval for the project granted by the Planning Board in 1998, ***modified in accordance with the 28 revised plan sheets annexed hereto, with the last revision dates of June 1, 2010***.

(Emphasis added.)

533.     The Settlement Agreement further provided in paragraph 2 that:

> ***The Town of Chester Town Board hereby agrees to guarantee municipal sewer capacity for the entire 431-unit subdivision and site plan project.***  No further fees or contributions shall be required of Arlington Chester, LLC or the Greens at Chester project to access or receive such guarantee, other than the Town of Chester standard hook-up fee and any such ordinary and customary fees owed by virtue of membership in the particular sewer district. The Town of Chester Town Board agrees to cooperate and provide to the Orange County Department of Health, within 90 days of a request from Arlington Chester, LLC, whatever documentation is necessary to evidence such sewer capacity guarantee for the entire Greens at Chester project in accordance with this Settlement Agreement, so as to satisfy the requirements of the Orange County Department of Health in this regard relative to its Realty Subdivision approval of the project.

(Emphasis added.)

534.     In addition, the Settlement Agreement provided at page 3 that the submission of the final subdivision plat shall be:

in such phasing or sections as from time to time may be proposed by Arlington Chester, LLC, **consistent with State Law and applicable provisions of the Town of Chester Code**.

(Emphasis added.)

535.    The Settlement Agreement added in paragraph 1 on page 3, as follows:

The Town Board may **not rezone, or enact, additional regulations** affecting the property containing the Greens at Chester project, **unless the Greens at Chester project is exempted from the effects of such rezoning and/or additional regulations**.

 (Emphasis added.)

536.    As aforementioned, the Settlement Agreement incorporated by reference the Approved Plans.

537.    The Settlement Agreement mandated good faith cooperation by the Town with development of The Project and expressly stated in paragraph 9 that:

The parties hereby agree to execute all documents and to do all things necessary to fully effectuate the terms of this Settlement Agreement.

538.    As aforesaid, the Town Planning Board unanimously granted Final Approval for The Greens and on or about July 7, 2014, after receipt of **all** necessary approvals and signatures from, *inter alia*, the Town, County and State, the Final Plat for The Greens was duly filed in the Orange County Clerk's Office.

539.    Neither the Final Approval, Settlement Agreement nor the Approved Plans contained any condition that restricted the permitted square footage of housing units at The Project to a size lower than as prescribed by the Bulk Table, and the Town was at all relevant times well aware of this material fact.

540.    Neither the Final Approval, Settlement Agreement nor Approved Plans contained or referenced the Purported Infrastructure Condition.

541. The Planning Board did not require Plaintiff's predecessor-in-interest to (a) place any note on the Final Plat referencing the Purported Infrastructure Condition or (b) record a declaration in the County Clerk's Office notifying the public of the purported applicability of the Purported Infrastructure Condition to The Greens.

542. Plaintiff has performed all its obligations under the Settlement Agreement.

543. As explained in detail hereinabove, by the Discriminatory Acts, including the Building Permit Denials, the Town has breached—and continues to breach—its plain and unambiguous obligations under the Settlement Agreement, including its obligation "to do all things necessary to fully effectuate the terms of this Settlement Agreement" and its obligations under, *inter alia*, paragraphs 1 and 5 thereof.

544. Because of the Town's breach of multiple provisions of the Settlement Agreement, including by the Building Permit Denials and its other Discriminatory Acts, Plaintiff has incurred and will continue to incur substantial damages including compensatory and consequential damages, plus interest, costs, expenses, expert fees and attorneys' fees.

545. Plaintiff's compensatory damages include, *inter alia*, millions of dollars in borrowing costs (equity and debt) over and above the ordinary and necessary costs incurred as a result of the Town's breach, delay damages, residual loss of the Property value, increased carrying costs arising from a prolonged period of development caused by the breach, excessive Town charges, substantially reduced profits, increased soft costs and hard costs attributable to the Discriminatory Acts and special requests and all the other conduct constituting the Town's breach, professional fees incurred solely by reason of the Town's breaches together with interest, including attorneys' fees, engineering fees, architectural fees and costs and disbursements, all for a total of at least $80 million.

