# EXHIBIT 21

Exhibit 21

TOWN OF CHESTER: COUNTY OF ORANGE
STATE OF NEW YORK
-----------------------------------------------------------------X

GREENS AT CHESTER LLC,

                                            Claimant,

                    -against-

TOWN OF CHESTER,

                                            Respondent.
-----------------------------------------------------------------X

NOTICE OF CLAIM

RECEIVED
*Elizabeth Zappala*
APR 30 2019
3:34 pm
TOWN CLERK
CHESTER, NEW YORK

TO:    Town Clerk of the Town of Chester
       1786 Kings Highway
       Chester, New York 10918

PLEASE TAKE NOTICE, that GREENS AT CHESTER LLC ("Greens") hereby gives

notice of its intent to bring suit against the Town of Chester (the "Town") for declaratory,

injunctive, and monetary relief arising from, *inter alia*, the Town's breach of its contractual

obligations as set forth under that certain Settlement Agreement, effective June 18, 2010 (the

"Settlement Agreement"), entered into by and among Greens' predecessor, Arlington Chester,

LLC, the Town, Stefan Neuhaus, H. Jerry Murray, Alexander Jamieson, Cynthia Smith, and Town

of Chester Planning Board in settlement of the action styled *Arlington Chester, LLC v. Town of*

*Chester et al.*, United States District Court, Southern District of New York, Docket No. 09 CIV

4110 (CS) (the "Prior Action") and the Town's breach of the covenant of good faith and fair

dealing under the Settlement Agreement.

       1.      Greens is a limited liability company organized and existing under and pursuant to

the laws of the State of New York, having a Post Office address of 65 Steuben Street, Brooklyn,

New York 11205.

4071743.v7

2.      The name and Post Office address of Greens' attorneys are Cuddy & Feder LLP, 445 Hamilton Avenue, 14th Floor, White Plains, New York 10601, Attention: Joshua J. Grauer, Esq., (914) 761-1300.

3.      The Town is a municipal corporation having offices at 1786 Kings Highway, Chester, New York 10918.

## BACKGROUND

4.      The Greens' claim arises from the Town's failure to comply with its contractual obligations with respect to the Greens' development of a fully-approved 431-unit residential cluster subdivision (the "Project") on an approximately 117.7 acre parcel of real property of which approximately 113.4 acres are situated in the Town (the "Property").

5.      In 2009, after incurring 24 years of delay and obstruction by the Town of the Project, Greens' predecessor ("Arlington") commenced the Prior Action.

6.      In 2010, Arlington and the Town entered into the Settlement Agreement to permanently conclude, *inter alia*, the Town's delay and obstruction of the Project pursuant to the terms of the Settlement Agreement. A copy of the Settlement Agreement is annexed hereto as Exhibit "1".

7.      Greens, as successor-in-interest to Arlington, is the holder of all right, title, interest, and benefits accruing to the Property owner under the Settlement Agreement.

8.      In recognizing that its purpose was to ensure the expeditious development of the Project without any further delay or obstruction from the Town, paragraph 1 of the Settlement Agreement provided in the first paragraph that:

> "The Town of Chester Planning Board shall, within 90 days of the submission of a final subdivision plat in accordance with the filing requirements of the Town of Chester Code (but without the payment of further fees other than escrow monies to cover the

2

4071743.v7

Planning Board consultants' review of such submission), grant
final subdivision and site plan approval to the Greens at Chester
project as a cluster subdivision project for 431 units, in accordance
with the preliminary subdivision and site plan approval for the
project granted by the Planning Board in 1998, modified in
accordance with the 28 revised plan sheets annexed hereto, with
the last revision dates of June 1, 2010."

9.    The Settlement Agreement further provided in paragraph 2 that:

"The Town of Chester Town Board hereby agrees to guarantee
municipal sewer capacity for the entire 431-unit subdivision and
site plan project. No further fees or contributions shall be required
of Arlington Chester, LLC or the Greens at Chester project to
access or receive such guarantee, other than the Town of Chester
standard hook-up fee and any such ordinary and customary fees
owed by virtue of membership in the particular sewer district.

The Town of Chester Town Board agrees to cooperate and provide
to the Orange County Department of Health, within 90 days of a
request from Arlington Chester, LLC, whatever documentation is
necessary to evidence such sewer capacity guarantee for the entire
Greens at Chester project in accordance with this Settlement
Agreement, so as to satisfy the requirements of the Orange County
Department of Health in this regard relative to its Realty
Subdivision approval of the project."

10.    In addition, the Settlement Agreement provided at page 3 that the submission of

the final subdivision plat shall be:

"in such phasing or sections as from time to time may be proposed
by Arlington Chester, LLC, **consistent with State Law and
applicable provisions of the Town of Chester Code.**"

(Emphasis added.)

11.    The Settlement Agreement further provided in paragraph 1 on page 3, as follows:

"The Town Board may **not rezone, or enact, additional
regulations** affecting the property containing the Greens at Chester
project, **unless the Greens at Chester project is exempted from
the effects of such rezoning and/or additional regulations.**"

*Id.* (Emphasis added.)

3

4071743.v7

12.    As aforementioned, the Settlement Agreement incorporated by reference 28 revised plan sheets annexed thereto, having last revision dates of June 1, 2010 (hereinbefore and hereinafter called the "Approved Plans").

13.    The Settlement Agreement mandated good faith cooperation by the Town with development of the Project and expressly stated in paragraph 9 that:

> "The parties hereby agree to execute all documents and to do all things necessary to fully effectuate the terms of this Settlement Agreement."

### THE FINAL APPROVAL AND THE FINAL FILED PLAT

14.    As required by the Settlement Agreement, in and by the Town Planning Board's "Resolution of Approval Final Subdivision and Site Plan" dated November 6, 2013 ("Final Approval"), the Town Planning Board unanimously granted Final Subdivision and Site Plan Approval for the Project. A copy of the Final Approval is marked Exhibit "2".

15.    The Final Approval contained several conditions including conditions precedent to the signing and filing of the Final Subdivision Plat and Site Plan ("Final Plat").

16.    By July 2014, the Town determined that all Final Approval conditions precedent to Final Plat signing by the Planning Board Chairman, and to Final Plat filing had been duly satisfied.

17.    On or about July 7, 2014, after receipt of all necessary approvals and signatures from, *inter alia*, the Town, County and State, the Final Plat for the Project was duly filed in the Orange County Clerk's Office.

18.    One of the conditions to execution of the Final Plat was that the developer bond the public improvements for the Project.

4

19.     Accordingly, prior to the Planning Board Chairman's execution of the Final Plat, Arlington duly bonded all public improvements in the amount fixed by the Town, fully satisfying that requirement of the Final Approval.

20.     The Town Planning Board duly recognized in the Final Approval that the Project was consistent with the Town's Master Plan and in the public interest.

21.     Consequently, the Town Planning Board held in the Final Approval as follows:

> **The Planning Board has determined that approval of this subdivision will substantially serve the public convenience, safety and welfare in that the land to be improved is of such character that it can be used safely for building purposes without danger to health or peril from fire, flood or other menace. Further, the subdivision is appropriate and consistent with the requirements of the Master Plan,** the official map of the Town, Chapter 83 of the Town of Chester Municipal Code and applicable zoning regulations, subject to compliance in full, with conditions hereinafter imposed. **Moreover, this approval is mandated by the United States District Court for the Southern District of New York pursuant to the aforementioned Settlement Agreement.**

(Emphasis added.)

22.     The Final Approval did not contain any condition which limited or "capped" the permitted square footage of housing units at the Project.

23.     The Approved Plans did not contain any condition which limited or "capped" the permitted square footage of housing units at the Project.

24.     Neither the Settlement Agreement, Final Approval or Approved Plans contained any condition which delayed issuance of building permits for housing units in the five-phase Project until after all Project infrastructure for all five phases of the Project were first completed.

25.     The Settlement Agreement did not provide for either of the items above referenced in paragraphs 23 or 24 to be made covenants applicable to the Project or to any

4071743.v7

housing units to be constructed at the Project despite the agreement of the parties to one specific covenant in paragraph 4 of the Settlement Agreement.

## THE TOWN'S BREACH OF THE SETTLEMENT AGREEMENT

26.     On or about April 6, 2018, Greens filed informal plans with the Town for two building permits.

27.     On April 6, 2018, the Building Inspector provided minor plan comments to Greens, copies of which are marked Exhibit 3 (collectively the "April 6 Comments").

28.     Conspicuous by its absence, the April 6 Comments did *not* reference any alleged special restriction of square footage or size of homes at the Project.

29.     So too, the April 6 Comments did *not* indicate that construction of these model homes would have to await completion of all infrastructure for all five phases of the Project.

