

445 Hamilton Avenue, 14th Floor
White Plains, New York 10601
T 914 761 1300
F 914 761 5372
cuddyfeder.com

September 27, 2019

BY ECF: chambersnysdseibel@nysd.uscourts.gov
Hon. Cathy Seibel
United States District Judge
United States Courthouse
300 Quarropas St.
White Plains, NY 10601-4150

RE:     *Greens at Chester LLC v. Town of Chester, et al.*
        Docket No.: 19-cv-06770

Dear Judge Seibel:

We represent Plaintiff and submit this letter in response to the County and Town Defendants' separate letters requesting a pre-motion conference in anticipation of moving to dismiss the Complaint.

## Case Background

Plaintiff seeks redress to (a) end Defendants' campaign of discrimination and (b) recover damages for the harm already done by their conduct aimed—thus far successfully—at "keeping the Hasidic out" of Plaintiff's fully-approved 431-unit residential development known as the Greens at Chester ("Greens").

Defendants present this civil rights action as a garden-variety land use dispute over the denial of building permits (the "Denials"). This pose entails (i) hiding the contrived and pretextual grounds upon which the Denials were based; (ii) recasting Defendants' extensively documented prejudicial declarations and admissions, which evince motive and intent, as irrelevant "critical" comments; and (iii) pretending, against all evidence, that there is no link between Defendants' prejudicial statements and Defendants' actions.

The record makes plain that this is a meritorious civil rights case based on Defendants' "intentionally prejudicial" affirmative acts to damage, delay, harass, and ultimately stop Plaintiff from developing the Greens according to the Final Approval, Approved Plans and duly filed Final Plat.[1]  It is a ripe action, with substantial damages already incurred based on final decisions made by the Town and County.

## The Town Defendants' legal arguments

*Ripeness*

The Town argues that Plaintiff's claims are not ripe because Plaintiff failed to seek a "final decision" by appealing the Denials to the Zoning Board of Appeals ("ZBA").

---

[1]Unless otherwise indicated capitalized terms shall have the same meaning as these Defined Terms in Plaintiff's Complaint.

4240724.v1

September 27, 2019
Page 2

First, the Town Defendants disregard that, independent of their illegal withholding of building permits, the Town Defendants have already caused concrete damage to Plaintiff. The Town Defendants have forced Plaintiff, at great cost, to deviate from its approved subdivision plans and alter in-progress work. Plaintiff's resulting injuries exist in "a concrete and final form." Murphy v. New Milford Zoning Com'n, 402 F.3d 342 (2d Cir. 2005). There is not "one way" Plaintiff "could have appealed any aspect of" these targeted and unprecedented directives from an assortment of Town officials. Sherman v. Town of Chester, 752 F.3d 554 (2d Cir. 2014). See also West 95 Housing Corp. v. New York City Dept. of Housing Preservation and Development, No. 01-345-CV, 2001 WL 664628, at *5 (S.D.N.Y. June 12, 2001).

Second, Plaintiff's claims regarding the Denials are ripe, as the Denials could not have been appealed to the ZBA. *In fact, it was the Town's own explicit basis for the Denials that put the matter outside the jurisdiction of the ZBA*.

While the ZBA often has authority to review a building inspector's determination, the ZBA is not an administrative law, or appellate, court sitting in review of all determinations made by a building inspector and certainly not of a Town Board, Planning Board or Town Supervisor. Rather, *the ZBA's jurisdiction is strictly limited to a review of decisions based on zoning regulations*. Where, as here, a decision is based on anything external to the local zoning code, the ZBA has no authority to review that decision. See Portion Properties, Inc. v. De Luca, 126 A.D.2d 650, 652 (2d Dep't 1987) (ZBA had no authority to review building permit denial based on application and interpretation of State and Town building codes); see also Shank v. Town of Dryden, 195 A.D.2d 858, 859 (3d Dep't 1993) (ZBA power limited to zoning ordinances).

