UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
GREENS AT CHESTER LLC,

                                    Plaintiff,           **FIRST AMENDED**
                                                         **COMPLAINT_____**

        -against-                                        Docket No. 19-cv-06770 (CS)

TOWN OF CHESTER, JAMES. M. FARR,
individually and as Building Inspector of the
Town of Chester, ROBERT VALENTINE,
individually and as Supervisor of the Town of
Chester, ALEXANDER J. JAMIESON,
as former Supervisor of the Town of Chester,
STEVEN M. NEUHAUS, individually and as
County Executive of the County of Orange,
and THE COUNTY OF ORANGE,
                                    Defendants.
------------------------------------------------------------X

        **PLAINTIFF, GREENS AT CHESTER LLC** ("Plaintiff"), as and for its First Amended

Complaint against the above-captioned Defendants, hereinafter alleges as follows:

**Nature of the Case**

        1.      This action arises from illegal, discriminatory conduct by the Town of Chester,

County of Orange, and their highest officials to obstruct a fully approved housing development

known as The Greens at Chester ("The Greens").

        2.      Pursuant to a 2010 settlement agreement resolving an action in this Court (Seibel,

USDJ, Docket No. 09-cv-4110), the Town and its Planning Board approved the 117 acres of The

Greens for a 431-lot cluster subdivision ("Settlement Agreement," a copy of which is annexed

hereto as Exhibit 1).

        3.      A final subdivision plan (the "Approved Plans") for The Greens was unanimously

adopted by the Town Planning Board in a November 6, 2013 Resolution of Final Subdivision

and Site Plan Approval ("Final Approval"). (A copy of the Approved Plans and the Final

Approval are annexed hereto as Exhibit 2 and Exhibit 3, respectively.) The "Final Plat" for The Greens was filed with the Orange County Clerk on July 7, 2014.

4.    All that remained for Plaintiff to be able to build homes at The Greens was to receive from the Town ministerial, non-discretionary building permits for houses complying with the Approved Plans.

5.    Yet since Plaintiff acquired The Greens in 2017, Defendants have improvised a series of illegal policies to prevent the construction of any homes at The Greens and drive Plaintiff out of business.

6.    Defendants have done so because, by their own account, they fear the homes will be purchased and occupied by Hasidic Jewish families, whom Defendants regard as "threats" to the "character" of the Town.

7.    Defendants' obstructionist actions have included, *inter alia*:

- denying ministerial, non-discretionary building permits for houses that comply fully with the Approved Plans;
- fabricating passages in official documents to invent (1) house-size restrictions at odds with the Approved Plans and (2) a requirement at odds with the Final Approval and Town Law that Plaintiff must complete all (and may not bond any) public infrastructure prior to receiving a building permit;
- abusing government offices to rescind or reopen permits on mendacious grounds;
- imposing a farcical maze of continuously evolving conditions to the use of Plaintiff's property;
- treating Plaintiff differently from similarly situated property owners or developers in the history of the Town;
- abusing authority to make demands for public improvements not required by the Approved Plans;
- enacting local laws targeting Plaintiff and Hasidic Jews; and
- imposing newly adopted regulations on The Greens in direct contravention of the Settlement Agreement (and doing so knowingly in bad faith).

8.    That Defendants have undertaken these actions out of discriminatory motives is not a matter of inference; Defendants have spoken publicly of their aim to keep Hasidic Jews out of the Town.

9. Here are then-Town Supervisor Alex Jamieson and then-Deputy Town Supervisor (and current Town Supervisor) Robert Valentine responding to a resident's request that they act to "keep" the community "as is"—*i.e.*, without Hasidic Jews:

> JAMIESON: We're doing what we can to alleviate 432 *[sic]* Hasidic houses in the Town of Chester. We're trying.
>
> VALENTINE: Every day.
>
> JAMIESON: There's nobody on this Board, there's nobody on the Board, nobody that works in the Town, there's nobody that want this development to go through. There's nobody. There's nobody who wants the development to go through.

(May 9, 2018 Meeting at 1:30:30, bit.ly/Chester-01).[1]

10. Here is Orange County Executive Steven M. Neuhaus, himself a resident of Chester and formerly its Supervisor, responding at a Town meeting to an inquiry whether there was "a way financially to slow them [Plaintiff] down" because "they [Hasidic Jews] all or many of them" rely on public assistance:

> I'm trying to slow things down because I don't think the school district can handle it. I don't think my accountant can handle it. . . . We don't have the sewer. Your question about welfare, I'm not going to get into it. Scott [Bonacic, Chester Town Attorney] is proud as hell that I'm not his client right now. But here's the deal: you live in Warwick, you go on welfare in Orange County, you need SNAP, you need any type of assistance, you got to come through me, and we are tight with you. We're tough. . . . The [Hasidic] village of Kiryas Joel, if that's what you're asking about—because I know you are, everybody in the room is doing it and Alex [Jamieson, Chester Town Supervisor] and the rest of us are being careful [not to mention the Hasidic/Kiryas Joel factor explicitly]— goes directly to Albany for their social service benefits. . . . It was set up that way because of cultural differences.  (April 25, 2018 Meeting at 2:40:08, bit.ly/Chester-03).

(Needless to say, only in the fervid imaginings of Steven M. Neuhaus do Hasidic Jews enjoy their own special welfare distribution system from the state.)

---

[1] Here, and wherever possible throughout this Complaint, video reference is provided for quotations. Navigating in an internet browser to the address beginning with "bit.ly" will bring up video of a public meeting at the moment of the utterance in question.

11.     At the same meeting, Neuhaus elaborated on "ways that we could stop the development":

> First of all, we can pressure the developer. We have a lot of influence here. This gentleman talked about building permits, the County Health Department. I don't know when the water was tested. . . . There's a lot of stuff to revisit. . . . When was the traffic study done?. . . . But we can pressure them to either go commercial, which I think we should do, or we can buy it. . . . You could also take it by eminent domain for the purposes of economic development. . . . That's why I'm not talking about when they're gonna start building. . . . Alex [Jamieson, then-Town Supervisor], I know you're with me on this. I know you are too, Bobby [Valentine, then-Deputy Town Supervisor] and Ryan [Wensley, Town Board Member].

(April 25, 2018 Meeting at 2:36:30, bit.ly/Chester-05).

12.     That Defendants know their policies and actions are illegal is evident from prior admissions they made in public.

13.     As Valentine stated: "If there were any way that, like, you know, legally, we could, like, choose who could live there or pick who could live there or what size house they could do, we would love to do that. But we can't do it." (February 28, 2018 Meeting at 37:28, bit.ly/Chester-07).

14.     Two months later, Valentine went further:

> What are we supposed to do to stop him? Do you have an idea? Do you have something you can tell us because we're trying to do everything we can. . . . We can't require further testing . . . It's approved by every agency that is supposed to approve it. . . . So what do you expect us to do? Break somebody's kneecaps? I mean it's not that easy. . . . We can't stop it right now. They've done what they're supposed to do. We can't stop it.

(April 25, 2018 Meeting at 2:29:38, bit.ly/Chester-06)

15.     At the same meeting, Jamieson acknowledged that he expected 80 to 90 houses to be built at The Greens within one year.

16.     That Defendants meant to conceal their anti-Hasidic motives, knowing them to be an illegal basis for policy, is evident from numerous public statements they made.

17.     Neuhaus took care to stress that he and Jamieson were "being careful" not to call attention to how Hasidic Jews figured in their thinking. *See* quote in ¶ 10, above.

18.     More than once, Neuhaus remarked wryly that County and Town lawyers were undoubtedly displeased with his rhetoric concerning The Greens.

19.     Jamieson himself said: "We are going to fight them and we're not rolling over, and, although, we, sometimes, in my situation I have to be careful what I say and what I can't say." (April 25, 2018 Meeting at 2:03:34, bit.ly/Chester-04).

20.     James Farr, the Town Building Inspector, was similarly coy: "I cannot respond to you or anyone else's emails in regard to this matter [The Greens].  As you know, any formal correspondence can be FOIL'd."

21.     Despite knowing better, at certain moments in public meetings Defendants could not hold back their true feelings about their Hasidic problem, including the following:  February 28, 2018 Meeting at 46:39, bit.ly/Chester-09; March 14, 2018 Meeting at 28:15, bit.ly/Chester-08; April 25, 2018 Meeting at 41:42, bit.ly/Chester-10; April 25, 2018 Meeting at 2:12:57, bit.ly/Chester-13; May 9, 2018 Meeting at 1:29:30, bit.ly/Chester-12; May 9, 2018 Meeting at 1:17:49, bit.ly/Chester-02; May 9, 2018 Meeting at 1:19:28, bit.ly/Chester-23.

22.     To date, the Town has not issued a single building permit to Plaintiff, and has made it plain that it will never do so absent a court order.