4178131.v1

546.     Plaintiff is also entitled to an Order vacating and declaring null and void the

Building Permit Denials, directing the Town and its agents, employees, and representatives to

grant in the ordinary course building permit applications for any phase of the Greens submitted

by Plaintiff which are complete, accompanied by all required fees, and conform to the Approved

Plans, and prohibiting and enjoining the Town and its agents, representatives, and employees

from denying any such building permit application on the grounds of the Purported Infrastructure

Condition, Chapter 59, Article I of the Town Code, the F.A.R. Law, any alleged size limitation

not included in the Bulk Table within the Approved Plans, or any other reason.

**COUNT TWELVE**

**<u>Breach of the Implied Covenant of Good Faith and Fair Dealing</u>**

**(Against the Town)**

547.     Plaintiff repeats and realleges all of the allegations set forth above of the

Complaint with equal force and effect as if set forth at length and verbatim herein.

548.     Under the Settlement Agreement, the Town assumed the obligations of good faith

and fair dealing in connection with its dealings with Plaintiff and The Greens.

549.     Plaintiff has, to date, invested millions of dollars on The Greens in reliance upon

the Town's obligations of good faith and fair dealing under the Settlement Agreement.

550.     Plaintiff was entitled to rely upon the Town's obligation of good faith and fair

dealing under the Settlement Agreement.

551.     Since the first moment that Plaintiff began its dealings with the Town

commencing with the meetings of November 2017 and on an ongoing and continuous basis, the

Town has breached its obligations of good faith and fair dealing.

4178131.v1

552.    The Town's trying "every day" to prevent construction of houses at The Greens was a flagrant and willful breach of the Town's covenant of good faith and fair dealing.

553.    The Town's pressuring of Plaintiff to pursue commercial development was a breach of the covenant of good faith and fair dealing.

554.    Jamieson's public pledge as Town Supervisor at the April 25, 2018 Meeting to fight Plaintiff (and The Greens) was a breach of the Settlement Agreement covenant of good faith and fair dealing.

555.    The Town's attempt to impose the F.A.R. Law upon The Greens was a breach of the Settlement Agreement covenant of good faith and fair dealing.

556.    The Town's "special requests" which inflicted extensive delay and much higher project costs upon Plaintiff were breaches of the covenant of good faith and fair dealing.

557.    Valentine's invitation as Town Supervisor to Town residents to "come up with a plan to stop it," referring to The Greens, was a breach of the covenant of good faith and fair dealing.

558.    The Town's multiple attempts to impose a size restriction on homes at The Greens beyond that contained in the Bulk Table breached the Town's covenant of good faith and fair dealing.

559.    The 2018 Building Permit Denial was a breach of the covenant of good faith and fair dealing because it was a pre-determined decision to deny premised upon contrived grounds.

560.    The Town's invocation of the Purported Infrastructure Condition was a breach of the covenant of good faith and fair dealing.

561.    The Town's due process, equal protection and fair housing violations herein breached the covenant of good faith and fair dealing of the Settlement Agreement.

562.     The Town's actions under color of law in violation of Section 1983 of the Civil Rights Act pursuant to the Town's policy to stop The Greens and keep Hasidic Jews out from housing at The Greens breached the Settlement Agreement covenant of good faith and fair dealing.

563.     In and by the Town's continuous and ongoing efforts to prevent The Greens from proceeding, including, *inter alia*, by virtue of the Discriminatory Acts and the Building Permit Denials, the Town has breached this implied covenant of good faith and fair dealing.

564.     The Discriminatory Acts, including the Building Permit Denials, have denied Plaintiff the fruits of the Settlement Agreement.

565.     The Town's *de facto* condemnation of the Property breached the covenant of good faith and fair dealing of the Settlement Agreement.

566.     As a direct and proximate result of the Town's breach of the implied covenant of good faith and fair dealing, Plaintiff has incurred and will continue to incur substantial damages including compensatory and consequential damages, plus interest, costs, expenses, expert fees and attorneys' fees.

567.     Plaintiff's compensatory damages include, *inter alia*, millions of dollars in borrowing costs (equity and debt) over and above the ordinary and necessary costs incurred as a result of the Town's breach, delay damages, residual loss of the Property value, increased carrying costs arising from a prolonged period of development caused by the breach, excessive Town charges, substantially reduced profits, increased soft costs and hard costs attributable to the Discriminatory Acts and special requests and all the other conduct constituting the Town's breach, professional fees incurred solely by reason of the Town's breaches together with interest,

4178131.v1

including attorneys' fees, engineering fees, architectural fees and costs and disbursements, in a total sum of not less than $80 million.