30.     Greens made all the ministerial plan revisions required by the April 6 Comments.

31.     On November 20, 2018, Greens applied for a routine building permit to construct a Phase One model home.

32.     By letter dated November 30, 2018 (the "Denial Letter"), acting as agent for the Town, the Town's Building Inspector denied Greens' building permit application. A copy of the Denial Letter is annexed hereto as Exhibit 4.

33.     In the Denial Letter, the Building Inspector held that:

> The project was approved per a Settlement Agreement dated June 10 *[sic]*, 2010, with respect to this matter, **dictated that all final subdivision and site plan approval was to be made in accordance with** the preliminary subdivision and site plan approval **Statement of Findings. The Statement of Findings** has many requirements. Two of the requirements noted below have not been satisfied.

(Emphasis added.)

6

4071743.v7

34. The Building Inspector misquoted and misrepresented the actual terms of the Settlement Agreement in the Denial Letter.

35. Contrary to the Building Inspector's egregious misrepresentation, the Settlement Agreement does *not* reference the "Statement of Findings" or "Findings" in a single provision, paragraph or sentence.

36. The words "Statement of Findings" or even the word "Findings" cannot be found within and does not exist in the four corners of the Settlement Agreement.

37. The Settlement Agreement actually provides that the Town must "grant final subdivision and site plan approval to the Greens at Chester Project as a Chester subdivision approval project for 431 units, in accordance with the preliminary subdivision and site plan approval for the project granted by the Planning Board in 1998 **modified in accordance with the 28 revised plan sheets annexed hereto, with the last revision dates of June 1, 2010.**" (Emphasis added.)

### ALTHOUGH NOT A PART OF THE SETTLEMENT AGREEMENT, THE FINDINGS DID NOT IMPOSE A "CAP" ON SQUARE FOOTAGE

38. In the Denial Letter, the Town asserted that the application and plans did not conform with the Project Findings in two respects.

39. First, the Denial Letter claimed that the application and plans did not conform to the Findings because, according to the Town, the Findings "limited" the size of one-unit dwellings at the Property to 1,700 – 2,500 square feet in a two-story structure and "limited" the size of two-unit dwellings to 1,500 – 2,300 square feet in a two-story structure.

40. Specifically, the Building Inspector, on behalf of the Town, also misrepresented the actual language of the Findings by quoting that the Findings provided that:

7

4071743.v7

> (i) one unit dwellings *shall be limited* to 1,700 – 2,500 square feet in a two-story structure and (ii) two-unit dwellings *shall be limited* to 1,500 – 2,300 square feet in a two-story structure.

(Emphasis added.)

41.    In fact and in truth, the actual language used in one portion of the Findings reads as follows:

> The *typical* lot size depicted for the one-unit dwellings is 3,600 square feet with a building floor area of 1,700 to 2,500 square feet in a two story structure. The two-unit dwellings will each be located on lots of approximately 1,750 square feet and will have a typical building square footage of between 1,500 and 2,300 square feet in a two-story structure.

42.    Nowhere do the words *"shall be limited,"* as falsely quoted and created by the Building Inspector to support a pre-determined Denial Letter, appear in the Findings.

43.    Neither the Settlement Agreement, Final Approval, Final Plat, nor 28 sheets of Approved Plans annexed to the Settlement Agreement contains any restriction or limitation on the permitted amount of square footage of any housing unit conforming to the Approved Plans.

44.    To the precise contrary, the Final Plat and Approved Plans contain the Bulk Table approved by the Town for the development of all 431 homes at the Project.

45.    Thus, according to the Approved Plans, the permitted square footage of each housing unit is derived from every conforming building envelope and the ministerial mathematical calculation of each housing unit's square footage.

46.    The absence of any square footage limitation beyond that established by conforming building envelopes pursuant to the Bulk Table is corroborated by the Town's engineer as of 1998, when the Findings were adopted. ("Based upon my personal involvement in the review and approval of the project, as well as review of the Resolution, I can definitively

8

4071743.v7

state that no such restriction was enacted, nor was it intended.") See written confirmation of Mr. Salerno marked Exhibit 5.

47.     In addition, the public hearing minutes applicable to the Planning Board's review of this portion of the Findings Project Description confirmed that the term "typical" and figures referenced for housing units were minimums -- the opposite of any limitation.  See public hearing transcript at page 41 marked Exhibit 6.

48.     On November 30, 2018, the Town, by the Town's Building Inspector, altered the language of the Findings in and by the Denial Letter and then unlawfully extended the limits of their legal reach to impose a non-existent and new regulatory requirement on the Project, all in violation of the Settlement Agreement.

49.     The Town's breach of the Settlement Agreement was willful and motivated by discriminatory animus, with the latter misconduct well documented (See local newspaper editorial and articles collectively marked Exhibit 7).

50.     At the time of the Denial Letter the Town was well aware that its reliance upon a purported square footage limitation or "cap" was a product of bad faith and frivolous.  In fact, the then Deputy Town Supervisor Robert Valentine had previously admitted in the presence of the Town Engineer, Town Attorney, Town Board and Town residents at the Town Board meeting of February 28, 2018, that:

> If there is any way, like...legally...choose who would live there or pick who could live there or what size house they could do...we would love to do that...But we can't do [that] (February 28, 2018 Town Board meeting at approximately 37:27).

4071743.v7

## THE SETTLEMENT AGREEMENT, THE FINAL APPROVAL, FINAL PLAT AND APPROVED PLANS DO NOT REQUIRE COMPLETION OF ALL PROJECT INFRASTRUCTURE BEFORE BUILDING PERMIT ISSUANCE FOR PHASE ONE HOUSING UNITS

51.     The Denial Letter further alleged, based on another distortion of the Final

Approval, that no building permit could or would <u>ever</u> issue until all public improvements for all

<u>five</u> phases of the Project were first constructed and accepted by the Town.

52.     According to the Denial Letter, Greens would have to complete every last inch of

public improvements for all five phases of the Project before the first building permit could ever

be issued.

53.     The Town's contention in the Denial Letter is belied by the authorization

contained in the Final Approval, Final Plat, Settlement Agreement and Approved Plans to, *inter*

*alia, undertake phased construction* and constitutes another material breach of the Settlement

Agreement.

54.     Following execution of the Settlement Agreement, the Final Resolution and the

Final Plat was signed and filed in 2014 without any note or condition requiring the prior

completion of all the public improvements for all five phases prior to issuance of building

permits for the first phase.

55.     Here, Arlington posted a bond for all public improvements, which allowed for the

signing and filing of the Final Plat.

56.     The Town's signing of the Final Plat, Settlement Agreement terms, State Law and

the Zoning Ordinance all  belie the Town's assertion in the Denial Letter that Greens must

construct all public improvements for all phases – let alone a single phase – prior to issuance of a

single building permit.

4071743.v7

57.     The Zoning Code's cluster subdivision provisions allow developers, such as Greens, to phase construction, requiring only that "the parking and open space requirements shall be complete as to the particular phase being implemented prior to issuance of building permits for the next succeeding phase." Zoning Code § 98-20.1(B)(8).

58.     Neither State Law nor the Zoning Code provisions (nor the Settlement Agreement, Final Approval or Approved Plans) require the completion of all public infrastructure in every phase of this five phase development before issuance of building permits for merely the first phase housing units.

59.     Greens has fully performed under the Settlement Agreement

60.     The Town's November 30, 2018 wrongful denial of a building permit violates multiple provisions of the Settlement Agreement, including paragraphs 1, 5, and 9 thereof.

61.     The Town's wrongful denial of building permits on November 30, 2018 breaches the covenant of good faith and fair dealing contained in every contract e.g. the Settlement Agreement.

62.     Specifically, every contract implies a promise that neither party will do anything that has the effect of destroying or injuring the right of the other party to receive the fruits the agreement.

63.     Here, by wrongfully and unlawfully denying Greens' application for a building permit for a Phase One model home, the Town has, in bad faith, taken action to destroy the Green's right to receive the fruits of the Settlement Agreement; to wit: the timely, normal and routine development of the Project, including by the issuance of routine, ministerial permits such as building permits, without obstruction, interference and delay from the Town.

4071743.v7

64.     Because of the Town's breach of multiple provisions of the Settlement Agreement via the November 30, 2018 Denial Letter, Greens has incurred and will continue to incur substantial damages including compensatory and consequential damages, plus interest, costs, expenses, expert fees and attorneys' fees.

65.     Greens' compensatory damages include, *inter alia*, devaluation of the Property, reduced profits, and increased carrying costs.

66.     Greens is also entitled to declaratory and injunctive relief to the effect that (a) Greens is entitled <u>now</u> to building permits for model homes for Phase One and to building permits for all Phase One housing units conforming to the Approved Plans; (b) the Town has acted wrongfully and illegally in denying building permits for model homes and housing units for Phase One; and (c) by way of a mandatory permanent injunction that the Town is required to grant Greens' conforming applications for building permits for model homes for Phase One unconditionally without further delay and in the ordinary course for all Phase One housing units applications conforming to the Approved Plans, upon payment of customary permitting fees.