The Town did not allege that Plaintiff had violated the Final Approval, Approved Plans or the Town Zoning Code in the Denials. Rather, the Town Building Inspector invoked additional restrictions on the Greens supposedly contained in the Settlement Agreement between the Town and Plaintiff's predecessor in interest. When pressed about the pretext for the second ground of the two Denials, the Purported Infrastructure Condition[2] (Complaint, ¶209-236), the Building Inspector claimed that he was merely a messenger as that issue would be decided by the Town Board. (Complaint, Ex. 24). Regardless, concerning a contract, the ZBA could issue no variance, special permit, interpretation or reversal. Plaintiff's only recourse was to the Judiciary. See, e.g., Murphy, 402 F.3d at 349 ("property owner need not pursue such application when a zoning agency lacks discretion to grant variances").

The facts at bar satisfy both primary concerns of the ripeness doctrine identified by Second Circuit decisions; specifically, that the court have a full record and that it know how the governing law or documents at issue will ultimately be applied. Here, there is a full record of the Town Defendants' actions with respect to Plaintiff and the Greens. So too, the Court has certainty over how the Town Defendants will use their power and, with respect to the building permits, how the Town has interpreted the Settlement Agreement and SEQRA Findings. The ZBA has no jurisdiction and is unable to develop the record further.

---

[2] See Joy Builders, Inc. v. Town of Clarkstown, 165 A.D.3d 1084, 87 N.Y.S.3d 60 (2d Dept. 2018) (holding that a holdback of 10% of building permits under a Town of Clarkstown Code provision until all development infrastructure was first completed was null and void because in conflict with Town Law §277(9); See also Incorp. Vil. Of Northport v. Guardian Federal Savings & Loan Assoc., 87 Misc.2d 344 (Sup. Ct. Suffolk Cty., April 26, 1976) (citing Tuckerman v. Dassler, 121 N.Y.S.2d 205 (Sup. Ct. Westchester Cty., March 11, 1953) (determining that where like here a Planning Board approved bonding as security for the subdivision's infrastructure and bond posted the Town could not subsequently withhold building permits and require first the completion of all improvements.)). A fortiori the Town's 100% holdback of building permits (after bonding no less) is patently illegal.

4240724.v1

September 27, 2019
Page 3

*Causal Links*

The Town argues that the Complaint is larded with irrelevant scandalous allegations. Upon examination of the record, these arguments crumble to dust. The pretext for the Denials was a nonexistent restriction conjured from a misquoted passage in a document falsely claimed to be referenced in the Settlement Agreement. (Complaint, ¶198-99.) And the Town Defendants placed unprecedented restrictions and conditions on the Green's development. The Town Defendants would have the Court believe that this thin gruel bears no relation to the Town Supervisor and Deputy Town Supervisor's promise that they were working "every day" to "alleviate 432 Hasidic houses" in the Town of Chester. [3] This is absurd.

*Plaintiff's Count for breach of the covenant of good faith and fair dealing should not be dismissed*

There is no prohibition against pleading both breach of contract (express terms) and breach of the covenant of good faith and fair dealing (implied duty). Where the claims are supported by factually distinct allegations, both claims may stand. *See, e.g.*, Hospital Authority of Rockdale County v. GS Capital Partners V Fund, L.P., 2011 WL 182066, at *4-5 (S.D.N.Y. January 20, 2011).

**The County's position and legal arguments**

The County engages in sleight of hand in its pre-motion letter. The County posits that it inquired earnestly about the adequacy of the Greens' water supply in its letter to the New York State Department of Health but nevertheless proceeded to renew Plaintiff's water permit. The chronology is the opposite. The County *engineers* first renewed the Greens water permit with their finding that the water system was adequate. Afterward, a County political appointee went against the engineers and wrote a letter to the New York State Department of Health asking the agency to require further testing by the Greens. In that letter, the County engaged in another sleight of hand, including the assertion that there existed ongoing litigation at that time. Only after the County's unprecedented letter did the State seek to require costly new water testing. (Complaint, ¶147-157).

It strains credulity to suggest that Neuhaus's words were not directly connected to the County actions. The Complaint accepted him at his word when he directly declared without equivocation that "I am the County" and when he promised that he would "use" his control of water and sewer systems, among other "firepower," to prevent his hometown from becoming another Kiryas Joel (a predominantly Hasidic village). (Complaint, ¶ 9, 12, 62, 118-121, 143-146). Village of Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252, 263, 97 S.Ct. 555, 562 (1977); Rosen v. Thornburgh, 928 F.2d 528, 533 (2d Cir. 1991); Doe v. Village of Mamaroneck, 462 F.Supp. 2d 520 (S.D.N.Y. 2006).