23.     Based on the discriminatory treatment Plaintiff has suffered at the hands of Defendants, and the injuries Plaintiff has already sustained in a final and concrete form, Plaintiff is entitled to damages and permanent injunctive relief under, *inter alia,* Section 1983 of the Civil Rights Act, with punitive damages from the individual Defendants, for (i) denying Plaintiff due process and equal protection of the laws, (ii) violating Plaintiff's constitutional right to just

5

compensation for the taking of Plaintiff's property, and, *inter alia*, (iii) violations of the Fair Housing Act and §§ 1981 and 1982.

24.     Plaintiff is also entitled to damages from the Town for breaching the Settlement Agreement, as well as various forms of declaratory relief.

## Jurisdiction and Venue

25.     This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331, 1343, 1367, 1651(a) and 2201 and 42 U.S.C. §§ 1981, 1982, 1983, 1985, 3604, and 3617.

26.     The venue of this action is proper in the Southern District of New York, under 28 U.S.C. § 1391 (b) and (c).

27.     All parties reside or transact business within the territorial bounds of this district.

28.     Designation of The Hon. Charles L. Brieant, Jr. United States Courthouse is proper as the claims asserted herein arose in whole or in major part in the Town of Chester, County of Orange, and State of New York.

## The Parties

29.     Plaintiff is a limited liability company duly organized and existing under the laws of the State of New York, having an office and place of business in the Town of Monroe, County of Orange and State of New York.

30.     Defendant Town of Chester (the "Town") is a municipal corporation duly organized and existing under the laws of the State of New York having an office at Town Hall, 1786 Kings Highway, Chester, New York 10918.

31.     Defendant James M. Farr ("Farr" or the "Building Inspector") is a New York resident and the Building Inspector of the Town.

4317835.v3

32.     Defendant Robert Valentine ("Valentine") is a New York resident and the Town Supervisor.

33.     Defendant Alexander J. Jamieson ("Jamieson") is a New York resident and former Town Supervisor (2014-18) (collectively with the Town, Farr, Valentine, and Jamieson, the "Town Defendants"; each, a "Town Defendant").

34.     Defendant Steven M. Neuhaus ("Neuhaus"), is a New York resident, the County Executive of the County of Orange, and the former Town Supervisor (2008-13).

35.     Defendant County of Orange (the "County"; collectively with Neuhaus, the "County Defendants" and, together with Neuhaus and the Town Defendants, "Defendants"), is the county government for Orange County, New York having its principal office at the Orange County Government Center, 255 Main Street, Goshen, New York 10924.

### Facts

36.     Plaintiff is a venture of experienced New York homebuilders and real estate professionals which was formed to serve consumer demand for housing in Orange County.

37.     Some of the members and managers of Plaintiff are visibly Hasidic Jews in their dress and appearance.

38.     On October 27, 2017, Plaintiff acquired the 117-acre development property (the "Property") in the Town on which The Greens is to be built.

*"A non-Hasidic Community"*

39.     Immediately upon Plaintiff's purchase of the Property, Jamieson and Valentine, on behalf of the Town, summoned Plaintiff to a meeting (the "November 13, 2017 Meeting") attended by eight principal members of Plaintiff, Valentine and Jamieson, the Town Engineer, and Neuhaus, who joined midway.

4317835.v3

40.     Valentine opened the meeting by stating that it was "off the record," and jokingly asked the members of Plaintiff if they were recording it.

41.     Valentine informed the members of Plaintiff that they had "rights" as property owners, and went on to interrogate them about their specific building program.

42.     Valentine asked what The Greens "is going to be for"; "what is the target" audience"; had Plaintiff "advertise[d] in [a] Jewish newspaper"; and did Plaintiff intend to build houses for "their [own] community"—*i.e.*, for Hasidic Jews.

43.     A member of Plaintiff explained that the partners were businessmen who between them had built thousands of residential units in New York for the general public, had never once engaged in any form of discrimination, and were not about to start doing so.

44.     Plaintiff also acknowledged the fact that Hasidic Jews represented a significant portion of the demand for housing in the Orange County market.

45.     Plaintiff informed Valentine that it had done no advertising, direct or indirect, in any media outlet, Jewish or otherwise, and had issued no press release of any kind.

46.     Valentine instructed Plaintiff to inform him before ever taking out any advertisements about The Greens in Jewish newspapers.

47.     Valentine then urged Plaintiff specifically to "create a non-Hasidic community."

48.     To that end, Valentine offered to introduce Plaintiff to a former Town Board member who had enjoyed success selling "non-Hasidic homes" as a real estate broker.

49.     Valentine's extraordinary discourse at the November 13, 2017 Meeting is memorialized in the Town Engineer's notes to the meeting, a copy of which is annexed hereto as Exhibit 4.

50.     Valentine made it clear that from his standpoint, Hasidic Jews did not belong in Chester when he added: "This isn't Brooklyn. People here have big guns."

51.     At the end of the meeting, Neuhaus communicated that the Town and County were generally aligned in their ideas about The Greens.

52.     The November 13, 2017 Meeting was a more ominous echo of a meeting held three days earlier for construction professionals of both Plaintiff and the Town.

53.     At that meeting, the Town Engineer informed Plaintiff that the Town would be requiring a number of changes to the Approved Plans, but there was no need for concern because Chester was a "quid pro quo" town.

54.     At the end of the meeting, Valentine advised Plaintiff that he and his colleagues would ensure "expedited approval" for an application by Plaintiff to rezone the Property from residential to commercial development centered around the Legoland theme park that was scheduled to be constructed nearby.

55.     Thus, within days of Plaintiff's acquisition of the Property, both the Town and the County had pressured Plaintiff to abandon its residential plan and vested rights.

*Deviations from the Approved Plans*

56.     As Plaintiff began initial site clearing shortly after its purchase of the Property, Town policy toward The Greens took the form of peremptory "special requests" that were outside of what was required by the Approved Plans or any standard to which similarly situated developments are held.

57.     For example, with no basis in the Approved Plans or any engineering necessity, the Town required Plaintiff to (a) double the quantity of certain subgrade material in the main road through The Greens that would eventually be dedicated to the Town; (b) move the road by

ten feet after Plaintiff had performed time-consuming and costly earth work pursuant to the

Approved Plans; and (c) reroute the sewer waste line for The Greens from underneath the

adjacent public roadway to underneath neighboring private property—for which Plaintiff was

required to purchase expensive easements from local property owners.

58.     These impositions came at substantial delay and cost to Plaintiff.

59.     The Town stationed an inspector at The Greens—who would often be found

reading or napping in his car—all hours of the work day no matter how minimal the site activity

(*e.g.*, clearing snow), and charged the cost to Plaintiff.

60.     What the Town Defendants repeatedly described as "24/7" surveillance of

Plaintiff is contrary to customary practice, including the Town's—and certainly has not been

warranted by Plaintiff's construction practices, which (as the Town Defendants themselves

acknowledge) have been exemplary.

***"Keep the Hasidic Out"***

61.     In time, the Town's policy response to The Greens coalesced around a number of

proposed new local laws aimed at "keep[ing] the Hasidic out," as Jamieson was reported in the

local newspaper to have explained. (Jamieson claims to have been misquoted.)

62.     The Town introduced the idea of dividing the Town into wards for purposes of

electoral representation on the Town Board. Instead of Board Members being elected by popular

vote of the Town, each ward would vote in its own Board Member.

63.     In this way, the influence of a well-organized, geographically concentrated

group—like an imagined future Hasidic community at The Greens—could be contained within a

single ward, and would not "take over" the Town.

4317835.v3

64.     In a public meeting, Jamieson linked the ward system directly to The Greens and Hasidic Jews, and said in his summation on behalf of the law: "You're not going to stop everybody from moving in. But if we could stop 'em a little bit, that's better than nothing" (April 25, 2018 Meeting at 38:23, bit.ly/Chester-72).

65.     The Town also proposed and approved a tax that would be levied exclusively on newcomers buying property in the Town ("PDR Tax").  Revenue from the PDR Tax would support the Town's own purchase of private property to prevent it from being developed by private owners.

66.     The anti-Hasidic intent of the PDR Tax was twofold: (a) as a barrier to entry for Hasidic homebuyers who are thought to represent the bulk of the local demand for housing; and (b) to allow the Town to purchase property adjacent to The Greens in order to isolate the imagined Hasidic community there and prevent it from expanding.

67.     In advocating for the PDR Tax, Jamieson said: "I personally feel that the PDR is the only way, or not the only way, but one of the sure ways to ensure that we keep our town. It's one of those things that I really think that with the PDR in place, we could preserve the open space that's still left in this town so that others can't get to it" (April 25, 2018 Meeting at 8:06, bit.ly/Chester-86).