568.    Plaintiff is also entitled to an Order vacating and declaring null and void the Building Permit Denials, directing the Town and its agents, employees, and representatives to grant in the ordinary course building permit applications for any phase of The Greens submitted by Plaintiff which are complete, accompanied by all required fees, and conform to the Approved Plans, and prohibiting and enjoining the Town and its agents, representatives, and employees from denying any such building permit application on the grounds of the Purported Infrastructure Condition, Chapter 59 of the Town Code, the F.A.R. Law, any alleged size limitation not included in the Bulk Table within the Approved Plans, or any other reason.

**WHEREFORE**, Plaintiff **GREENS AT CHESTER LLC** respectfully asks for:

1.    On Plaintiff's First Count, (A) an Order (i) vacating and declaring null and void the Building Permit Denials, (ii) directing the Town and its agents, employees, and representatives to grant in the ordinary course building permit applications for any phase of The Greens submitted by Plaintiff which are complete, accompanied by all required fees, and conform to the Approved Plans, and (iii) prohibiting the Town and its agents, employees, and representatives from denying any such building permit application for any phase of The Greens on the grounds of the Purported Infrastructure Condition, Chapter 59, Article I of the Town Code, the F.A.R. Law, any alleged size limitation not included in the Bulk Table within the Approved Plans, or any other reason, and (B) an award to Plaintiff of compensatory damages against the Town and Farr, jointly and severally, in the amount of not less than Eighty Million ($80,000,000.00) Dollars, together with interest, together with Plaintiff's attorney's fees and costs incurred in the prosecution of this action under the provisions of 42 U.S.C. § 1988(b);

4178131.v1

2.      On Plaintiff's Second Count, (A) an Order (i) vacating and declaring null and void the Building Permit Denials, (ii) directing the Town and its agents, employees, and representatives to grant in the ordinary course building permit applications for any phase of The Greens submitted by Plaintiff which are complete, accompanied by all required fees, and conform to the Approved Plans, and (iii) prohibiting the Town and its agents, employees, and representatives from denying any such building permit application for any phase of The Greens on the grounds of the Purported Infrastructure Condition, Chapter 59, Article I of the Town Code, the F.A.R. Law, any alleged size limitation not included in the Bulk Table within the Approved Plans, or any other reason, and (B) an award to Plaintiff of compensatory damages against Defendants, jointly and severally, in the amount of not less than Eighty Million ($80,000,000.00) Dollars, together with interest, together with Plaintiff's attorney's fees and costs incurred in the prosecution of this action under the provisions of 42 U.S.C. § 1988(b);

3.      On Plaintiff's Third Count, a permanent injunction (A) barring Defendants, individually and collectively, from taking any further steps to preclude development of The Greens as approved in the Settlement Agreement, Final Approval, and Approved Plans, and ordering that Defendants cease and desist from all the Discriminatory Acts or any further acts of discrimination aimed at delaying or preventing development of The Greens and exclusion therefrom of Hasidic Jews, and (B) enjoining the Town and its agents, representatives, and employees from denying any of Plaintiff's building permit applications for any phase of The Greens that comply with the Final Approval and Approved Plans and denying any such building permit application on the grounds of the Purported Infrastructure Condition, Chapter 59, Article I of the Town Code, the F.A.R. Law, any alleged size limitation not included in the Bulk Table within the Approved Plans, or any other reason;

4.     On Plaintiff's Fourth Count, (A) an Order (i) vacating and declaring null and void the Building Permit Denials, (ii) directing the Town and its agents, employees, and representatives to grant in the ordinary course building permit applications submitted by Plaintiff for any phase of The Greens which are complete, accompanied by all required fees, and conform to the Approved Plans, and (iii) prohibiting the Town and its agents, representatives, and employees from denying any such building permit application for any phase of The Greens on the grounds of the Purported Infrastructure Condition, Chapter 59, Article I of the Town Code, the F.A.R. Law, any alleged size limitation not included in the Bulk Table within the Approved Plans, or any other reason; and (B) an award to Plaintiff of compensatory damages against Defendants, jointly and severally, in the amount of not less than Eighty Million ($80,000,000.00) Dollars, together with interest, together with Plaintiff's attorney's fees and costs incurred in the prosecution of this action under the provisions of 42 U.S.C. § 1988(b);