67.     The time of the happening of the actions on the part of the Town upon which the damages were sustained by Greens and the time when this claim commenced is on or about November 30, 2018 when on behalf of the Town James M. Farr, P.E., in his capacity as Town Building Inspector for the Town, sent the Denial Letter to Jehuda Landau, Managing Member of Greens, denying Greens' application for a building permit on Lot B76 – SBL: 38-2-76.

68.     Upon information and belief, the place of the happening of the actions on the part of the Town occurred at 1786 Kings Highway, Chester, NY 10918.

4071743.v7

69. This Notice is made and served on behalf of Greens in compliance with the provisions of Town Law § 65, Section 50-e of the General Municipal Law and such other laws and statutes as may be applicable.

Dated: White Plains, New York
April 29, 2019

GREENS AT CHESTER LLC

By: _____
Jehuda Landau, Managing Member

CUDDY & FEDER LLP
*Attorneys for Greens at Chester LLC*
By: _____
Joshua J. Grauer
*Office & P.O. Address:*
445 Hamilton Avenue, 14th Floor
White Plains, New York 10601
(914) 761-1300

13

4071743.v7

## VERIFICATION

STATE OF NEW YORK      )
                       )ss.:
COUNTY OF KINGS        )

Jehuda Landau, being duly sworn, deposes and says:

I am the Managing Member of Greens at Chester LLC, the Claimant herein.  I have read the annexed Notice of Claim, know the contents thereof and the same are true to my knowledge, except as to those matters therein stated to be alleged on information and belief, and as to those matters I believe them to be true based on the books and records in my possession, custody and control.

GREENS AT CHESTER LLC

By: _____
Name: Jehuda Landau
Its: Managing Member

Affirm
Sworn to before me this
29th day of April, 2019

_____
Notary Public

JOEL KLEIN
NOTARY PUBLIC, Sate of New York
No. 01KL6066768
Qualified in Kings County
Commission Expires January 14, 2022

14

4071743.v7

# EXHIBIT 1

Exhibit 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
ARLINGTON CHESTER, LLC,

                                        Plaintiff

          -against-                                    09 CIV 4110 (CS)

TOWN OF CHESTER, STEVEN M. NEUHAUS, H. JERRY
MURRAY, ALEXANDER JAMIESON, CYNTHIA SMITH,
and TOWN OF CHESTER PLANNING BOARD,

                                        Defendants,
------------------------------------------------------------------X

### SETTLEMENT AGREEMENT

This SETTLEMENT AGREEMENT (the "Agreement"), effective June
_18_, 2010, is entered into by and among ARLINGTON CHESTER, LLC (which
for purposes of this Settlement Agreement shall include any successor owners of
the property containing the Greens at Chester project), TOWN OF CHESTER,
STEFAN NEUHAUS, H. JERRY MURRAY, ALEXANDER JAMIESON,
CYNTHIA SMITH, and TOWN OF CHESTER PLANNING BOARD.

### WITNESSETH

WHEREAS, an action was commenced in the United States District Court
for the Southern District of New York, as captioned above, wherein Arlington
Chester, LLC alleged various constitutional and other claims against Town of
Chester, Stefan Neuhaus, H. Jerry Murray, Alexander Jamieson, Cynthia Smith,
and the Town of Chester Planning Board, which claims Defendants deny, all in
connection with a certain "cluster" subdivision and site plan application known as

the "Greens at Chester," which application remains pending before the Town of Chester Planning Board; and

WHEREAS, the parties hereto desire to resolve this action without the burden or expense of further litigation,

NOW, THEREFORE, it is stipulated to and agreed by the parties in this action as follows:

1.  The Town of Chester Planning Board shall, within 90 days of the submission of a final subdivision plat in accordance with the filing requirements of the Town of Chester Code (but without the payment of further fees other than escrow monies to cover the Planning Board consultants' review of such submission), grant final subdivision and site plan approval to the Greens at Chester project as a cluster subdivision project for 431 units, in accordance with the preliminary subdivision and site plan approval for the project granted by the Planning Board in 1998, modified in accordance with the 28 revised plan sheets annexed hereto, with the last revision dates of June 1, 2010.

In addition, the Homeowner's Association Agreement shall require, in such form as is acceptable to the Town Attorney for the Town of Chester, that (i) its snow plowing for the courtyard streets shall include the plowing of the driveways accessing such courtyard streets, (ii) that the snow plowing for other driveways shall be the responsibility of the individual owners and not the Town, (iii) sufficient plowed areas will be provided on such courtyard streets for all emergency and other vehicles, and (iv) these requirements may be enforceable by the Town of Chester.

2

11/18/2008  18:28     1221449919

This submission shall be in such phasing or sections as from time to time may be proposed by Arlington Chester, LLC, consistent with State law and applicable provision of the Town of Chester Code. Also, at the option of Arlington Chester, LLC the submission may request conditional final subdivision of all or part of the plat. Further, in order to maintain the *status quo* of the approvals for the project, (i) the Chester Planning Board may not revoke any preliminary subdivision or site plan approval for the Greens at Chester project, in accordance with Town Law § 276(5)(h) or otherwise, prior to the filing of the final plat for the entire subdivision (the preliminary approval remaining in effect without need for extensions of such approval), and (ii) the Town Board may not rezone, or enact additional regulations affecting, the property containing the Greens at Chester project, unless the Greens at Chester project is exempted from the effects of such rezoning and/or additional regulations.

2.   The Town of Chester Town Board hereby agrees to guarantee municipal sewer capacity for the entire 431-unit subdivision and site plan project. No further fees or contributions shall be required of Arlington Chester, LLC or the Greens at Chester project to access or receive such guarantee, other than the Town of Chester standard hook-up fee and any such ordinary and customary fees owed by virtue of membership in the particular sewer district.

The Town of Chester Town Board herein agrees to cooperate and provide to the Orange County Department of Health, within 90 days of a request from Arlington Chester, LLC, whatever

3

documentation is necessary to evidence such sewer capacity
guarantee for the entire Greens of Chester project in accordance
with this Settlement Agreement, so as to satisfy the requirements
of the Orange County Department of Health in this regard relative
to its Realty Subdivision approval of the project.

3.     Arlington Chester, LLC hereby grants to the Town of Chester, all
right, title and interest in the plans and drawings prepared at the
expense of Arlington Chester, LLC for the proposed Black
Meadow Creek Wastewater Treatment Plant. Whatever such
plans, drawings, and other documents of Arlington Chester, LLC
not presently in the possession of the Town of Chester will be
provided to the Town of Chester upon written request to Arlington
Chester, LLC.    Arlington Chester, LLC shall obtain the
appropriate release(s) from its design engineers in order to assure
that the Town of Chester, its agents and contractors, have all the
necessary rights and approvals to utilize the aforesaid plans and
drawings for the Black Meadow Creek Wastewater Treatment
Plant.

4.     Arlington Chester LLC shall, within 90 days of the date of this
Settlement Agreement, draft a covenant, to be approved by the
Town of Chester Attorney as to form and suitable for recording
with the County Clerk's office, as against the last 188 units of the
Greens at Chester project (presently identified as encompassing
Phases IV and V of the project). This covenant shall require each
of the owners of those 188 units to pay to the Town of Chester
$1,936.17 (the "developer's fee") for the right to connect to Town
and/or County municipal sewer infrastructure, in the event that

4

that portion of the Town of Chester has not then been incorporated into Orange County Sewer District No. 1 (or other Orange County Sewer District). If that portion of the Town of Chester has been incorporated into an Orange County Sewer District prior to a given unit's connection to municipal sewer infrastructure, then such obligation to pay the $1,936.17 shall have no force or effect for that given unit. Nothing herein shall require the Town of Chester to reimburse the developer's fee to the owner of any unit who paid the developer's fee prior to the incorporation into an Orange County Sewer District.

It is agreed by all parties that the collective value of all such per unit connection fees is $364,000.00 at the time of the execution of this agreement. It is also agreed by all parties, and binding on all successors in interest to Arlington Chester LLC, that this per unit connection fee is not an illegal impact fee imposed by the Town of Chester, but is a freely and voluntarily bargained for consideration, forming an essential part of the consideration for the entirety of this Settlement Agreement. The recording of the above-referenced covenant, as approved by the Town Attorney as to form, shall be accomplished as soon as possible, but in no event may a building permit for the Greens at Chester project be issued unless and until said covenant is recorded.

Simultaneously with the execution of this Settlement Agreement, counsel for the parties will execute and file a Stipulation of Discontinuance of the filed federal action, which shall be a discontinuance with prejudice. Said Stipulation of Discontinuance shall be held in escrow by the attorney for the Town of Chester

5

until such time as the Town of Chester Planning Board issues final approval to the Greens at Chester cluster subdivision and site plan.