To the extent, however, that the County and Neuhaus are now claiming that they (a) have no power over any aspect of the development of The Greens, (b) will not deny the Greens a sewer permit, or otherwise delay or obstruct the issuance of same from the Town, which the County as owner and operator of the Sewer Plant has the power to do, *inter alia*, by invidiously limiting the sewer allotment of the Town (which

---

[3]The Town Supervisor openly admitted that the Greens could not be stopped because it had every required approval. Further, the Supervisor specifically acknowledged that the size of homes could not be restricted. Consequently, when the Town subsequently acted to impose two sequential size restrictions, it could no longer hide behind the denials as a typical good faith albeit erroneous decision of a public servant. Brady v. Town of Colchester, 863 F.2d 205 (2d Cir. 1988); Sullivan v. Town of Salem, 805 F.2d 81 (2d Cir. 1986); Bloomingburg, *infra*.

4240724.v1

September 27, 2019
Page 4

is contractually obligated to provide sewer to the Greens), (c) will withdraw its disingenuous letter to the Department of Health and will  not further interfere with the Greens' water permit; and (d) will not interfere directly or indirectly with the development of the Greens, Plaintiff is prepared to agree upon a simple confirmatory stipulation and discontinue this action against the County without prejudice. Of course, if Plaintiff has misunderstood the County's submission, Plaintiff's formal response continues below and Plaintiff's claims stand.

*The claims against the County are ripe*

The County distorts the ripeness doctrine. Plaintiff does not need to allege that it "applied, for, and the County rejected," a permit (County's pre-motion letter, p.3). *See, e.g.*, Sherman v. Town of Chester, 752 F.3d 554 (2d Cir. 2014); Le-Blanc-Sternberg v. Fletcher, 67 F.3d 412, 424-425 (2d Cir. 1995); Bloomingburg Jewish Educ. Ctr. v. Village of Bloomingburg, 111 F.Supp.3d 459 (S.D.N.Y. 2015).

Plaintiff's claims are ripe because the County's many discriminatory acts—*e.g.*, its pretextual request for costly and time-consuming water retesting—that underlie Plaintiff's claims against it exist in "a concrete and final form." Murphy, 402 F.3d at 349. There is not "one way" Plaintiff "could have appealed any aspect of the" County's actions complained of. Sherman, 752 F.3d at 563. *See also* West 95 Housing Corp. v. New York City Dept. of Housing Preservation and Development, No. 01-345-CV, 2001 WL 664628, at *5 (S.D.N.Y. June 12, 2001) (claims ripe where no administrative procedures available). All the cases the County cites are distinguishable because, unlike here, they involved situations where the plaintiff failed to appeal or seek a variance from the zoning agency with jurisdiction to determine how plaintiff could use its land. Here, the County acted pursuant to County policy to stop the Greens because it already had Final Approval. Therefore, Neuhaus announced the need for a plan and how the County could play its role.  When it then initiated water retesting, it crossed the line from mere political speech to action.

*Plaintiff states a claim against the County for violation*
*of the Fair Housing Act, Equal Protection Clause, and Sections 1981 and 1982*

In an FHA case, if the motive for the complained of conduct is discriminatory, it is irrelevant that such conduct would be permissible if taken for nondiscriminatory purposes. Smith v. NYCHA, 410 Fed. Appx. 404, 406 (2d Cir. 2011). Here, among other things, the County's complaint to the State regarding the Greens' water (Complaint, ¶147-153, Ex.'s 8, 9), after Neuhaus' admission that he would use "every resource we have in this County to explore all these options," falls squarely within this definition.