68.     The actual implementation of the PDR Tax was vetoed by Governor Cuomo.

***The April 25, 2018 Meeting***

69.     In early 2018, as Plaintiff continued undaunted to set down infrastructure and prepare lots for houses, the Town made Plaintiff and The Greens the focus of several public meetings—even when neither Plaintiff nor The Greens had any application or matter pending before the Town.

11

70.     With the PDR Tax and Ward System on the agenda for the Town Board Meeting of April 25, 2018 (the "April 25, 2018 Meeting"), residents, activists, and politicians came out in unprecedented numbers for a broad discussion of policy in the face of The Greens.

71.     Several openly anti-Semitic comments were expressed by members of the public who were given the floor, including:

> I get that they [Hasidic Jews] won but my God, it doesn't mean they have to rape us.  (April 25, 2018 Meeting at 1:53:15, bit.ly/Chester-16).
>
> They're not gonna use their Medicaid cards for us to pay for them [to plow their snow]? I don't understand how they get away with not telling the state that they're married, so that they're all single moms. And they all get Medicaid. And we pay for them. (April 25, 2018 Meeting at 1:39:08, bit.ly/Chester-17).
>
> Forget about just Chester because let's say we stop this [here]. That's great.  [But] they're just gonna move on to the next [town]. They've got all this money. They've got all these attorneys. Every attorney is Jewish nowadays. (April 25, 2018 Meeting at 2:32:18, bit.ly/Chester-18).

72.     The first comment was greeted with applause and the second comment with titters and applause; only the third drew any groans of protest.

73.     A few minutes later, a local politician took the floor to suggest that the third comment be condemned lest it be used as evidence of improper motives for Town policies. (April 25, 2018 Meeting at 2:35:23, bit.ly/Chester-19).

74.     As chair of the meeting, Jamieson proceeded to condemn the incriminating comment and instruct that it be "stricken from the record." (April 25, 2018 Meeting at 2:36:06, bit.ly/Chester-20).

75.     Neuhaus told the crowd that it was imperative to "say no" to The Greens, and to use all the resources of the Town and County governments to do so. (April 25, 2018 Meeting at 1:20:55, bit.ly/Chester-14).

76.     Included among the ideas proposed by Neuhaus were "pressure," "coercion," "firepower," use of the "eminent domain" power, forcing a commercial rezoning, extra-ordinary scrutiny, application of new, costly "rules" and "tests" and "requirements," economic "leverage," withholding of permits, and re-opening of prior approvals relating to traffic and water.

77.     Neuhaus made several veiled and not-so-veiled references to the supposedly Hasidic identity of the eventual residents at The Greens.

78.     For their part, Jamieson and Valentine joined the ritual denunciation of The Greens with several contributions of their own, but repeatedly found themselves on the defensive as audience members accused them of not doing enough to stop The Greens.

79.     In response, they emphasized that there was little they could legally do to stop a project like The Greens that was "approved by every agency."

80.     But Jamieson and Valentine also protested that they had not been pushovers in allowing the development of The Greens to proceed, and were still exploring other ideas.

81.     Jamieson said: "I never said I wasn't gonna stop them"; "we are ["looking into" "further things" "to slow down the development"]"; "stay[ing] on top of these developers to try to prevent an overgrowth." (April 25, 2018 Meeting at 2:26:26, bit.ly/Chester-21).

82.     Valentine said: "If you can come up with a plan to stop it, we are all ears. We would love to hear it."  (April 25, 2018 Meeting at 2:30:44, bit.ly/Chester-22).

83.     The April 25, 2018 Meeting marked a turning point, when Town policy shifted from pressure and interference to outright obstruction.

***Buyout***

84.     The day after the April 25, 2018 Meeting, Jamieson communicated an offer from the Town to buy the Property from Plaintiff for $20 million, nearly $8 million more than Plaintiff

had paid for the land six months earlier and nearly double the Town's entire operating budget for 2018.

85.     After Plaintiff turned down the Town's offer, Jamieson sent a text message to Plaintiff raising the Town's offer to $30 million (which Plaintiff rejected as well).

*Water*

86.     On June 11, 2018 the Orange County Department of Health ("OCDOH") wrote to the New York State Department of Health's ("NYSDOH") Bureau of Water Supply Protection, asking that NYSDOH require re-studying and re-testing of the wells at The Greens for adequate water availability and quality (the "County Water Letter," annexed hereto as Exhibit 5).

87.      The County Water Letter was a false, disingenuous, nakedly political intervention dressed up as a hydrological engineering concern.

88.     "Given Orange County's growth over the past two decades," the County Water Letter explained, "we believe such a [new] study is in order and would be appropriate."

89.     This statement was obviously intended to create the false impression that in the vicinity of The Greens there had been significant growth adversely impacting its wells and the continued validity of Plaintiff's public water supply approval from the NYSDOH (the "Water Approval").

90.     But, as the County was well aware, there had been no growth in the vicinity likely to impact the Water Approval.

91.     Certainly there had been no growth that gave pause to the County about courting Great Wolf Lodge to build a major indoor water-park resort nearby, or about converting The Greens to an industrial facility, either of which would use far more water than 431 residences.

92.     In an especially misleading and inflammatory representation, the County Water Letter stated that as of June 11, 2018 "extensive litigation . . . appears to be ongoing" concerning The Greens.

93.     Most scandalously, the County Water Letter failed to inform the NYSDOH that on May 7, 2018, only one month earlier, the County itself had granted a five-year extension of its own approval of The Greens' water system—an extension that included the express finding by County engineers and hydrologists that The Greens' water system was adequate. (A copy of the letter memorializing the County's five-year extension is annexed hereto as <u>Exhibit 6</u>.)

94.     The County's Senior Public Health Engineer also reminded his political superiors by email (a copy of which is annexed hereto as <u>Exhibit 7</u>) that any issues pertaining to The Greens' water supply would be discovered during, and addressed after, the standard State and local health "look-in" before certificates of occupancy would be issued for The Greens' completed homes.

95.     There was therefore no public-safety justification whatsoever for the County Water Letter.

96.     It is plain that the County Water Letter was a mendacious ploy whereby County politicians and their political appointees usurped the authority of the County's public health professionals in order to deliver on the County Executive's public promise to use the "firepower" of his office to stop The Greens by "revisiting" its water.

97.     Having no reason to suspect ulterior motives on the part of the County (which sent the County Water Letter to the NYSDOH behind Plaintiff's back), the NYSDOH duly proceeded to inform Plaintiff that it "will be requiring a resubmittal" of The Greens' water

4317835.v3

supply plans, a costly undertaking for Plaintiff. A copy of NYSDOH's August 3, 2018 letter is annexed hereto as Exhibit 8.

98.     In a Town Board meeting, Jamieson referred to the water ploy as a tactic the Town was coordinating with the County, questioning aloud whether it had a sound legal basis that would "hold up in Court" (May 9, 2018 Meeting at 1:35:30, bit.ly/Chester-26).

### Size Restriction I: F.A.R. Law

99.     Two days after the April 25, 2018 Meeting, Building Inspector Farr in coordination with the Town Board informed Plaintiff by letter (the "Size Restriction Letter," annexed hereto as Exhibit 9) that all plans accompanying any building permit application for The Greens had to conform to the Town's newly enacted "Floor Area Ratio" ("F.A.R.") Law. Valentine was copied on the Size Restriction Letter.

100.    The F.A.R. Law amended the Town Zoning Code to cap "floor area ratio" or restrict the allowable floor area of a new structure based on the size of the lot on which it is built.

101.    The Size Restriction Letter was false and disingenuous and absurd all at once.

102.    The Size Restriction Letter was false because, as Plaintiff's engineer pointed out in a reply letter to Farr dated April 30, 2018, The Greens was exempt from the F.A.R. Law under the grandfather clause of the Settlement Agreement prohibiting the Town from enacting regulations affecting The Greens and exempting The Greens from their effect.

103.    The Size Restriction Letter was disingenuous because, first, the Town Board knew well that applying the F.A.R. Law to The Greens was illegal and (in Valentine's words) "probably won't work."

104.    The Size Restriction Letter was disingenuous because, second, Farr had just given detailed written feedback to Plaintiff's architect and engineer on plans for a model home—

feedback that included not a word about any need to comply with the F.A.R. Law. A copy of Farr's letter, dated April 6, 2018, is annexed hereto as <u>Exhibit 10</u>.

105.    The Size Restriction Letter was absurd because, as applied to The Greens, the F.A.R. Law would result in almost half the houses being no larger than approximately 583 square feet—slightly smaller than a standard two-car garage and not a legal dwelling unit under the Town Code (not to mention being completely unmarketable).

***2018 Building Permit Denial***

106.    After the Size Restriction Letter, the Town soon conceived entirely new but equally contrived restrictions on the houses at The Greens.

107.    On November 20, 2018 Plaintiff applied for a building permit for a 3,300 square foot house (the "2018 Building Permit Application").