5.     On Plaintiff's Fifth Count, (A) an Order (i) vacating and declaring null and void the Building Permit Denials, (ii) directing the Town and its agents, employees, and representatives to grant in the ordinary course building permit applications for any phase of The Greens submitted by Plaintiff which are complete, accompanied by all required fees, and conform to the Approved Plans, and (iii) prohibiting the Town and its agents, representatives, and employees from denying any such building permit application for any phase of The Greens on the grounds of the Purported Infrastructure Condition, Chapter 59, Article I of the Town Code, the F.A.R. Law, any alleged size limitation not included in the Bulk Table within the Approved Plans, or any other reason; and (B) an award to Plaintiff of compensatory damages against Defendants, jointly and severally, in the amount of not less than Eighty Million

4178131.v1

($80,000,000.00) Dollars, together with interest, together with Plaintiff's attorney's fees and costs incurred in the prosecution of this action under the provisions of 42 U.S.C. § 1988(b);

6.      On Plaintiff's Sixth Count, (A) an award to Plaintiff of compensatory damages against Defendants, jointly and severally, in the amount of not less than Eighty Million ($80,000,000.00) Dollars, together with interest, together with Plaintiff's attorney's fees; or, alternatively, (B) an Order (i) enjoining Defendants from engaging in any of the Discriminatory Acts or any other act of discrimination aimed at or that has the effect of defeating development of The Greens; and (ii) vacating and declaring null and void the Building Permit Denials and directing the Town and its agents, employees, and representatives to grant in the ordinary course building permit applications for any phase of The Greens submitted by Plaintiff which are complete, accompanied by all required fees, and conform to the Approved Plans, and prohibiting and enjoining the Town and its agents, representatives, and employees from denying any such building permit application for any phase of The Greens on the grounds of the Purported Infrastructure Condition, Chapter 59, Article I of the Town Code, the F.A.R. Law, any alleged size limitation not included in the Bulk Table within the Approved Plans, or any other reason;

7.      On Plaintiff's Seventh Count, (A) an award to Plaintiff of compensatory damages against Defendants, jointly and severally, in the amount of not less than Eighty Million ($80,000,000.00) Dollars, together with interest, together with Plaintiff's attorney's fees; or, alternatively, (B) an Order (i) enjoining Defendants from engaging in any of the Discriminatory Acts or any other act of discrimination aimed at or that has the effect of defeating development of The Greens; and (ii) vacating and declaring null and void the Building Permit Denials and directing the Town and its agents, employees, and representatives to grant in the ordinary course building permit applications for any phase of The Greens submitted by Plaintiff which are

4178131.v1

complete, accompanied by all required fees, and conform to the Approved Plans, and prohibiting and enjoining the Town and its agents, representatives, and employees from denying any such building permit application for any phase of The Greens on the grounds of the Purported Infrastructure Condition, Chapter 59, Article I of the Town Code, the F.A.R. Law, any alleged size limitation not included in the Bulk Table within the Approved Plans, or any other reason;

8.      On Plaintiff's Eighth Count, awarding to Plaintiff damages against the Town Defendants as just compensation for the taking of Plaintiff's Property, together with interest at the lawful rate from the date of the taking of Plaintiff's Property;

9.      On Plaintiff's Ninth Count, a declaratory judgment decreeing and declaring that: (A) the Purported Infrastructure Condition and any requirement, whether under Chapter 59, Article I of the Town Code or otherwise, that Plaintiff complete all public improvements for all phases of The Greens prior to the issuance of any building permit for a Phase One residential unit or a residential unit for any other phase of The Greens are superseded by the Settlement Agreement, Final Approval, Approved Plans, and Final Plat, and hence are inapplicable to the Property or The Greens; (B) Town Code Sections 59-1 to 59-4 (Chapter 59, Article I) are in derogation of and preempted by Town Law Section 277 and, therefore, null and void; (C) the Renewal Security is sufficient for purposes of satisfying the requirements of Town Law Section 277 and the first condition of the Final Approval; (D) Plaintiff is not required to complete all public improvements for all phases of The Greens prior to the issuance of Phase One building permits or issuance of building permits for a residential unit for any other phase of The Greens on the basis of the Purported Infrastructure Condition, Chapter 59, Article I of the Town Code, or otherwise; and (E) upon filing a building permit application for a Phase One residential unit or any other unit within any phase of The Greens that conforms to the Final Approval and