If there is any litigation by nonparties to this Settlement Agreement challenging the enforceability of this Settlement Agreement that concludes with a court order, decision and/or judgment effectively nullifying this Settlement Agreement, or any essential element thereof, then Arlington Chester, LLC may re-file in State court only the N.Y. CPLR Article 78 cause of action pled in the federal court action that is now being discontinued, with no claim for monetary damages, and the Defendants hereby consent to such re-filing but reserve all defenses that were raised, or could have been raised, in their Answer that was previously filed in this action. If no such litigation is filed within six (6) months of the full execution of this Settlement Agreement, then Arlington Chester, LLC shall have no right to re-file the action.

In connection with this Settlement Agreement, Arlington Chester, LLC shall also execute the General Release annexed hereto as Exhibit "A". This General Release shall be held in escrow by counsel for Arlington Chester, LLC until such time as the Town of Chester Planning Board issues final approval of the Greens at Chester cluster subdivision and site plan, at which time the original General Release shall be provided to counsel for the Town of Chester.

5.   No amendments or variations of the terms of this Settlement Agreement shall be valid unless made in writing and executed by

6

PAGE  01

Arlington Chester, LLC, or its successor in interest, and the Town of Chester.

6.   This Settlement Agreement may be executed in one or more duplicate counterparts, which, when executed, shall be deemed to constitute one original.   A facsimile copy of a signature on the Settlement Agreement (but not the Stipulation of Discontinuance) will have the same force and effect as that of an original.

7.   The parties hereto, by and through their attorneys, have all participated in the final form of this Settlement Agreement and the language of this Settlement Agreement shall not be presumptively construed either in favor of or against any of the parties hereto. This Settlement Agreement shall be construed in accordance with the laws of the State of New York.

8.   This Settlement Agreement is an integrated agreement, containing the entire understanding among the parties and, except as set forth in this Settlement Agreement, no representations, warranties, promises, or understandings have been made, relied upon or reached by the parties to this Settlement Agreement.   This Settlement Agreement shall prevail over any contemporaneous or prior communications regarding the matters addressed herein.

9.   The parties hereby agree to execute all documents and to do all things necessary to fully effectuate the terms of this Settlement Agreement.

7

IN WITNESS WHEREOF, the undersigned, after being given the proper authorizations to do so, affix their signatures hereto on behalf of the parties noted.

ARLINGTON CHESTER, LLC

BY: _____
Wilbur Fried, President

TOWN OF CHESTER, NEUHAUS, MURRAY, JAMIESON, SMITH, CHESTER PLANNING BOARD

BY: _____
Stefan Neuhaus, Town Supervisor

STATE OF NEW YORK )
                                            ss:
COUNTY OF New York )

On the 18 day of June , 2010, before me personally came Wilbur Fried, who, being by me duly sworn, did depose and say that he resides at 9850 Bye Ave., NY NY, that he is the President of Arlington Chester, LLC, the corporation described in and which executed the above instrument, and that he signed his name thereto by authority of the Board of Directors of said corporation.

MAUREEN MARKS
NOTARY, ... STATE OF NEW YORK
... ... 1M
QUALIFIED .. ... COUNTY
MY COMMISSION ... ... 24 2010

_____
Notary Public

STATE OF NEW YORK )
                                            ss:
COUNTY OF ORANGE )

On the 23rd day of June , 2010, before me personally came Stefan Neuhaus, who, being by me duly sworn, did depose and say that he resides at St. Corneward Rd., Chester NY that he is the duly elected Supervisor of the Town of Chester, the municipal corporation described in the above instrument, and that he signed his name thereto binding all Defendants as duly authorized by such Defendants.

_____
Notary Public

SHARON A. SENKIEW
Notary Public, State of New York
ID No. 01SE6071697
Qualified in Orange County
Commission Expires March 25, 20/1/6

8

## GENERAL RELEASE

KNOW THAT I, WILBUR FRIED, in my capacity as the President, and on behalf, of ARLINGTON CHESTER, LLC, the plaintiff in the action entitled *Arlington Chester, LLC, v. Town of Chester, et al.*, Docket Number 09 Civ. 4110 (CS), pending in the United States District Court for the Southern District of New York, in consideration of the terms set forth in the Settlement Agreement, dated 6-18-18 and based upon the Town of Chester Planning Board's approval of the cluster subdivision and site plan application known as the "Greens at Chester," do hereby release and discharge the Town of Chester, Stefan Neuhaus, N. Jerry Murray, Alexander Jamieson, Cynthia Smith, and the Town of Chester Planning Board, their agents, successors, and assigns, and all past and present Town of Chester Board members, Planning Board members, Zoning Board members, and all past and present officials, officers, employees, representatives, agents and assigns of the Town of Chester, from all claims, actions, causes of action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, extents, executions, claims, and demands whatsoever, in law, admiralty or equity, which ARLINGTON CHESTER, LLC, its agents, successors, and assigns ever had, now has or hereafter can, shall or may, have for, upon, or by reason of any matter, cause or thing from the beginning of the world to the day of the date of this RELEASE, including, but not limited to, all claims under 42 U.S.C. § 1983; all claims under 42 U.S.C. § 1988; all claims alleging violations of the United States and/or New York State Constitutions; all claims alleging violations of due process and/or equal protection; all claims in any form under any federal, state, or local statute, law, rule, regulation, or

common law; all claims pursuant to N.Y. C.P.L.R. Article 78; and all claims for attorney's fees, expenses and costs.

This Release may not be changed orally.

THE UNDERSIGNED HAS READ THE FOREGOING RELEASE AND FULLY UNDERSTANDS IT.

IN WITNESS WHEREOF, I have executed this Release this 18th day of June, 2010.

_____
WILBUR FRIED, as President of
ARLINGTON CHESTER, LLC

STATE OF     New York    )
                                             ) ss:
COUNTY OF   Nassau    )

On 18th June, 2010 before me personally came WILBUR FRIED to me known, and known to me to be the individual described in, and who executed the foregoing RELEASE, and duly acknowledged to me that he executed the same.

_____
Notary Public

11

# EXHIBIT 2

Exhibit 2

FILE COPY

RESOLUTION OF APPROVAL

FINAL SUBDIVISION AND SITE PLAN

FOR

ARLINGTON CHESTER, LLC

[GREENS AT CHESTER]

## Nature of Application

Arlington Chester LLC [Greens at Chester] hereinafter referred to as the "applicant," is the owner of certain real property consisting of a total of 117.7+/- acres[1] that is generally situated adjacent and south west of the Village of Chester line with New York State Route 94 to the south, Conklingtown Road to the south/southwest and the Town of Goshen line to the North. The portion to be developed is designated on the Town of Chester tax map Section 6, Block 1 Lot 1.3.

The applicant has made application to the Planning Board for a 431 lot residential subdivision.[2]

## Property Involved

The property affected by this resolution is shown on the Tax Maps of the Town of Chester as parcel(s) 9-1-1.3.

## Zoning District

The property affected by this resolution is located in the SR-.6 zoning district of the Town of Chester.

---

[1] 113.4 acres are located within the Town of Chester and 4.2 acres are located in the Town of Goshen.  No improvements of any kind are proposed in Goshen.
[2] The applicant originally received preliminary subdivision approval for 455 lots.  Between preliminary and final approval, however, it was determined that only 431 lots could be supported on site.

History

A summary of the history of this application before the Board is as follows:

- An application for subdivision and site plan approval, together with a Full Environmental Assessment Form (Full EAF), was submitted to this Board on or about May 26, 1994;
- On September 7, 1994 this Board issued a *positive declaration* pursuant to those certain regulations known as the "SEQRA regulations," contained and set forth in the *State Environmental Quality Review Act* at 6 NYCRR part 617 *et.seq.* finding that the application of Arlington Chester, LLC may have a significant adverse impact on the environment and that an environmental impact statement would be required;[3]
- A formal scoping session as provided for in the SEQRA regulations[4] was conducted on October 5, 1994;
- A written scope identifying those areas of concern to be studied at length in a formal Environmental Impact Statement was adopted by the Board on March 1, 1995;
- A Draft Environmental Impact Statement was submitted by the applicant to the Board in May of 1995 and thereafter revised in June and July of 1995 and ultimately accepted as complete for public review on December 6, 1995;
- A public hearing was held on the Draft Environmental Impact Statement and preliminary subdivision approval on February 21, 1996;
- A Draft Final Environmental Impact Statement was submitted to the Board in March of 1997;
- The Draft Final Environmental Impact Statement was accepted by the Board on September 30, 1998;
- The SEQRA Findings Statement was adopted and preliminary subdivision approval was granted the applicant on November 18, 1998

Thereafter, this project entered a period of dormancy at least with regard to its presence before the Town of Chester Planning Board. However, the required extensions of the preliminary subdivision approval were requested by the applicant at the proper intervals and were granted by the Planning Board.