Contrary to the County's position, Plaintiff has standing to pursue its FHA claims against the County. The law is clear that a developer may bring a claim on behalf of "future residents of a subdivision." Bloomingburg Jewish Educ. Center, 111 F. Supp.3d at 490 (citing Eldorado Estates v. City of Fillmore, 765 F.3d 1118, 1122 (9th Cir. 2014). Even though Plaintiff easily meets the test for standing—as its principals are Hasidic and garner the protection of the FHA themselves—"courts have granted standing to, among others, developers asserting challenges under the FHA against municipal decisions that present a barrier to developments." Bloomingburg Jewish Educ. Center, 111 F. Supp.3d at 490 (*citing* Anderson Grp., LLC v. City of Saratoga Springs, No. 1:05-cv-1369 (GLS DRH), 2011 WL 2472996, at *2 (N.D.N.Y. 2011). See also Franklin Bldg. Corp. v. City of Ocean City, 946 F. Supp. 1161, 1166 (D.N.J. 1996) ("plaintiff builder may assert the rights of third-party 'John Does' who allegedly would have benefited from the proposed housing").

4240724.v1

September 27, 2019
Page 5

Neuhaus, (1) advocated for a "special formula" for Hasidic Jews (Complaint, ¶ 158, May 9, 2018 Meeting at 1:17:49, bit.ly/Chester-02), (2) expressed that he and the Town Supervisor were being "careful" not to mention that neighboring Kiryas Joel are why the County was seeking to stop the Greens (id., ¶ 9; April 25, 2018 Meeting at 2:40:08, bit.ly/Chester-03), (3) exclaimed that Hasidic Jews enjoy their own special welfare distribution from the State (*id.*), (4)  explained the need to "pressure the developer" via, *inter alia*, pushing for renewed water testing and the inevitable denial of a sewer permit (which the County now claims it does not even have authority to issue) as follows: "we use the reason for not having sewer capacity…you guys are out of sewer right now…I don't care what your lawyer tells you, you're not getting a sewer permit from me…I'm not giving you a permit…I'm telling you right now I'm the County. I'm telling you, you don't have the capacity." (*Id.*, ¶ 12, May 9, 2018 Meeting at 1:19:28, bit.ly/Chester-23).

These declarations support an independent claim and serve as a "barrier to development." Neuhaus's discriminatory statements railing against an influx of Hasidic purchasers are relevant proof of FHA and other civil rights violations.[4] *See, e.g.*, Congregation Rabbinical College of Tartikov, Inc. v. Village of Pomona, 915 F.Supp.2d 574 (S.D.N.Y. 2013); Bloomingburg Jewish Educ. Center 111 F. Supp.3d at 459, 486-489. The County's claim that Neuhaus merely "aired his concerns with the project" is itself offensive.

The County's assertion that § 1982 does not protect Hasidic or Orthodox Jews from discrimination is wrong. Responding to an argument that discrimination against Orthodox Jews did not violate §§ 1981 and 1982, the Second Circuit held "Sections 1981 and 1982 were 'intended to protect from discrimination identifiable classes of persons who are subjected to intentional discrimination solely because of their ancestry or ethnic characteristics' . . . . Because Jewish culture, ancestry, and ethnic identity are intricately bound up with Judaic religious beliefs, racial and religious discrimination against Jews cannot be as easily distinguished as defendants would have it . . . . Moreover, the Supreme Court has explicitly stated that Jews are entitled to the protections of §§ 1981 and 1982 because Jews were considered to be a separate race in 1870 when those statutes became law. We need not inquire any further." LeBlanc-Sternberg v. Fletcher, 781 F.Supp. 261, 267-68 (2d Cir. 1991).

Finally, individual defendants Valentine (current Town Supervisor), Jamieson (former Town Supervisor), and Neuhaus (County Executive) are not immune from suit under § 1983. Qualified immunity shields only conduct, which "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Any reasonable person would know that discrimination against Hasidic Jews violates statutory and constitutional rights. Here, Neuhaus conceded that he and the Town knew of this when he publicly announced that he, Jamieson, and the rest of the Town officials were being careful not to directly mention Hasidic Jews and Kiryas Joel in connection with their desire to stop the Greens.  Complaint, ¶ 9.

Based upon the foregoing, Defendants' anticipated motions to dismiss should be strongly discouraged.

Respectfully submitted,

/S/ Joshua J. Grauer

Joshua J. Grauer

---

[4]Soo too are all similar rantings and actions by the Town Supervisors and those responsive to them overwhelming evidence of FHA violations by the Town Defendants herein.

4240724.v1