108.    Ten days later, on November 30, 2018, by letter from Farr, the Town denied Plaintiff's 2018 Building Permit Application (the "2018 Building Permit Denial"). A copy of the 2018 Building Permit Denial is annexed hereto as <u>Exhibit 11</u>.

109.    Like the Size Restriction Letter, the 2018 Building Permit Denial is false and disingenuous and absurd all at once.

110.    The 2018 Building Permit Denial is false because it fabricates quotations in documents that it cites; disingenuous because its restrictive theories were clearly improvised after earlier attempts to thwart The Greens appeared they would be unsuccessful; and absurd because it presumes the existence of fundamental restrictions on The Greens that were omitted from, and contradicted by, the Settlement Agreement, Approved Plans, and Final Approval.

111.    To understand the scandal of the 2018 Building Permit Denial, some background is required.

4317835.v3

*Size Restriction II: The 2,500 Square Foot Size Cap*

112.     The allowable size of the houses at The Greens is conditioned by the Approved

Plans established by the Settlement Agreement and the bulk parameters prescribed in the

Approved Plans ("Bulk Table," so called because the parameters are laid out in a table).

113.     The Bulk Table establishes various setback requirements: the footprint of the

detached homes must be "set back" specified distances from the front, side and rear of the

property lines, and from the sidewalk or pavement, utility easements, and neighboring buildings.

114.     A house that conforms to the size conditions of the Bulk Table may be built "as of

right" without any variance, and is entitled to the ministerial issuance of a building permit.

115.     Incredibly, however, the 2018 Building Permit Denial purported to create a new

size restriction limiting the square footage of any and all homes at The Greens to 2,500 square

feet (the "Size Cap").

116.     In fact, the Size Cap is not only absent from the Bulk Table or anywhere else in

the Approved Plans, but is woven from falsifications of the Settlement Agreement and the

Planning Board's 1998 SEQRA Findings (the "Statement of Findings").

117.     The Settlement Agreement stated that the Planning Board was required to: "grant

final subdivision and site plan approval to the [Greens] in accordance with the ***preliminary***

***subdivision and site plan approval for the project granted by the Planning Board in 1998,***

***modified in accordance with the*** [28 pages of the Approved Plans attached to the Settlement

Agreement]."

118.     But in the 2018 Building Permit Denial, the Building Inspector deliberately

misquoted the Settlement Agreement, falsely stating that it provided that "all final subdivision

18

and site plan approval was to be made in accordance with the preliminary subdivision and site plan approval ***Statement of Findings***."

119.    In fact, the "Statement of Findings" is not cited or referenced anywhere in the Settlement Agreement.

120.    The Building Inspector also omitted the Settlement Agreement's inclusion of 28 pages of the Approved Plans and the Bulk Table contained therein, none of which contained or referenced the Statement of Findings.

121.    Having falsely linked the Settlement Agreement to the Statement of Findings, the 2018 Building Permit Denial went on to fabricate a quote from the Statement of Findings to create the Size Cap.

Specifically, the 2018 Building Permit Denial quoted the Statement of Findings <u>as if</u> they read: "(i) one-unit dwellings ***shall be limited*** to 1,700 - 2,500 square feet in a two-story structure and (ii) two-unit dwellings ***shall be limited*** to 1,500 - 2,300 square feet in a two-story structure." (Emphasis added.)

122.    But the words "shall be limited" are conjured out of thin air; they do not appear in the Statement of Findings.

123.    Moreover, the passage in the Statement of Findings—when quoted correctly and read in conjunction with its exposition in the public hearing on the Statement of Findings— demonstrates that the listed size ranges were in fact the <u>minimum</u> that the developer at the time was considering based on market conditions.

124.    As reflected by the transcript of the public hearing, the developer's engineer addressed the Town Engineer's specific question about sizing:

MR. SALERNO: You must have some order of magnitude for the house sizing.

MR. YOUNGBLOOD: *Probably 1700 to 2500 square feet* for the single family home on a lot 3600 square feet **as** *a minimum.  They go up larger than that* . . . . *They range up higher than that. Those are the minimum.*

125.    The Town's own Planning Board Engineer at the time the Statement of Findings was issued, Phillip Salerno, P.E., has furnished a letter utterly refuting the Size Cap:

> The language in the Project Description was intended to provide a conceptual overview of the subdivision. It was not intended, nor should it be interpreted, to establish development standards. The development standards, as determined by the Planning Board and agreed to by the Applicant, as a part of the cluster subdivision review process, are identified on Page 10 of the Resolution, in the Bulk Table. These bulk requirement are limited to the establishment of minimum setback lines and minimum separations between buildings. These bulk requirements are also reflected on the approved subdivision plans.

> The Cluster Development Regulations contained in the Town's Zoning Code specifically give the Planning Board the authority to "impose floor area ratios to prevent excessively large residences on smaller lots". Based upon my involvement in the review process and approval of this project; as well as review of the Resolution, I can definitively state that no such restriction was enacted; nor was it intended.

A copy of Mr. Salerno's October 31, 2018 letter is annexed hereto as <u>Exhibit 12</u>.

126.    The very notion put forward by the Town Defendants—that something as material as an absolute house Size Cap in a cluster subdivision exists but was omitted from the fully integrated Settlement Agreement and its attached Approved Plans—is so absurd that it cannot be advanced with good faith.

*A New Infrastructure Condition*

127.    The 2018 Building Permit Denial added another obstacle to building permits: the new requirement that all the infrastructure for all five neighborhoods or "phases" of The Greens must be completed in the ground—none of it bonded—before Plaintiff could obtain a single building permit (the "Infrastructure Condition").

20

128.    The Infrastructure Condition is yet another of the Town's contrivances to thwart development of The Greens.

129.    The Infrastructure Condition is nowhere to be found in the Settlement Agreement, Approved Plans, Final Approval, Final Plat, or Farr's April 6, 2018 letter.

130.    Like the Size Cap, the Infrastructure Condition was conceived from a passage in the Statement of Findings, which itself was said falsely to be referenced in the Settlement Agreement.

131.    However, the Statement of Findings conceives of the Infrastructure Condition as an optional measure the Planning Board <u>could have instituted</u>: "The Town of Chester Planning Board will be able to place [the Infrastructure Condition] as a condition(s) on Final Subdivision Plat/Site Plan approval."

132.    And when the Planning Board had the opportunity to include the Infrastructure Condition as part of the Final Approval, it <u>specifically elected not to do so</u>.

133.    To the contrary, the Final Approval provided that, prior to the signing of the Final Plat, Plaintiff was to furnish a bond securing construction of public infrastructure at The Greens <u>in lieu of constructing such infrastructure</u>.

134.    Indeed, in or about May 2014, Plaintiff's predecessor filed with the Town an "Irrevocable Standby Letter of Credit" to secure the public improvements identified by the Town's consulting engineers, the Town Board, the Planning Board, and the Town Attorney (the "First Security").

135.    The amount of the First Security was fixed and accepted because there ***never*** was any requirement that the developer of The Greens complete all five phases of infrastructure as a

4317835.v3

condition of receiving building permits for residential units of the first phase of The Greens ("Phase One") or any subsequent phase.

136.    In any case, the Infrastructure Condition is preempted by Town Law § 277(2)(c), which provides a developer with the option of completing public infrastructure or posting a bond for such infrastructure prior to issuance of a building permit.

137.    The Infrastructure Condition was a belatedly conceived sham that was never raised with Plaintiff's predecessor and never once raised in any of the many meetings between Plaintiff's construction representatives and the Town Engineer, Building Inspector and Town Board Members in 2017 and the first half of 2018.

138.    The sham of the Infrastructure Condition is demonstrated by the Town Engineer's notes and minutes of meetings wherein he acknowledged that a bond for Phase One—and not all phases—of public infrastructure expressly allowed Plaintiff to commence construction of Phase One houses. (A copy of these notes and minutes are collectively annexed hereto as Exhibit 13.)

139.    Likewise, prior to Plaintiff's purchase of the Property, Farr acknowledged to a representative of Plaintiff's predecessor that construction of homes could occur simultaneously with the construction of public infrastructure. A copy of Farr's October 19, 2017 email is annexed hereto as Exhibit 14.

140.    Based on, *inter alia*, the Town's wrongful 2018 Building Permit Denial, on April 30, 2019, Plaintiff served the Town with a Notice of Claim.  A copy of Plaintiff's Notice of Claim is annexed hereto as Exhibit 15.

*2019 Building Permit Denial*

141.    On May 14, 2019, entirely without prejudice, Plaintiff yet again applied for a building permit to construct a "Model 2500" home (the "2019 Building Permit Application" and, together with the 2018 Building Permit Application, the "Building Permit Applications").