Approved Plans, the Town by its building inspector or any other appropriate agent, employee, or representative shall issue a building permit for such unit; or, alternatively, if the Court finds that the Purported Infrastructure Condition applies to The Greens or that Sections 59-1 to 59-4 of the Town Code are valid and not preempted by Town Law 277, or both, that (F) Plaintiff is required to complete only the Phase One public improvements prior to issuance of building permits for Phase One residential units, and upon completion of such public improvements and filing of building permit applications that conform with the Final Approval and Approved Plans, the Town, by its building inspector or other appropriate agent, employee, or representative, shall issue to Plaintiff building permits for any Phase One residential unit, with the same procedure applying for every other phase of The Greens, *i.e.*, that Plaintiff must complete only the public infrastructure for the particular phase for which it is seeking building permits prior to issuance of such building permits upon filing of compliant building permit applications;

10.     On Plaintiff's Tenth Count, a declaratory judgment decreeing and declaring that: (a) the Building Inspector had no legal or factual basis or authority to deny Plaintiff's Building Permit Applications on the basis of the Purported Infrastructure Condition; (b) Plaintiff is not required to complete all public improvements for all phases of The Greens prior to the issuance of a building permit for a Phase One residential unit or for a building permit for any other phase of The Greens; (c) the Renewal Security is sufficient for purposes of satisfying the requirements of Town Law Section 277 and the Final Approval; (d) the Town and its building department may not deny any building permit application for any phase of The Greens filed by Plaintiff on the basis of the Purported Infrastructure Condition; and (e) under the first condition in the Final Approval Plaintiff is entitled to the issuance of building permits for Phase One residential units

upon filing of proper applications and payment of the requisite fees therefor and for the balance

of the phases as well, upon filing of an application conforming to the Approved Plans;

11.    On Plaintiff's Eleventh Count, (A) an award to Plaintiff of compensatory damages

against the Town in the amount of no less than $80,000,000.00, together with interest and

reasonable attorney's fees; and (B) an Order vacating and declaring null and void the Building

Permit Denials, directing the Town and its agents, employees, and representatives to grant in the

ordinary course building permit applications for any phase of The Greens submitted by Plaintiff

which are complete, accompanied by all required fees, and conform to the Approved Plans, and

prohibiting and enjoining the Town and its agents, representatives, and employees from denying

any such building permit application for any phase of The Greens on the grounds of the

Purported Infrastructure Condition, Chapter 59, Article I of the Town Code, the F.A.R. Law, any

alleged size limitation not included in the Bulk Table within the Approved Plans, or any other

reason;

12.    On Plaintiff's Twelfth Count, (A) an award to Plaintiff of compensatory damages

against the Town in the amount of no less than $80,000,000.00, together with interest and

reasonable attorney's fees; and (B) an Order vacating and declaring null and void the Building

Permit Denials, directing the Town and its agents, employees, and representatives to grant in the

ordinary course building permit applications for any phase of The Greens submitted by Plaintiff

which are complete, accompanied by all required fees, and conform to the Approved Plans, and

prohibiting and enjoining the Town and its agents, representatives, and employees from denying

any such building permit application for any phase of The Greens on the grounds of the

Purported Infrastructure Condition, Chapter 59, Article I of the Town Code, the F.A.R. Law, any

4178131.v1

alleged size limitation not included in the Bulk Table within the Approved Plans, or any other reason;

13.     On Plaintiff's First, Second, Fourth, and Fifth Counts, an award to Plaintiff of punitive damages as against Farr, Neuhaus and Valentine, as is applicable, in the total sum of $20 million; and

14.     On all Counts, such other, further and different relief as to the Court may seem just and proper.

Dated:   White Plains, New York
        July 19, 2019

**CUDDY & FEDER LLP**
*Attorneys for Plaintiff*
*Greens at Chester LLC*
445 Hamilton Avenue - 14th Floor
White Plains, New York 10601
(Tel.) (914) 761-1300

By: */s/ Joshua Grauer*
     Joshua J. Grauer (4594)
     Jordan Brooks (0614)

4178131.v1