In or around 2007, this application returned to the Board for purpose of obtaining their final approval. At that time, a dispute arose between the Town of Chester and the applicant over the proper and necessary measures required to obtain final approval. That dispute resulted in the commencement of litigation by the applicant in the United State District Court for the Southern District of New York. That litigation was settled by virtue of that certain Settlement Agreement dated June 18, 2010 attached to and made part of this resolution of Final Subdivision Approval.

---

[3] See 6 NYCRR 617.2(ac)
[4] See 6 NYCRR 617.8

### Findings

The Planning Board has determined that approval of this subdivision will substantially serve the public convenience, safety and welfare in that the land to be improved is of such character that it can be used safely for building purposes without danger to health or peril from fire, flood or other menace. Further, the subdivision is appropriate and consistent with the requirements of the master plan, the official map of the Town, Chapter 83 of the Town of Chester Municipal Code and applicable zoning regulations, subject to compliance in full with conditions hereinafter imposed. Moreover, this approval is mandated by the United States District Court for the Southern District of New York pursuant to the aforementioned Settlement Agreement.

### Resolution of Approval

*NOW, THEREFORE, THE PLANNING BOARD RESOLVES* to grant final approval to the subdivision application of Arlington Chester, LLC [Greens at Chester] as said proposal is depicted on the plans referenced in the attached Settlement Agreement provided by the applicant and upon the conditions outlined below, and the Chairperson (or his designee) is authorized to sign the subdivision plat upon satisfaction of those conditions below noted to be conditions precedent to such signing.

### Conditions to be Satisfied

1. The furnishing of proper performance security [bonding of all public improvements] to the satisfaction of the Town attorney must be accomplished prior to the signing of the plat.

2. The delivery of proof of filing (prior to construction) of a Notice of Intent for Stormwater Discharges Associated with Construction Activity Under a SPDES General Permit and delivery of copy of same to the Town Engineer.

3. The delivery of all required outside agency approvals, including but not limited to the Orange County Department of Health, the New York State Department of Environmental Conservation and/or the United States Army Corps of Engineers as well as

proof that said approvals remain valid as of the date of this resolution must be accomplished prior to the signing of the plat.

4. The creation of a homeowners association (HOA) to own and maintain the common space depicted upon the plans approved herein. The HOA shall be deemed created for the purposes of this approval at the time of the filing of the required Offering Plan with the NYS Attorney General. This condition must be accomplished prior to the issuance of the first certificate of occupancy. The plat may be signed and filed prior to the satisfaction of this condition.

5. To the extent required by law, the applicant shall be required to form a Transportation Corporation (prior to construction) to own and operate the central water and central sewer systems that will service the project until such time as the Town of Chester accepts the offers of dedication required of the applicant of the central water and sewer systems and their appurtenances.

6. The public roadway shall be constructed in accordance with Town Code section 83-20.

## General Conditions

This approval is conditioned upon the applicant satisfying the foregoing conditions and submitting all necessary offers of dedication and posting all required and necessary performance assurance security for the proposed public improvements as well as copies of the plans to be signed, including mylars when required, to the Town of Chester Planning Board within one hundred and eighty days of the date of this approval. Extensions of this approval may only be granted in accordance with applicable law.

This approval is further conditioned upon the applicant delivering proof, in writing, that all fees—engineering, planning, legal and otherwise—in regard to this project have been fully paid.

A FAILURE to comply with any such condition in a timely manner shall result, without further action, in a lapsing of this approval.

In Favor __6__     Against __0__     Abstain __0__     Absent __1__

Dated: November 6, 2013

DONALD SEROTTA, CHAIRMAN
TOWN OF CHESTER PLANNING BOARD

# EXHIBIT 3

Exhibit 3

Supervisor - Alexander Jamieson
Town Board
    Brandan W. Medican
    Cynthia Smith
    Robert Valentine
    Ryan C. Wensley
Town Justices -
    Janet M. Halasip
    Sharon Worthy-Splegi

# TOWN OF CHESTER
1786 Kings Highway
Chester, NY 10918

Tel: (845) 469-7000
Fax: (845) 469-9242
www.chester-ny.gov

Town Clerk - Linda A. Zeppele
Highway Supt. - Anthony LaSpina
Receiver of Taxes - Vincent A. Manlscalco
Building Inspector -- James Farr
Assessor - John Schuler, III
Police Dept. - Daniel J. Doellinger, Chief

To: John Petroccione, P.E.

From: Jim Farr, P.E., Town of Chester Building Inspector

Date: 6 April 2018

Re: Greens of Chester Model 2500

Design Professional: John Tili, R.A. Architect

Pursuant to your request we have reviewed the Greens of Chester Model 2500 plans. This review is for the generic Model 2500 and not to be considered for a specific building lot. The following are our comments:

1. Place a note on the plan the indicating that the basement is "Unfinished space and not to be used for Living Space as defined by IRC 2015."

2. There is a room noted on the first floor whose use is noted as P.O.K. Please clarify the use of this space.

3. The interior home walls on the first and second floors that are shaded black. Provide a detail of this wall section.

4. Sheet A-5 includes two exterior wall sections appear to be identical. If they are identical, please delete one of them.

5. Note on the plans the number of bedrooms in the home.

6. Note on plans that the building is for single family occupancy.

7. Note on plans that the rooms are only to be used for the purposes noted on the plan.

8. Locations of all water using fixtures including sinks, dishwashers, clothes washers, etc. shall be shown on the architectural plans.

9. Lighting needs to be provided for the interior and exterior stairways.

10. Light switch locations should be provided.

11. Electrical, plumbing and mechanical plans should be provided.

12. ResCheck will be required with each submittal.

13. A site plan with grading and utility locations shall be provided with each submittal on the same size sheet as the building plans. Alternatively, the site plan can be included on the architectural plans.

14. The stairwell wall section shall be provided

15. The home mechanical systems, hot water tank, water, wastewater, electrical panel, etc. shall be shown on the plan.

16. Water meters will be required. Confirm with water department the meter typed required.

17. Show footing depth on wall sections.

18. Sheet A-2 shows a 42-inch deck handrailing which conflicts with the deck detail on sheet A-6.

19. A landing is required at the bottom of the deck.

20. A door should be shown at the top of the basement stairs.

21. Note the number of feet above the grade plan per the IRC 2015 definition on the plans.

Should you have any questions please call me at (914) 474-1980 or e-mail me at JFarr@Farr-Engineering.com.

*Supervisor – Alexander Jamieson*
*Town Board*
    Brandon W. Madison
    Cynthia Smith
    Robert Valentine
    Ryan C. Wensley
*Town Justices –*
    Janet M. Halsig
    Sharon Worthy-Spiegl

# TOWN OF CHESTER
1768 Kings Highway
Chester, NY 10918

Tel: (845) 469-7000
Fax: (845) 469-9242
www.chester-ny.gov

*Town Clerk – Linda A. Zappala*
*Highway Supt. – Anthony LaSpina*
*Receiver of Taxes – Vincent A. Maniscalco*
*Building Inspector – James Farr*
*Assessor – John Schuler, III*
*Police Dept. – Daniel J. Doellinger, Chief*

To: John Petrocciane, P.E.

From: Jim Farr, P.E., Town of Chester Building Inspector

Date: 6 April 2018

Re: Greens of Chester Model 2700

Design Professional: John Till, R.A. Architect

Pursuant to your request we have reviewed the Greens of Chester Model 2500 plans. This review is for the generic Model 2700 and not to be considered for a specific building lot. The following are our comments:

1. Place a note on the plan the indicating that the basement is "Unfinished space and not to be used for Living Space as defined by IRC 2015."

2. There is a room noted on the first floor whose use is noted as "Slop Kitchen". Please clarify the use of this space.

3. On Sheet A-2 add to the floor area table the area of "unfinished" space.

4. The interior home walls on the first and second floors that are shaded black. Provide a detail of this wall section.

5. Sheet A-5 includes two exterior wall sections appear to be identical. If they are identical, please delete one of them.

6. Note on the plans the number of bedrooms in the home.

7. Note on plans that the building is for single family occupancy.

8. Note on plans that the rooms are only to be used for the purposes noted on the plan.

9. Lighting needs to be provided for the interior and exterior stairways.

10. Light switch locations should be provided.

11. Electrical, plumbing and mechanical plans should be provided.

12. ResCheck will be required with each submittal.

13. A site plan with grading and utility locations shall be provided with each submittal on the same size sheet as the building plans. Alternatively, the site plan can be included on the architectural plans.

14. The stairwell wall section shall be provided

15. The home mechanical systems, hot water tank, water, wastewater, electrical panel, etc. shall be shown on the plan. The hot water tank and furnace ae only shown generically.