142.    The size of the home applied for was exactly 2,500 square feet—that is, within the Town's contrived Size Cap.

143.    Nevertheless, Farr again invoked the Infrastructure Condition, denying the 2019 Building Permit Application partially on that basis by letter dated June 10, 2019 (the "2019 Building Permit Denial" and, together with the 2018 Building Permit Denial, the "Building Permit Denials").  A copy of the 2019 Building Permit Denial is annexed hereto as Exhibit 16.

144.    Thereafter, although not legally required, Plaintiff filed with the Town a cash deposit in the sum of $1,676,979.66 as performance security for the completion of all public improvements for Phase One. A copy of the check tendered as "Renewal Security" together with the accompanying cover letter, is annexed hereto as Exhibit 17.

145.    The Renewal Security was in the same dollar amount as the First Security.

146.    In fact, because Plaintiff had by then already completed more than half of the originally secured public improvements for The Greens (including the public road) as estimated by the Town's Engineer, Plaintiff was over-securing the Town by at least $1 million.

147.    While Plaintiff proceeded to construct the Phase One public improvements, Plaintiff stood ready to post the Renewal Security had the Town indicated that the Renewal Security was the only remaining requirement for Phase One building permits.

4317835.v3

148.     As further evidence of the Town's bad faith, even after Plaintiff voluntarily tendered the Renewal Security, the Town held onto Plaintiff's check for four months without ever depositing, returning, or saying a word to Plaintiff about it.

***Additional Fallback Restrictions***

149.     Seizing on the NYSDOH's directive that Plaintiff submit new studies on the water supply for The Greens, at a September 25, 2019 Town Board Meeting, Farr publicly declared, "[w]e can't issue any building permits or do any approvals until there is a water supply permit and approved plans, and right now they don't have that."

150.     Yet, as the Town knows, the NYSDOH's directive does not nullify The Greens' existing approvals and permits, all of which Plaintiff continues to possess.

151.     By his announcement, Farr further revealed the Town's intention to never issue a building permit for The Greens absent a Court Order directing it to do so.

## COUNT ONE

## <u>Violation of Plaintiff's Substantive Due Process Rights under 42 U.S.C. § 1983</u>

### (Against the Town, Valentine and Farr)

152.     Plaintiff repeats and realleges all of the allegations set forth above of the Complaint with equal force and effect as if set forth at length and verbatim herein.

153.     Based on the Settlement Agreement, Approved Plans, Final Approval, and Final Plat, Plaintiff has and had a constitutionally protected property right to reasonably use and develop The Greens, which includes a protected right to the building permits for which it applied in the Building Permit Applications.

4317835.v3

154.    Plaintiff had a constitutionally protected right to be free from predetermined, pretextual and continually changing reasons for the denial of building permits solely motivated by the official Town policy to keep the Hasidic out of The Greens and the Town.

155.    Plaintiff's Building Permit Applications fully complied with the Settlement Agreement, Approved Plans, Final Approval and Final Plat, all of which provide the applicable requirements for development of The Greens and ministerial issuance of building permits to Plaintiff as of right and without any need for a variance.

156.    The Town, Valentine and Farr wrongfully and in bad faith denied the Building Permit Applications pursuant to the official Town policy to stop The Greens to keep Hasidic Jews from purchasing a house at The Greens and moving into the Town.

157.    The Town's official policy as aforesaid caused Plaintiff to be subjected to the denial of a constitutional right.

158.    The Town Defendants' discriminatory acts as set forth in this Complaint were performed under the municipal and/or governmental policy of the Town in that discriminatory practices of municipal officials were so persistent and widespread as to constitute a custom or usage with the force of law.

159.    The Town wrongfully and in bad faith imposed unprecedented and pretextual conditions (and costs) upon Plaintiff based on the Town's policy to "Keep the Hasidic Out."

160.    But for the Town's, Valentine's, and Farr's unlawful, irrational, and arbitrary denial of the Building Permit Applications under the aforesaid Town policy, Plaintiff would have been duly issued long ago many building permits to which it was entitled under the law to construct and sell homes at The Greens.

161.    Through the Town's, Valentine's and Farr's discriminatory acts and conduct as described in this Complaint, including the Building Permit Denials, Plaintiff has been denied due process of law and deprived of: (a) Its right to reasonably use and develop The Greens; (b) Its investment-backed expectations regarding the permissible use and development of The Greens; and (c) A property interest via the diminution in the value of its investment in the Property caused by the financial injury sustained from the substantial delays in constructing and closing on sales of homes at The Greens.

162.    The Town's denial of the Building Permit Applications, and its many other discriminatory acts described in this Complaint, have been improperly and maliciously motivated, and involve an intentional plan to permanently deprive Plaintiff of its ability to reasonably use the Property in an economically viable manner pursuant to the Settlement Agreement, Approved Plans, Final Approval, and Final Plat.

163.    The Town's, Valentine's, and Farr's actions with regard to Plaintiff and The Greens have been arbitrary and designed to target Plaintiff's Hasidic principals and prospective Hasidic Jewish residents of the Town, for whom The Greens would be an especially attractive place to live.

164.    Plaintiff has been deprived of, *inter alia*, building permits, and the purported "procedures" invoked by the Town, Valentine, and Farr were constitutionally inadequate.

165.    All the discriminatory acts and conduct as alleged in the Complaint in which the Town, Valentine and Farr engaged violated clearly established statutory or constitutional rights of which a reasonable person would have known and of which said Defendants had actual knowledge.

4317835.v3

166.     Accordingly, Plaintiff asks that the Building Permit Denials be vacated and declared null and void and the Court enter an Order directing the Town and its agents, employees, and representatives to grant in the ordinary course building permit applications submitted by Plaintiff which are complete, accompanied by all required fees, and conform to the Settlement Agreement, Approved Plans, Final Approval, and Final Plat and prohibiting the Town and its agents, employees, and representatives from denying any such building permit application in reliance upon the Size Restriction Letter, the Size Cap, the contents of the 2018 Building Permit Denial, the Infrastructure Condition or such other, further, or additional fallback restrictions publicly discussed in furtherance of the Town and County policy to stop The Greens and thereby exclude Hasidic Jews from the Town (the "Permanent Injunctive and Declaratory Relief").

167.     Plaintiff further should be awarded damages against the Town, Valentine and Farr, jointly and severally, for violation of Plaintiff's substantive due process rights in the amount of not less than $80 million, together with interest, and punitive damages against Valentine and Farr in the sum of not less than $20 million, together with Plaintiff's attorney's fees and costs incurred in the prosecution of this action under the provisions of 42 U.S.C. § 1988(b) and such other relief that the Court deems equitable and just.

## COUNT TWO

## Denial of Equal Protection under 42 U.S.C. § 1983

### (Against all Defendants)

168.     Plaintiff repeats and realleges all of the allegations set forth above of the Complaint with equal force and effect as if set forth at length and verbatim herein.

27

169.     Plaintiff had a right to be treated like any other property owner in the Town and County.

170.     Defendants' discriminatory acts and other misconduct, as described in this Complaint, including the Town's and Farr's denial of the Building Permit Applications, and the County Water Letter, deprived and continue to deprive Plaintiff of its right to equal protection of the laws.

171.     Farr's public declaration that the Town will not issue building permits to Plaintiff until after the Neuhaus-provoked water approval review by NYS DOH is concluded is further evidence of the Town's and County's respective equal protection violations herein.

172.     Defendants were openly opposed to Hasidic Jewish individuals moving to the Town and The Greens, and Defendants' discriminatory acts and conduct as described in this Complaint were premised upon the official Town and County policies to keep out Hasidic Jews, an objective Defendants have accomplished to date.

173.     Defendants' discriminatory acts were performed under the municipal and/or governmental policy of the Town and County in that discriminatory practices of municipal officials were so persistent and widespread as to constitute a custom or usage with the force of law.

174.     Defendants' discriminatory conduct and acts described in this Complaint have infringed upon Plaintiff's rights by (1) discriminating against and targeting Plaintiff for disfavor; (2) imposing additional conditions and costs on Plaintiff that have never been imposed on similarly situated property owners or developers; (3) enforcing inapplicable land use regulations and rewriting portions of the Settlement Agreement and Statement of Findings to change the plain meaning of those documents in bad faith to support a pretextual and pre-determined denial

4317835.v3

of Plaintiff's Building Permit Applications; (4) applying land use regulations, the Settlement

Agreement, and the Statement of Findings in an unlawful and discriminatory manner; and (5)

applying land use regulations and intentionally altered passages from the Settlement Agreement

and Statement of Findings in order to reach a predetermined determination consistent with Town

and County policy to deprive Plaintiff of its constitutionally protected property rights.

175.    All the Defendants, acting under color of law, have treated Plaintiff differently

than other, similarly situated developers or property owners based on the religion, race and

ethnicity of the principals of Plaintiff and religious practices of Defendants' perceived buyer's

market for housing units at The Greens.