16. Water meters will be required. Confirm with water department the meter typed required.

17. Show footing depth on wall sections.

18. Sheet A-2 shows a 42-inch deck handrailing which conflicts with the deck detail on sheet A-6.

19. A door should be shown at the top of the basement stairs.

20. Note the number of feet above the grade plan per the IRC 2015 definition on the plans.

Should you have any questions please call me at (914) 474-1980 or e-mail me at JFarr@Farr-Engineering.com.

# EXHIBIT 4

Exhibit 4

Supervisor - Robert Valentine

Town Board -
    Brendan W. Medican
    Cynthia Smith
    Ryan C. Wensley

Town Justices -
    Janet M. Haislip
    Sharon Worthy-Spiegl

# TOWN OF CHESTER
1786 Kings Highway
Chester, NY 10918

Tel: (845) 469-7000
Fax: (845) 469-8242
www.chester-ny.gov

*Rec* 12/3/18

Town Clerk - Linda A. Zappala
Highway Supt. - Anthony LoSpina
Receiver of Taxes - Vincent A. Maniscalco
Building Inspector - James Farr
Assessor - John Schuler, III
Police Dept. - Daniel J. Doellinger, Chief

30 November 2018

Jehuda Landau, Managing Member
Greens at Chester LLC
65 Steuben St.
Brooklyn, NY 11205

Re: Greens at Chester, Lot B76 – SBL: 38-2-76 – Request for Building Permit

Dear Mr. Landau,

We received your application on 20 November 2018 for a building permit for a single-family home to be constructed at the above referenced lot. Based on a partial review of the submitted application we have determined that a building permit cannot be issued a at this time.

The project was approved per a Settlement Agreement dated June 10, 2010, with respect to this matter, dictated that all final subdivision and site plan approval was to be made in accordance with the preliminary subdivision and site plan approval Statement of Findings.  The Statement of Findings has many requirements. Two of the requirements noted below have not been satisfied:

    1.  The overall dimensions of the structure are approximately 50'-0" wide by 36'-0" deep resulting in approximately 1800 square feet of floor area per level. The plans show 2 finished floors totally 3600 square feet plus an "unfinished" basement adding another 1800 square feet for a total structure area of at least 5400 square feet not including the attic area, if applicable. Depending on the "grade plane" as defined in the IRC 2015, the building may also be considered a 3-story structure.

    The following has been excerpted from the Statement of Findings:

*"(i) one-unit dwellings shall be limited to 1,700 – 2,500 square feet in a two-story structure, and (ii) two-unit dwellings shall be limited to 1,500 – 2,300 square feet in a two-story structure."*

The structure exceeds these limits and is not approvable.

2. It is my understanding that the entire approved subdivision has been filed with the County Clerk. Also, it is my understanding that the project's public improvement infrastructure has not been accepted by the Town.

The following has been excepted from the Statement of Findings:

*"The second method of enforcement available to the Town would be employed if the Applicant chooses to seek Final Subdivision Plat/Site Plan approval for the entire project at one time. Such a full Final Approval would require, per the Town of Chester Code, that all public improvements were constructed and accepted by the Town as satisfactory prior to the issuance of a single building permit for the proposed dwelling units."*

A building permit cannot be issued since requirement has not been satisfied.

Based on the above, I did not proceed further with a review of the building plans or any other sections of the statement of findings since a building permit could not be issued.

Respectfully submitted,

James M. Farr, P.E.
Building Inspector

# EXHIBIT 5

Exhibit 5

# PHILIP SALERNO, P.E.
## P.O. Box 996
## Goshen, New York 10924

Mr. Livy Schwartz                                          October 31, 2018
4003 Summerville Way
Chester, New York 10918

Re: Greens at Chester Subdivision-
Dwelling Sizes

Dear Mr. Schwartz:

As you requested, I reviewed the November 18, 1998 SEQR Findings Statement Resolution for the Greens at Chester, with specific reference to the language on Page 8 of this document in the Project Description, regarding the building floor areas.

As the Town of Chester Planning Board's Engineering Consultant, I reviewed the engineering aspects of the project, and was directly involved in the discussions with the Planning Board and the Applicant regarding the project development, including the development of the bulk requirements established for the subdivision and the review of the proposed SEQR Resolution, prior to Planning Board acceptance of the document.

The language in the Project Description was intended to provide a conceptual overview of the subdivision. It was not intended, nor should it be interpreted, to establish development standards. The development standards, as determined by the Planning Board and agreed to by the Applicant, as a part of the cluster subdivision review process, are identified on Page 10 of the Resolution, in the Bulk Table. These bulk requirements are limited to the establishment of minimum setback lines and minimum separations between buildings. These bulk requirements are also reflected on the approved subdivision plans.

The Cluster Development Regulations contained in the Town's Zoning Code specifically give the Planning Board the authority to "impose floor area ratios to prevent excessively large residences on smaller lots". Based upon my involvement in the review process and approval of this project, as well as review of the Resolution, I can definitively state that no such restriction was enacted, nor was it intended.

Please do not hesitate to contact me, should you have any comments or questions, or require additional information.

Very truly yours,

Philip Salerno, P.E.

# EXHIBIT 6

Exhibit 6

*From Public Hearing*

41

1    of the property? Not the houses. Houses you said is not

2    indicated, but the size of the property has been.

3                    MR. SALERNO: You must have some order of

4    magnitude for the house sizing.

5                    MR. YOUNGBLOOD: Probably 1700 to 2500 square

6    feet for the single family home on a lot 3600 square feet as a

7    minimum. They go up larger than that. The builder where you

8    have 2 families in one building, even though they are single

9    family, those lots or a minimum of 750 square feet. They range

10   up higher than that.

11                   Those are the minimum.

12   A-PH4            MS. WALEN: The time frame you anticipate is

13   over five years; is that what I read?

14                   MR. YOUNGBLOOD: Basically it is market

15   availability. I think if you see next door that Whispering

16   Hills built had out over a number of years. It is basically how

17   fast the demanded is and so forth.

18                   They would start with the first section of

19   single family homes and depending on how that sells, continue

20   from there. We envision at least five years. We can't see we

21   will do it in less nor would the demand be there.

22                   MS. WALEN: Thank you.

23                   MS. MEMMELAAR: My name is Elizabeth

24   Memmelaar. This was originally the farm that my family grew up

25   on. I have a intimate knowledge of it. I have several

# EXHIBIT 7

Exhibit 7

# recordonline.com
### TIMES HERALD-RECORD

Opinion

# Editorial: Town makes no effort to hide its discrimination

Posted Sep 17, 2018 at 9:18 PM
Updated Sep 17, 2018 at 9:18 PM

No Hasidic Jews allowed.

That's the new slogan of the Town of Chester where the town board is actively buying property with the express purpose of keeping the Hasidim out.

While exclusionary tactics usually are less blatant, this one in Chester is as clear as can be. It started when the new owners of the long-delayed Greens at Chester development said they would be marketing it to Hasidic families.

At the time, amid local grumbling and demands to do something, the town supervisor, Alex Jamieson, was a voice of reason. While there were calls to change the town voting from at-large to a ward system in an effort to dilute the power of bloc voting, the supervisor said he was not in a hurry.

He did not want to rush to a ward system "because it's the flavor of the month." And he said that the town had to accept development at Greens at Chester which was mandated by a lawsuit from 2010.

Now, he wants wards. "The idea is to keep the Hasidic out so that they can't control the Town Board," he said.

He's leading the effort to buy as much property as the town can afford because "We made a promise to the people to preserve as much of the town as possible."

It started last week with the town purchase of the shuttered Sugar Loaf Performing Arts Center for $1 million with no idea what it will do with the property. It is a deal Jamieson said was one of several to be finalized in the coming weeks and months that are meant to slow the expansion of the Hasidic community outside of Kiryas Joel.

"This is just the first phase," he said.

Two years ago, townspeople voted down a proposal to buy some property but Jamieson says things have changed.

The town is looking at more than $3 million in purchases with the express purpose of blocking Hasidic development. The town board will have to approve a bond to make the purchase and if enough residents are concerned with either the amount or the general idea, they could gather signatures on a petition and force a townwide vote.

Now, we have to see if any are brave enough to withstand the scrutiny such a petition drive would bring. As the supervisor explained, "People realize what the possibilities are. The fear of KJ expanding into Chester is scaring people half to death."

He won't get any argument from his predecessor, County Executive Steve Neuhaus. While Neuhaus was instrumental in helping the Greens development get approvals when he was supervisor, he turned against it when Hasidic developers came on the scene. And during his re-election campaign, he stoked fears of Hasidic expansion outside the Village of Kiryas Joel, a tactic that brought condemnation from the Jewish Federation of Greater Orange County.

So now we wait for leadership. It will not come from those in charge in Chester nor from the county government.

Is there anybody who will call these actions what they are, blatant discrimination based on religion, or are the Hasidim in Orange County not going to be defended?