176.    The Town Defendants have failed to issue building permits to Plaintiff for any

homes at The Greens, notwithstanding whatever purportedly neutral policy the Town has in

place for the issuance of building permits.

177.    Defendants have applied their facially neutral policies regarding, *inter alia*,

subdivision development, issuance of building permits, and water supply, in an intentionally

discriminatory manner.

178.    Neuhaus, Valentine, and Farr were personally involved in the bad faith

discrimination against Plaintiff and Hasidic Jews, including through those discriminatory acts

and conduct in which they were involved as heretofore specifically detailed.

179.    All of the discrimination perpetrated by Neuhaus, Valentine, and Farr violated

clearly established statutory or constitutional rights of which a reasonable person would have

known, and which in fact said Defendants all actually knew.

180.    Accordingly, Plaintiff asks that the Court grant the Permanent Injunctive and

Declaratory Relief.

4317835.v3

181.    Plaintiff is entitled to recover from Defendants compensatory damages in the amount of no less than $80 million, together with interest, and punitive damages against Neuhaus, Valentine and Farr in the sum of not less than $20 million, all together with attorneys' fees under 42 U.S.C § 1988(b), costs, and disbursements and such other and further relief as the Court deems just and proper.

## COUNT THREE

## Violation of Plaintiff's rights under 42 U.S.C. § 1981

### (Against all Defendants)

182.    Plaintiff repeats and realleges all prior allegations of the Complaint with the same full force and effect as if set forth at length and verbatim below.

183.    Defendants, individually and collectively, based on racial animus and discrimination, have violated Plaintiff's rights under 42 U.S.C. § 1981 by impairing Plaintiff's right to make and enforce contracts.

184.    Defendants, individually and collectively, have discriminated against Hasidic Jews with impunity because Defendants do not want "them" to purchase homes within The Greens and reside in the Town or County.

185.    Plaintiff has standing to bring a claim for violation of 42 U.S.C. § 1981 directly because its principals are Hasidic Jews and on the basis of substantiated allegations of personal injury derivative of Defendants' discriminatory actions detailed in this Complaint against Hasidic Jews.

186.    As detailed in this Complaint, Defendants have made numerous anti-Semitic statements (the "Anti-Semitic Statements") regarding their objective to keep Hasidic Jews from buying homes in the Town.

187.    Defendants' discriminatory acts described in this Complaint and Anti-Semitic Statements concern—and have prevented—Plaintiff from making and enforcing contracts, including such contracts that but for Defendants' discriminatory conduct would have already been constructed at the Property long ago.

188.    Neuhaus, Valentine and Farr were personally involved in Defendants' bad faith discrimination against Plaintiff and Hasidic Jews.

189.    All of Defendants' discriminatory acts, Anti-Semitic Statements, discriminatory statements and/or discriminatory conduct (explicit and implicit), as described in this Complaint, together with the departures from normal and customary practices and procedures with which Neuhaus, Valentine and Farr were involved as described in this Complaint, violated clearly established statutory or constitutional rights of which a reasonable person would have known and of which said Defendants were all actually well aware.

190.    Accordingly, Plaintiff asks that the Court grant the Permanent Injunctive and Declaratory Relief.

191.    Plaintiff is entitled to recover from Defendants damages in the amount of no less than $80 million, together with interest, and punitive damages against Neuhaus, Valentine and Farr, jointly and severally, in the sum of not less than $20 million, all together with attorneys' fees under 42 U.S.C § 1988(b), costs, and disbursements and such other and further relief as the Court deems just and proper.

4317835.v3

## COUNT FOUR

## Violation of Plaintiff's rights under 42 U.S.C. § 1982

### (Against all Defendants)

192.    Plaintiff repeats and realleges all of the allegations set forth above of the Complaint with equal force and effect as if set forth at length and verbatim herein.

193.    42 U.S.C. § 1982 guarantees to all citizens of the United States regardless of race the same right, in every State and Territory, as is enjoyed by white citizens thereof, to, *inter alia*, purchase, sell, hold, and convey real property.

194.    Defendants, individually and collectively, have discriminated against Plaintiff and Hasidic Jews based on their race and have impaired Plaintiff's right, and the rights of Hasidic Jews, to, *inter alia*, purchase, sell, hold, and convey houses at The Greens.

195.    Plaintiff has standing to bring this claim for violation of 42 U.S.C. § 1982 directly based on the fact that its principals are Hasidic Jews and based on substantiated allegations of personal injury derivative of Defendants' discriminatory actions alleged in this Complaint.

196.    These discriminatory acts and Anti-Semitic Statements concern—and have prevented—Plaintiff from building and selling real property, including entering into and consummating such contracts for the sale of houses developed at The Greens under the Settlement Agreement, Approved Plans, Final Approval, and Final Plat.

197.    But for Defendants' discriminatory conduct detailed in this Complaint, by now Plaintiff would have been able to contract, sell and convey many lots and houses at The Greens, and other Hasidic Jews targeted for unlawful exclusion would have been able to purchase many such lots and houses.

198.    The discriminatory acts as detailed in this Complaint were performed under the municipal and/or governmental policies of the Town and County as aforesaid.

199.    Neuhaus, Valentine, and Farr, acting under color of state law, were personally involved in the continuous and bad faith discrimination against Plaintiff and Hasidic Jews detailed in this Complaint.

200.    All the discriminatory acts with which Neuhaus, Valentine and Farr were involved as described in this Complaint violated clearly established statutory or constitutional rights of which a reasonable person would have known and of which these Defendants were actually aware.

201.    Accordingly, Plaintiff asks that the Court grant the Permanent Injunctive and Declaratory Relief.

202.    Plaintiff is entitled to recover from Defendants damages in the amount of no less than $80 million, together with interest, and punitive damages against Neuhaus, Valentine and Farr, jointly and severally, in the sum of not less than $20 million, all together with attorneys' fees under 42 U.S.C § 1988(b), costs, and disbursements and such other and further relief as the Court deems just and proper.

## COUNT FIVE

## Fair Housing Act 42 U.S.C. § 3604

### (Against all Defendants)

203.    Plaintiff repeats and realleges all the allegations set forth above of the Complaint with equal force and effect as if set forth at length and verbatim herein.

33

204.     Defendants, by, *inter alia*, their discriminatory acts and conduct detailed in the Complaint, have intentionally discriminated against Plaintiff by making housing unavailable within the Town and County based on religion in violation of 42 U.S.C. § 3604(a).

205.     Defendants have also made dwellings unavailable or denied dwellings to prospective residents because of their religion in violation of 42 U.S.C. § 3604(a).

206.     The Town's and Neuhaus' animus toward Hasidic Jews moving into the Town and County at The Greens was the significant factor in the Town's, County's, and their respective agents', employees', and representatives' discriminatory acts and disparate treatment of The Greens and Plaintiff as set forth in this Complaint.

207.     Plaintiff has suffered distinct and palpable injuries that are traceable to Defendants' actions described in this Complaint that were and are discriminatory against Hasidic Jews, including the deprivation of Plaintiff's ability to economically benefit from the Property due to the inability to build any homes thereon, because of, *inter alia*, the Town's wrongful and illegal Building Permit Denials and the County's interference under false pretenses with the Water Approval, and other delay damages and costs incurred as a result of all Defendants' actions detailed in this Complaint.

208.     In and by their discriminatory conduct set forth in the Complaint, Defendants, individually and/or collectively, have, exactly as they admitted was their intent, precluded Hasidic Jewish individuals from moving into the Town and County, by virtue of, *inter alia*, preventing the construction of homes at The Greens.

209.     Plaintiff is an aggrieved person as that term is defined in the Fair Housing Act, 42 U.S.C. § 3602(i), and has suffered harm, damage and injury as a result of Defendants' conduct.

210.    Plaintiff is entitled to recover from Defendants damages in the amount of no less than $80 million, all together with attorneys' fees under 42 U.S.C § 1988(b), costs, and disbursements and such other and further relief as the Court deems just and proper.

211.    In addition, Plaintiff asks that the Court: (a) enjoin Defendants from engaging in any act of discrimination aimed at or that has the effect of defeating development of The Greens under the Fair Housing Act, 42 U.S.C. § 3604(a) and 3617 and (b) grant the Permanent Injunctive and Declaratory Relief.

## COUNT SIX

### Fair Housing Act 42 U.S.C. § 3617

### (Against all Defendants)

212.    Plaintiff repeats and realleges all of the allegations set forth above of the Complaint with equal force and effect as if set forth at length and verbatim herein described in this Complaint.

213.    Defendants, by their discriminatory acts and other misconduct, have intentionally discriminated against Plaintiff on account of having exercised its rights, or having aided or encouraged other persons to engage in the exercise or enjoyment of rights, that are granted or protected by 42 U.S.C. § 3604 in violation of 42 U.S.C. § 3617.