Welcome, Guest • Signin or Create an Account



**Vos Iz Neias?**

Easy to remember? > VINNews.com    Home    Archives    About    Contact     Search

## Orange County, NY - "Keep The Hasidic Out," Says Chester Supervisor In Announcement To Buy Up Additional Properties



Leasing Direct, the best way to buy or lease a new car    We negotiate with you without you ever leaving your own home. Delivered to your home or office

Published on September 14, 2018 02:18 PM      By: Sandy Eller

A Text Size    Email Post    Print Post    Comments (21)    Save Article


Advertisement:
HELLO GOOD BUY
.SELLMILESNOW.COM


PESACH


SIMPSON JEWELERS


SEAGATE



ALEX JAMIESON
TOWN OF CHESTER SUPERVISOR

Chester supervisor Alex Jamieson at the Greens at Chester development

Orange County, NY - An Orange County elected official went on the record with plans to acquire available properties within the town and to institute a ward-based voting system, specifically noting that the measures were intended to stem the influx of Chasidic residents and their potentially powerful vote.

According to The Times Herald Record (https://bit.ly/2Ndz9Bl), Chester supervisor Alex Jamieson said that locals are concerned about the political power that could be wielded by the predominantly Chasidic residents who are expected to move into the as yet unfinished 431 home Greens at Chester development.

As of the 2010 census, Chester, which is located approximately nine miles west of Kiryas Joel, had just under 12,000 residents. As many as 8,000 Chasidic residents could eventually call the new development home.

A ward system could lessen the impact of the bloc vote by splitting the town into districts, explained Jamieson. Both Blooming Grove, near Kiryas Joel, and Mamakating, located near Bloomingburg, have instituted ward systems since Chasidic residents have begun moving into the area. Efforts in the Monsey area to implement a similar system in the Town of Ramapo have yet to succeed.

"The idea is to keep the Hasidic out so that they can't control the town board," said Jamieson.

Jamieson's comments come as he announced the town's acquisition of the Sugar Loaf Performing Arts Center, an 8.6 acre property that was purchased for $1 million, although the town has yet to decide how the land will be used. Chester is also in the process of buying 160 acres of property near Sugar Loaf for $1.9 million and a 26 acre piece of property on Route 94, which could be used for a town pool and a running track.

Advertisement

Use promo code EASY to save up to 40% every time you ship.
UPS

All told, the town expects to spend $3.1 million on the acquisitions, which will be funded by long term bonds, if approved by the town board at its next meeting.

"People realize what the possibilities are," said Jamieson. "The fear of KJ expanding into Chester is scaring people half to death. It's not just the Greens at Chester. They are buying property all around it."

EXTENDED ONE MORE WEEK!
IT'S BACK!

BUY ONE MAYA WIG, GET ONE FREE. $1,550.

FREEDA

*Allow up to 8 weeks for second wig to ship.

SALES ENDS 4/11/19

Unbeatable Value!

Miami Beach Condo
6 Bed
4.5 Bath
3,985 sf
Asking $1,100,000

Batsheva Rivkin
718.450.5720
batsheva@compass.com

COMPASS





( Photo Courtesy Robert G. Breese/Times Herald-Record. )

At a previously held town board meeting, Jamieson also announced his intention to create a program that would preserve open space in Chester.

"We made a promise to the people to preserve as much of the town as possible," said Jamieson. "This is just the first phase."

Kiryas Joel school superintendent Joel Pollin called Jamieson out for his comments on Twitter, accusing him of anti-Semitism, saying that elected officials should be expected to curtail hatred instead of spreading it.

"Let's replace the word 'Hasidic' in the headline with the word 'Blacks,'" tweeted Pollin. "Say it out loud & hear how it sounds."

Jamieson has served as supervisor for the Town of Chester since January 2014.  He was arrested this past June and charged with grand larceny and filing false documents for collecting approximately $8,000 in unemployment benefits while he was working as the Chester town supervisor.

Jamieson did not immediately return a call for comment on the matter.

Advertisement                                                                 00:20



People eat this deadly poisonous fish all the time. Why?





# recordonline.com
## TIMES HERALD-RECORD

## Chester buying property 'to keep the Hasidic out'

By Hema Easley
Posted Sep 13, 2018 at 6:38 PM
Updated Sep 13, 2018 at 6:40 PM

CHESTER — The Town of Chester has finalized a contract to purchase the Sugar Loaf Performing Arts Center for $1 million, part of a sweeping effort to buy up as much open land in the town as possible to keep unwanted future Hasidic development in check.

The contract was approved at a Town Board meeting Wednesday night. The 8.8-acre property was appraised at $1.8 million, according to Chester Supervisor Alex Jamieson. It was a good deal for the town, he said.

Jamieson characterized the purchase as one of several to be finalized in the coming weeks and months that are meant to slow the expansion of the Hasidic community outside of Kiryas Joel.

"People realize what the possibilities are. The fear of KJ expanding into Chester is scaring people half to death," Jamieson said Thursday. "It's not just the Greens at Chester. They are buying property all around it."

Earlier this year, Chester residents learned that Greens at Chester, the 431-home development being built on a 110-acre site west of the Whispering Hills subdivision, would be a predominantly Hasidic community and could eventually be home to 3,000 people.

The news brought hundreds of people to a Town Board meeting, where they urged elected officials to stop the development. At the time, Jamieson told the public the town would explore instituting a ward system for electing Town Board members and adopting an open-space preservation program.

"We made a promise to the people to preserve as much of the town as possible," Jamieson said. "This is just the first phase."

In addition to the Sugar Loaf Performing Arts Center purchase, the town is also finalizing a contract to buy a 26-acre property on Route 94 in Chester where Primo Sports originally planned to build a sports complex. The Town Board expects to vote on that purchase at its next meeting, Jamieson said.

At this point, the town has not decided what it will do with the performing arts center. Jamieson said the town could rent it back to the Mid-Hudson Civic Center, the current owner, and let it continue operations. The town will look into building a community pool and running track on the Route 94 property, he said.

The town is also finalizing a contract to buy two parcels of land outside Sugar Loaf totaling 160 acres. The land is owned by the Laroe family foundation and will cost the town $1.3 million.

Altogether the purchases will total $3.1 million. The town plans to fund them by issuing long-term bonds. The town will vote on a bond resolution at its next meeting to borrow $3.5 million, Jamieson said.

Any resident can start a petition to put the bond to vote. If the petition has the required number of signatures to force a referendum, the bond will be put on the ballot in November. If no one raises an objection within 30 days of the resolution, the town will move ahead with borrowing the money.

Two years ago, Chester voters soundly rejected the town's plan to issue bonds to buy the Frozen Ropes baseball-softball training complex. This time around, Jamieson predicted, the response will be different.

"It's something people will embrace," Jamieson said.

The town plans to continue buying properties, according to Jamieson. He pointed to available land in the town, including the BT Holding property in the Village of Chester, Johnson Farm on Route 94 and properties owned by the Palmer family along Laroe Road.

This November, the ward system will also be on the ballot. If approved, Town Board members will be elected by district instead of townwide vote, thereby limiting Greens at Chester's potential political power.

"The idea is to keep the Hasidic out so that they can't control the Town Board," Jamieson explained.

Blooming Grove in Orange County and Mamakating in Sullivan County have instituted ward systems following surges in Hasidic home buyers.

heasley@th-record.com

WATCH NEWS 12 NOW


It's here Zillow - Find your way home
Advertisement

Log In   Change Region

WEATHER     TOP STORIES     TRAFFIC     CRIME     FOOD & FUN     VIDEOS

# Construction underway at controversial Chester housing project

Posted: Apr 23, 2018 6:10 PM EDT
Updated: Apr 23, 2018 6:14 PM EDT

CHESTER - Construction is underway on a controversial housing project in Orange that is expected to draw thousands of new neighbors from Brooklyn.

Chester Town Supervisor Alex Jameson says that's what's in the works at The Greens At Chester, a once-dormant project for 431 homes off West Avenue.

Jameson says that within a year, they are going to build close to 80 or 90 houses, with about six or seven people in each house.


ADVERTISING



480348 Invented by Teads

The development was approved decades ago but stalled until recently when the original builder sold plans as is to a Brooklyn-based developer, who's now fast-tracking construction.

Jameson says the development, expected to bring in thousands of new residents, could potentially double or triple the number of students within the district.

While he says that issue still needs to be ironed out, neighbors have their own concerns, like traffic and privacy, now that the once-shelved project has quickly resurfaced.

News 12's efforts to reach out to the developer have not been successful.

Officials say the project is expected to be complete within three to four years.