214.    Through their discriminatory acts and conduct, Defendants, individually and/or collectively, have repeatedly discriminated against Plaintiff and thereby have intentionally interfered with the Hasidic Jewish community's right to available housing and Plaintiff's right to build and sell houses to Hasidic Jews and any prospective purchaser regardless of race, religion or ethnic origin.

4317835.v3

215.     By acting to stop The Greens to keep out Hasidic Jews exactly as they admitted and declared they would proceed to do under the Town's and County's official policies, Defendants have violated the Fair Housing Act (the "FHA"), §§ 3604(a) and 3617.

216.     As a result of Plaintiff exercising its rights under the FHA, and/or aiding or encouraging any other person in the exercise or enjoyment of any right granted or protected by the FHA, Plaintiff has suffered interference and retaliation as detailed in the Complaint.

217.     Plaintiff is an aggrieved person as that term is defined in the FHA, 42 U.S.C. § 3602(i), and has suffered harm, damage and injury as a result of Defendants' conduct.

218.     Plaintiff is entitled to recover from Defendants damages in the amount of no less than $80 million, all together with attorneys' fees under 42 U.S.C § 1988(b), costs, and disbursements and such other and further relief as the Court deems just and proper.

219.     In addition, Plaintiff asks that the Court: (a) enjoin Defendants from engaging in any act of discrimination aimed at or that has the effect of defeating development of The Greens under the FHA, 42 U.S.C. § 3604(a) and 3617 and (b) grant the Permanent Injunctive and Declaratory Relief.

## COUNT SEVEN

### Taking of Private Property in Violation of The
### Fifth Amendment of The United States Constitution

### (Against the Town Defendants)

220.     Plaintiff repeats and realleges all of the allegations set forth above of the Complaint with equal force and effect as if set forth at length and verbatim herein.

221.     Plaintiff has and had a constitutionally protected property right to reasonably use and develop The Greens, which includes a protected right to the building permits for which it applied in the Building Permit Applications.

4317835.v3

222.    The Town Defendants, acting under color of law, have taken and deprived Plaintiff of its property rights without legal or factual basis, and without due process, in violation of the Fifth and Fourteenth Amendments to the United States Constitution.

223.    Through their discriminatory acts and conduct detailed in this Complaint in furtherance of the Town's official policy of preventing development of The Greens so as to preclude Hasidic Jews from purchasing homes at The Greens and moving to the Town, the Town Defendants have taken the Property without just compensation.

224.    The Town Defendants' discriminatory acts and conduct detailed in this Complaint, including the denial of the Building Permit Applications, in furtherance of the Town's aforesaid official policy, have significantly devalued the Property and have had an adverse economic impact on Plaintiff.

225.    When Plaintiff purchased the Property, it had the reasonable investment-backed expectation that it would be able to residentially develop the Property for The Greens in accordance with the Settlement Agreement, Approved Plans, Final Approval, and Final Plat.

226.    The Town Defendants' discriminatory acts and conduct detailed in this Complaint, including the denial of the Building Permit Applications, in furtherance of the aforesaid Town official policy, have interfered with Plaintiff's investment-backed expectations to date, and because of the Town Defendants' conduct and policy, Plaintiff has not been able to develop any homes at the Property.

227.    The character of the Town Defendants' actions in furtherance of the aforesaid Town policy, including issuance of the contrived Building Permit Denials and imposition of unprecedent requirements that deviate from the Approved Plans, is discriminatory, inequitable and illegitimate.

4317835.v3

228.   The Town Defendants' actions described in the Complaint constitute an illegitimate and inequitable attempt to prevent Plaintiff from developing the Property.

229.   The Town Defendants have permanently prevented the development of The Greens by the use of illegal means not applied to others.

230.   The Town Defendants have rendered the Property economically unusable for the purpose for which it is zoned and already fully approved for an as of right cluster subdivision.

231.   The Town Defendants' actions have converted the Property for purported public purposes for which Plaintiff is constitutionally entitled to just compensation for the taking of all the Property.

232.   The Town Defendants have not paid Plaintiff just compensation for the regulatory taking.

233.   Plaintiff should be awarded just compensation for the taking of its Property, together with all other damages deemed just and proper by the Court, including experts' fees, and attorneys' fees, interest, costs, and disbursements.

## COUNT EIGHT

### Declaratory Judgment

**(Against the Town Defendants)**

234.   Plaintiff repeats and realleges all of the allegations set forth above of the Complaint with equal force and effect as if set forth at length and verbatim herein.

235.   There is an actual, justiciable controversy between the parties.

236.   It is Plaintiff's position that the Infrastructure Condition is null and void and of no legal effect because, *inter alia*, (a) it violates the terms of the Settlement Agreement, Approved Plans, Final Approval, and Filed Plat; (b) the Planning Board and Town previously determined

38

that the First Security was a sufficient undertaking to secure the public improvement construction at The Greens such as to allow Plaintiff to proceed immediately with construction of homes; (c) Plaintiff posted and the Town accepted the First Security, barring the Town from imposing the Infrastructure Condition; and (d) it is in conflict with New York State Town Law (the "Town Law") § 277. Accordingly, the Infrastructure Condition is an invalid basis upon which to deny the Building Permit Applications.

237.    It is the Town Defendants' position that notwithstanding the terms of the Settlement Agreement, Approved Plans, Final Approval, and Final Plat, the Town's acceptance of the First Security, and Town Law § 277, it may impose the Infrastructure Condition.

238.    Accordingly, a determination is required by this Court resolving the instant controversy and, specifically, declaring and decreeing that (a) the Infrastructure Condition, and any claimed requirement that Plaintiff must complete all public improvements for The Greens in order to receive a building permit, including under Town Code Chapter 59, Article I, is null and void; and (b) upon the filing of a building permit application for a residential unit that conforms to the Settlement Agreement, Approved Plans, Final Approval and Final Plat, the Town through its building inspector or any other appropriate agent or body must issue a building permit for each such unit; or, alternatively, if the Court finds that the Infrastructure Condition can be imposed on Plaintiff, that Plaintiff is required to complete only the Phase One public improvements prior to the issuance of building permits for Phase One residential units, with the same procedure applying for every succeeding phase of The Greens.

4317835.v3

## COUNT NINE

### Declaratory Judgment

### (Against the Town Defendants)

239.     Plaintiff repeats and realleges all allegations set forth above of the Complaint with equal force and effect as if set forth at length and verbatim herein.

240.     There is an actual, justiciable controversy between the parties.

241.     It is Plaintiff's position that Chapter 59, Article I of the Town Code is in derogation of, and preempted by, Town Law § 277.

242.     Specifically, it is Plaintiff's position that Town Code 59, Article I, which seeks to "supersede" the provisions of Town Law § 277 providing that a planning board, in approving a plat, shall require an applicant to complete all public improvements *or* post a performance bond or other security (*i.e.* bond or build), is preempted by the Town Law and of no legal effect.

243.     It is the Town Defendants' position that Chapter 59, Article I of the Town Code and the Infrastructure Condition, supersede Town Law § 277.

244.     The Court should issue a declaratory judgment decreeing that Chapter 59, Article I of the Town Code and the Infrastructure Condition are preempted by Town Law § 277 and are therefore inapplicable to The Greens.

## COUNT TEN

### Breach of Contract

### (Against the Town)

245.     Plaintiff repeats and realleges all of the allegations set forth above of the Complaint with equal force and effect as if set forth at length and verbatim herein.

4317835.v3

246.     In 2010, Plaintiff's predecessor-in-interest and the Town entered into the Settlement Agreement.

247.     Plaintiff is the holder of all right, title, interest, and benefits accruing to Plaintiff's predecessor under the Settlement Agreement.

248.     The Settlement Agreement provided the terms and conditions to which The Greens development was subject including, *inter alia*, the Approved Plans.

249.     Plaintiff has performed all its obligations under the Settlement Agreement.

250.     The Town has breached the Settlement Agreement by, *inter alia*, adding material conditions to the development of The Greens that contravene the Settlement Agreement, enacting regulations that purport to affect the Property without exemption, and failing to do all things necessary to effectuate the terms of the Settlement Agreement.

251.     Plaintiff has been damaged in an amount to be determined at trial but believed to be no less than $80 million, together with attorneys' fees, interest, and costs.

252.     In addition, Plaintiff asks that the Court grant the Permanent Injunctive and Declaratory Relief.

## COUNT ELEVEN

### Breach of the Implied Covenant of Good Faith and Fair Dealing

### (Against the Town)

253.     Plaintiff repeats and realleges all of the allegations set forth above of the Complaint with equal force and effect as if set forth at length and verbatim herein.

254.     Under the Settlement Agreement, the Town assumed the obligations of good faith and fair dealing in connection with its dealings with Plaintiff and The Greens.

4317835.v3

255.    Plaintiff has, to date, invested millions of dollars on The Greens in reliance upon the Town's obligations of good faith and fair dealing under the Settlement Agreement.