---

HOME     WEATHER     TOP STORIES     TRAFFIC     CRIME     FOOD & FUN     VIDEOS

FOLLOW US
Join Us On Facebook
Join Us On Twitter
Get our Apps
Go to Mobile Website
Sign Up for Our Newsletters

OUR NETWORK
Optimum
Newsday
News 12 Varsity
Newsday Open
Newsday Homes

HELPFUL LINKS
Careers
Internships
Advertise
RSS
About Us

MORE LINKS
Site Map
Feedback
Terms of Service
Privacy Policy

# **recordonline.com**

### TIMES HERALD-RECORD

# Chester residents ask officials to stop 431-home development

**By Richard J. Bayne**
**Times Herald-Record**
Posted Apr 25, 2018 at 11:25 PM
Updated Apr 25, 2018 at 11:25 PM

CHESTER – With construction underway on the massive Greens at Chester development, to be marketed to Hasidic families, residents, fearful about a huge population influx and bloc vote power, packed Wednesday's Town Board meeting, calling on officials to somehow stop the subdivision.

"Isn't there somebody who can do something?" town resident Andrew Delo said.

The 431-home development will eventually house about 3,000 people, and the developers have told Chester Supervisor Alex Jamieson it is to be marketed to Hasidics. Residents at Wednesday's session raised fears about traffic, a Town Board takeover and a huge financial impact on the Chester School District.

Orange County Executive Steve Neuhaus, who was Chester supervisor before he became county executive, promised to lend his support to try and stop or reconfigure Greens at Chester. Plans call for the project to tie into Orange

County's sewage treatment plant. Neuhaus said he would raise capacity issues. He said he'd also try to steer the builders toward commercial development.

"It's not because we're anti-Semitic," Neuhaus told the crowd. "It's about what's right for the community."

Wednesday's session drew about 300 people and the crowd spilled out into the hallways behind the Town Board meeting room. About 30 people addressed the Town Board.

Going into the session, Jamieson had planned to focus on measures to limit the impact of the development, including instituting a ward system for electing town council members and adopting an open space preservation plan. As the meeting opened, Jamieson said a lawsuit mandated that Greens at Chester, located just west of the Whispering Hills development off West Avenue, had to go forward. He pledged to hire extra building inspectors to make sure the builders followed town codes.

But as the voices grew more strident, so did Jamieson. "I don't want to be the person who loses this town," Jamieson said near the end of the meeting. "We'll fight this. We're not rolling over." Jamieson didn't specify exactly how the town would somehow try to limit the scope of the development.

Several residents expressed fears about skyrocketing costs to the Chester School District, for programs like special education and busing, based on costs associated with other Hasidic populations. Assemblyman James Skoufis, D-Woodbury, pledged to push for state help, if those additional costs were to come about. Skoufis also reminded the crowd that it would be illegal for Greens at Chester to limit buyers to Hasidics.

With ward elections, town council members would be elected by districts, to limit the development's potential political power. Both Blooming Grove in Orange County and Mamakating in Sullivan County enacted wards following an influx of Hasidic homebuyers.

Michael Parietti, a Town of Ramapo councilman, warned Chester residents to move quickly if they want to institute wards. "We waited too long in Ramapo," Parietti said. "They (Hasidic residents) tossed it in the trash can."

dbayne@th-record.com

# recordonline.com
## TIMES HERALD-RECORD

Opinion

# Editorial: Chester development getting extra scrutiny

Posted May 7, 2018 at 2:49 PM
Updated May 7, 2018 at 2:49 PM

The Town of Chester may change the way it elects the town council, moving from an at-large voting system and creating wards which each would elect a member. It's a good idea anywhere, one that gives voters a better chance of knowing the officials they elect to represent them.

Of course a ward system does not automatically create political diversity. If a community is dominated by a political party, that usually is not limited to geography. Parties who control local machines to get out the vote, especially in local elections, prevail at large or ward by ward.

And, of course, it is hard to ignore that while this theoretical democratic exercise could have been brought up at many times in the past, it is coming up in Chester today because a large development, one planned for decades, is on the verge of being built.

And it is being marketed to Hasidic families.

Those who all of a sudden have become fans of a ward system insist that it has nothing to do with religion. It is only about equal representation.

The imminent arrival of so many new neighbors also has the county reconsidering an essential question involving infrastructure, one that seemed to have been settled long ago.

Back when he was the Chester Town Supervisor, Steve Neuhaus was instrumental in reaching a settlement requiring the town to guarantee sewer capacity for the large housing development. As a story put it in 2010, "The deal ensures that the town's allotted sewer capacity is not bartered away for other projects."

As the story put it, quoting Neuhaus, the developers of the Greens at Chester had been paying fees to help fund maintenance and operation of the local sewer system despite the lack of construction.

Now, however, as a story reported just last month, Neuhaus "has promised to lend his support to try and stop or reconfigure Greens at Chester. Plans call for the project to tie into Orange County's sewage treatment plant. Neuhaus said he would raise capacity issues. He said he'd also try to steer the builders toward commercial development."

These are not new issues.

The contrast between a ward system and one that elects representatives at large is as old as the nation itself. The question of sewage capacity is also a continuing concern, one that doubtless will be coming up all over the region as the economy improves and housing construction continues to increase.

It would be nice to discuss them without the disturbing overtones that have become so prevalent lately and, fortunately for Chester, the town supervisor understands that.

Alex Jamieson said he's not about to jump into wards "because it's the flavor of the month." And he reminded all involved, including the county executive, that the town must accept Greens at Chester because it's mandated by a lawsuit that was settled in 2010.

So, he said, the town is "going to make sure everything is built to code ... We'll be watching them 24/7 to make sure the water and sewer lines are done correctly."

Everybody else needs to watch the way the town and the county executive do their jobs.

# recordonline.com
## TIMES HERALD-RECORD

## Neuhaus warns residents about proposed Chester development

By Richard J. Bayne
Times Herald-Record
Posted May 9, 2018 at 2:00 AM
Updated May 10, 2018 at 5:41 AM

CHESTER — Orange County Executive Steve Neuhaus joined the public comment session at Wednesday's Chester Town Board meeting to tell residents the county's sewer plant might not have the capacity to handle the 431-home Greens at Chester development.

Neuhaus' comments came at a meeting at which some residents were pushing the Town Board to approve a resolution to put a referendum on the November ballot to elect town council members by ward, as a way to head off Greens at Chester's potential bloc-vote political power. Greens at Chester, which will eventually house about 3,000 residents, is to be marketed to Hasidic Jewish families.

Plans call for Greens at Chester to send its sewage to the county's sewer plant. Neuhaus suggested a plant capacity issue might be one way to reconfigure the subdivision into more commercial development. That would mean less sewage effluent and more taxable properties, Neuhaus said.

"This is about sustainability," said Neuhaus, a former Chester supervisor, who is a town resident. "You're out of sewer capacity." Neuhaus urged the town to join with the county and other municipalities in a study focusing on the sewer plant's future capacity.

Chester Supervisor Alex Jamieson said since a 2010 lawsuit mandated the development to proceed, the town could be liable for millions in damages if the development is somehow stopped. Greens at Chester is located just west of the Whispering Hills development, north of West Avenue.

As for commercial development, Jamieson said he's met with the Greens developers, and they've said building houses is the best way to make a profit. He said the developers want to build 100 houses a year. He expects the first houses to be completed by spring 2019.

As the public comment session opened, speakers from Preserve Chester, a group pushing for wards, urged the board to approve a resolution to get the wards proposal on the November ballot. "Time is of the essence," said Kristi Greco, one of Preserve Chester's co-founders. Mary Luciana, another Preserve Chester member, pushed the board to set a hearing on the November ballot initiative right on the spot.

Councilman Robert Valentine accused Luciana of trying to "hijack" the board. Valentine said although he supports referendums, he said the board must do further study. "I'm not going to put it on the ballot unless it's an informed decision," Valentine said.

Jamieson is pushing the town to adopt a plan to buy up development rights as a means to preserve open space. The board set a hearing on that plan for June 13.

dbayne@th-record.com

TOWN OF CHESTER: COUNTY OF ORANGE
STATE OF NEW YORK
------------------------------------------------------------------x

GREENS AT CHESTER LLC,

*Claimant,*

v.

TOWN OF CHESTER,

*Respondent.*

------------------------------------------------------------------x

Index No.:

**AFFIDAVIT OF SERVICE**

| | |
|---|---|
| STATE OF NEW YORK | ) |
| | )ss.: |
| COUNTY OF WESTCHESTER | ) |

   MARIANA AGUILA, being duly sworn, deposes and says: I am over the age of 18 years and not a party to this action, am over 18 years of age, and reside in Mahopac, NY.

   That on the 30th day of April 2019, I served a true copy of the annexed Notice of Claim with Supporting Exhibits 1-7 by hand delivery, addressed to the last known addresses of the addressees as indicated below:

   Town Clerk of the Town of Chester
   1786 Kings Highway
   Chester, New York 10918

MARIANA AGUILA

Sworn to before me this
30th day of April, 2019

NOTARY PUBLIC

DANIELLE R. CALDER
Notary Public, State of New York
No. 01CA6275213
Qualified in Westchester County
Commission Expires January 22, ____

4079880.v1