256.    Through the official Town policy to stop The Greens to keep the Hasidic Jews out and its actions in furtherance thereof as described in this Complaint, the Town has undertaken, in bad faith, a campaign designed to deprive Plaintiff of the benefit of its bargain under the Settlement Agreement.

257.    Accordingly, to the extent the Town's conduct described in this Complaint does not constitute a breach, or multiple breaches, of the express terms of the Settlement Agreement, Plaintiff is entitled to recover damages in an amount to be determined at trial but believed to be no less than $80 million for the Town's breach of the implied covenant of good faith and fair dealing, together with attorneys' fees, interest, costs and disbursements.

258.    In addition, Plaintiff asks that the Court grant the Permanent Injunctive and Declaratory Relief.

## COUNT TWELVE

## Conspiracy in Violation of 42 U.S.C. § 1985

### (Against the Town, Valentine, County, and Neuhaus)

259.    Plaintiff repeats and realleges all the allegations set forth above of the Complaint with equal force and effect as if set forth at length and verbatim herein.

260.    Upon information and belief, an agreement existed between the Town, Valentine, the County, and Neuhaus, to act in concert to inflict an unconstitutional injury upon Plaintiff, with that injury being the denial of equal protection of the laws and substantive due process with respect to the development of The Greens at the Property with the objective of preventing Hasidic Jews from moving to the Town.

4317835.v3

261.     The agreement between the Town and Valentine, and the County and Neuhaus, is evidenced by, *inter alia*, public statements made by Neuhaus (*e.g.*, ¶ 11 above) and Jamieson (¶ 98 above).

262.     Based upon the acts and misconduct alleged in this Complaint, the Town, Valentine, the County, and Neuhaus undertook several overt acts in furtherance of the goal to preclude development of The Greens and stop Hasidic Jews from moving to the Town.

263.     The acts perpetrated by the Town, Valentine, the County, and Neuhaus have caused Plaintiff to suffer damages.

264.     The Town, Valentine, the County, and Neuhaus entered into the conspiracy for the purpose of depriving, either directly or indirectly, Plaintiff and Hasidic Jews equal protection of the laws with respect to the Property and The Greens.

265.     The Town, Valentine, the County, and Neuhaus, through their acts and conduct detailed in this Complaint, have acted in furtherance of the conspiracy for the purpose of thwarting development of The Greens and stopping Hasidic Jews from purchasing homes at The Greens and moving to the Town.

266.     As a result of the Town's, Valentine's, the County's, and Neuhaus's acts and conduct detailed in this Complaint, Plaintiff has been damaged in the sum of no less than $80 million, and deprived of, *inter alia*, its rights to equal protection of the laws and substantive due process, and rights under the FHA, and 42 U.S.C. §§ 1981 and 1982.

267.     In addition, Plaintiff asks that the Court: (a) enjoin Defendants from engaging in any act of discrimination aimed at or that has the effect of defeating development of The Greens under the Fair Housing Act, 42. U.S.C. § 3604(a) and 3617 and (b) grant the Permanent Injunctive and Declaratory Relief.

4317835.v3

WHEREFORE, Plaintiff **GREENS AT CHESTER LLC** respectfully asks for:

1.     On Plaintiff's First Count, (A) an Order (i) vacating and declaring null and void the Building Permit Denials and (ii) directing the Town and its agents, employees, and representatives to grant in the ordinary course building permit applications submitted by Plaintiff which are complete, accompanied by all required fees, and conform to the Settlement Agreement, Approved Plans, Final Approval, and Final Plat and prohibiting the Town and its agents, employees, and representatives from denying any such building permit application in reliance upon the Size Restriction Letter, the Size Cap, the contents of the 2018 Building Permit Denial, the Infrastructure Condition, or such other, further, and additional fallback restrictions publicly discussed in furtherance of the Town and County policy to stop The Greens and thereby exclude Hasidic Jews from the Town; and (B) an award to Plaintiff of compensatory damages against the Town, Valentine, and Farr, jointly and severally, in the amount of not less than $80 million, together with interest, together with Plaintiff's attorney's fees and costs incurred in the prosecution of this action under the provisions of 42 U.S.C. § 1988(b);

2.     On Counts 2-4, (A) an Order (i) vacating and declaring null and void the Building Permit Denials and (ii) directing the Town and its agents, employees, and representatives to grant in the ordinary course building permit applications submitted by Plaintiff which are complete, accompanied by all required fees, and conform to the Settlement Agreement, Approved Plans, Final Approval, and Final Plat and prohibiting the Town and its agents, employees, and representatives from denying any such building permit application in reliance upon the Size Restriction Letter, the Size Cap, the contents of the 2018 Building Permit Denial, the Infrastructure Condition, or such other, further, and additional fallback restrictions publicly discussed in furtherance of the Town and County policy to stop The Greens and thereby exclude

44

Hasidic Jews from the Town; and (B) an award to Plaintiff of compensatory damages against Defendants, jointly and severally, in the amount of not less than $80 million, together with interest, together with Plaintiff's attorney's fees and costs incurred in the prosecution of this action under the provisions of 42 U.S.C. § 1988(b);

3.      On Counts 5-6, (A) an award to Plaintiff of compensatory damages against Defendants, jointly and severally, in the amount of not less than $80 million, together with interest, together with Plaintiff's attorney's fees and costs; and (B) an Order (i) enjoining Defendants from engaging in any act of discrimination aimed at or that has the effect of defeating development of The Greens under the Fair Housing Act, 42 U.S.C. § 3604(a) and 3617; and (ii) vacating and declaring null and void the Building Permit Denials and directing the Town and its agents, employees, and representatives to grant in the ordinary course building permit applications for any phase of The Greens submitted by Plaintiff which are complete, accompanied by all required fees, and conform to the Settlement Agreement, Approved Plans, Final Approval, and Final Plat, and prohibiting the Town and its agents, employees, and representatives from denying any such building permit application in reliance upon the Size Restriction Letter, the Size Cap, the contents of the 2018 Building Permit Denial, the Infrastructure Condition, or such other, further, and additional fallback restrictions publicly discussed in furtherance of the Town and County policy to stop The Greens and thereby exclude Hasidic Jews from the Town;

4.      On Plaintiff's Seventh Count, awarding to Plaintiff damages against the Town Defendants as just compensation for the taking of Plaintiff's Property, together with interest at the lawful rate from the date of the taking of Plaintiff's Property;

4317835.v3

5.      On Plaintiff's Eighth Count, a declaratory judgment decreeing and declaring that: (a) the Infrastructure Condition, and any claimed requirement that the Plaintiff must complete all public improvements for The Greens in order to receive a building permit, including under Town Code Chapter 59, Article I, is null and void; and (b) upon the filing of a building permit application for a residential unit that conforms to the Settlement Agreement, Final Approval, Approved Plans, and Final Plat, the Town through its building inspector or any other appropriate body must issue a building permit for such unit; or, alternatively, if the Court finds that the Infrastructure Condition can be imposed on Plaintiff, that Plaintiff is required to complete only the Phase One public improvements prior to the issuance of building permits for Phase One residential units, with the same applying for every other phase of The Greens;

6.      On Plaintiff's Ninth Count, a declaratory judgment decreeing and declaring that: Chapter 59, Article I of the Town Code and the Infrastructure Condition are preempted by Town Law § 277 and therefore inapplicable to The Greens;

7.      On Counts 10-12, (A) an award to Plaintiff of compensatory damages against the Town in the amount of no less than $80 million, together with interest and reasonable attorney's fees; and (B) an Order (i) vacating and declaring null and void the Building Permit Denials and (ii) directing the Town and its agents, employees, and representatives to grant in the ordinary course building permit applications submitted by Plaintiff which are complete, accompanied by all required fees, and conform to the Settlement Agreement, Approved Plans, Final Approval, and Final Plat and prohibiting the Town and its agents, employees, and representatives from denying any such building permit application in reliance upon the Size Restriction Letter, the Size Cap, the contents of the 2018 Building Permit Denial, the Infrastructure Condition, or such

4317835.v3

other, further, and additional fallback restrictions publicly discussed in furtherance of the Town

and County policy to stop The Greens and thereby exclude Hasidic Jews from the Town;

8.      On Counts 1-4, an award to Plaintiff of punitive damages as against Farr,

Neuhaus and Valentine, as is applicable, in the total sum of $20 million; and

9.      On all Counts, such other, further and different relief as to the Court may seem

just and proper.

Dated:   White Plains, New York
         December 6, 2019

**CUDDY & FEDER LLP**
*Attorneys for Plaintiff*
*Greens at Chester LLC*
445 Hamilton Avenue - 14th Floor
White Plains, New York 10601
(Tel.) (914) 761-1300

By: _____
    Joshua J. Grauer (JG4594)
    Jordan Brooks (JB0614)

4317835.v3