**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

GREENS AT CHESTER LLC,

*Plaintiff,*

PEOPLE OF THE STATE OF NEW YORK by LETITIA JAMES, ATTORNEY GENERAL OF THE STATE OF NEW YORK,

*Plaintiff-Intervenor,*

v.

TOWN OF CHESTER, JAMES. M. FARR, Building Inspector of the Town of Chester, ROBERT VALENTINE, Supervisor of the Town of Chester, CYNTHIA SMITH, RYAN C. WENSLEY, ORLANDO PEREZ, and VINCENT FINIZIA, collectively, Members of the Town Board of The Town of Chester, ALEXANDER J. JAMIESON, former Supervisor of the Town of Chester, STEVEN M. NEUHAUS, County Executive of the County of Orange, and THE COUNTY OF ORANGE,

*Defendants.*

CIVIL ACTION NO. 19-cv-6770

**COMPLAINT IN INTERVENTION FOR DECLARATORY AND INJUNCTIVE RELIEF**

## PRELIMINARY STATEMENT

1. The Town of Chester ("Town") and County of Orange ("County"), through their officials,[1] have engaged in a concerted, systematic effort to prevent Hasidic Jewish families from moving into the Town in violation of the Fair Housing Act ("FHA"), 42 U.S.C. §§ 3604(a) and 3617. This discriminatory conduct contravenes New York State's longstanding commitment to ensure equal access to housing for all residents irrespective of religious identity and familial status.

2. For the past three years, Town and County officials have done everything in their power to block the construction of a 431-unit development called The Greens at Chester ("The Greens"). The Greens' developer, consists of a group of managing partners, some of whom are members of the Hasidic Jewish community. Because of the developer's religious background and Hasidic communities in neighboring towns, Town and County officials anticipated that families of this faith would move in droves into the new development.

3. The Town and County's animus against the Hasidic community is clear. In a series of publicly-recorded town meetings, officials explicitly referenced their desire to keep out Hasidic families and promised their residents that they would prevent the construction of The Greens at all costs. To date, they have fulfilled that promise.

4. Defendants passed a law and proposed others clearly directed at stopping The Greens and harassing its developer. They adopted a Floor to Area Ratio ("FAR") law, which would force the developer to build extremely small and unmarketable units and dissuade Hasidic families from living at The Greens. Defendants also proposed levying an extra tax on The Greens, limiting the hours the developer could work on construction, and requiring the developer to provide its

[1] Defendants Town of Chester, James M. Farr, Robert Valentine, Cynthia Smith, Ryan C. Wensley, Orlando Perez, Vincent Finizia, Alexander J. Jamieson, Steven M. Neuhaus, and the County of Orange, will be referenced to herein as collectively, "Defendants."

managing partners' personal information to local officials. Two of these laws were proposed *after* the commencement of the underlying lawsuit.

5. Town officials also imposed costly and unnecessary requirements on the developer. For example, they mandated that the sewer waste line under The Greens be re-routed, stationed an inspector at the property during construction at the developer's expense, and imposed unnecessary requirements to pre-approved plans.

6. When the developer eventually overcame these barriers, the Town and County mounted a campaign of permit denials. They denied all building permit applications, even when the developer clearly satisfied the permit requirements. The County even tried to undermine a water permit it previously granted to The Greens by asking the New York State Department of Health ("DOH") to reconsider its water supply approval.

7. Defendants have succeeded in effectively halting development of The Greens.

8. The New York State Attorney General seeks to intervene in this suit to put an end to Defendants' discriminatory conduct based on religion and familial status.

## JURISDICTION AND VENUE

9. This Court has jurisdiction over this action pursuant to 42 U.S.C. § 3613(a). This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3).

10. This Court has jurisdiction to issue the declaratory relief requested pursuant to the Declaratory Relief Act, 28 U.S.C. §§ 2201 and 2202. This Court may also grant injunctive relief pursuant to Federal Rule of Civil Procedure 65.

11. Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(b) because the events set forth in this complaint occurred here.

**PARTIES**

12. Plaintiff-Intervenor is the People of the State of New York, by its attorney, Letitia James, Attorney General of the State of New York ("NYAG").

13. The NYAG has a "unique status as the representative of the greater public good and [a] concomitant mandate to secure wide-ranging relief that will inure to the direct and indirect benefit of the broader community." *New York v. Utica City Sch. Dist.*, 177 F. Supp.3d 739, 753-54 (N.D.N.Y. 2016).

14. The NYAG invokes her *parens patriae* authority to intervene in the underlying action for violations of federal law.

15. The NYAG seeks to intervene in this action because of Defendants' obstruction of development of The Greens, and their policy or practice of preventing Hasidic families from purchasing and occupying those homes, all in violation of the FHA.

16. The NYAG has a quasi-sovereign interest in the health and well-being of the People of the State of New York, particularly as to systemic housing discrimination.

17. The NYAG further invokes her *parens patriae* authority because Defendants' conduct of attempting to prevent Hasidic families from moving into The Greens and their discriminatory conduct against this community harms a large number of New York residents.

18. The NYAG's requested relief is not limited to ending the discrimination with respect to The Greens. The NYAG seeks comprehensive and prospective relief to end the Town and County's discriminatory practices and ensure these practices do not continue in the future.

19. Plaintiff Greens at Chester LLC ("Plaintiff" or "the developer") is a limited liability company duly organized and existing under the laws of the State of New York, and composed of

a number of partners, some of whom are members of the Hasidic community. Plaintiff has an office and place of business in the Town of Monroe, County of Orange and State of New York.

20. Defendant Town of Chester ("Town") is a municipal corporation duly organized and existing under the laws of the State of New York. The Town has an office at Town Hall, Town of Chester, 1786 Kings Highway, Chester, New York, 10918.

21. Defendant James M. Farr ("Farr") is the Building Inspector of the Town of Chester.

22. Defendant Robert Valentine ("Valentine") is the Town Supervisor of the Town of Chester.

23. Defendants Valentine, Cynthia Smith ("Smith"), Ryan C. Wensley ("Wensley"), Orlando Perez ("Perez"), and Vincent Finizia ("Finizia") are members of the Town of Chester Town Board ("Town Board").

24. Defendant Alexander J. Jamieson ("Jamieson"), was the Town Supervisor of the Town of Chester from approximately 2014 to 2018.

25. Defendant Steven M. Neuhaus ("Neuhaus") is the current County Executive of Orange County, and the former Town Supervisor of Chester from approximately 2008 to 2013.

26. Defendant County of Orange ("County") is the county government for Orange County, New York, which has its principal office at the Orange County Government Center, 255 Main Street, Goshen, New York 10924.

## GENERAL ALLEGATIONS

### A. The County's History with the Hasidic Community

27. Orange County has a history of tension with members of the Hasidic community. In the 1970s, Grand Rabbi Joel Teitelbaum founded the Village of Kiryas Joel in Orange County, as a haven from the overcrowding of Brooklyn for members of the Hasidic community.

28. Over the years, the enclave of Kiryas Joel has burgeoned into a densely populated community of twenty-four thousand residents. After Kiryas Joel sought to expand its boundaries through annexation of adjacent land, a bitter conflict arose between the Hasidic community and the neighboring municipality of Monroe, New York. Ultimately, a referendum was passed in 2018 which led to the formation of a new town, adjacent to Kiryas Joel, known as Palm Tree.

29. In recent years, as a result of these hostilities and the overcrowding in Kiryas Joel, members of the Hasidic community have sought to relocate to neighboring communities by purchasing homes and tracts of land in surrounding towns in Orange County. This expansion has provoked opposition within these communities and prompted a spate of exclusionary zoning by municipalities.

30. In 2018, the Village of Woodbury proposed a law which regulated objects in public-rights-of-way that would have affected eruvs (symbolic borders that enable members of the Hasidic community to carry items and push strollers outdoors on the Sabbath). The proposed law would have also required owners to obtain permits, and would have prohibited eruvs from crossing streets. After fierce protest, the Village Board set the proposal aside.

31. The Town of Monroe recently enacted controversial zoning reforms, which developers argued reduced the number of homes that could be built and discriminated against Hasidic families.

32. The tension between the County, Towns, and members of the Hasidic community is indicative of a broader state-wide concern regarding an uptick in instances of anti-Semitism throughout the state. The Anti-Defamation League reported that the number of anti-Semitic incidents recorded in the state in 2017 rose by 90 percent from the previous year.

33. As described below, this pattern of discriminatory conduct and anti-Semitic sentiment has continued and is evident in the Defendants' treatment of the development of The Greens and its developers.

**B. The History of The Greens**

34. The Greens is a 117-acre property in the Town of Chester in Orange County, New York. Plaintiff Greens at Chester LLC presently owns this property and intends to build a 431-unit development, including a mix of free-standing and duplex homes.

35. Before Plaintiff purchased The Greens, the undeveloped property was owned by Arlington Chester, another real-estate developer. Following disputes with the Town, Arlington Chester and the Town reached a Settlement Agreement in 2010 that granted Arlington Chester final approval to develop the land. The Settlement Agreement ordered the Town to "grant final subdivision and site plan approval to the Greens at Chester project as a cluster subdivision project for 431 units."

36. As part of the Settlement Agreement, Arlington Chester and the Town also negotiated that: "[i]n order to maintain the *status quo* of the approvals for the project, (i) the Chester Planning Board may not revoke any preliminary subdivision or site plan approval for the Greens at Chester project . . . prior to the filing of the final plat for the entire subdivision, [a]nd (ii) the Town Board may not rezone, or enact additional regulations affecting the property containing The Greens at Chester project, unless the Greens at Chester project is exempted from the effects of such rezoning and/or additional regulations."

37. The County Department of Health also approved final site plan maps proposed by Arlington Chester in July 2013.

38. Despite these approvals, Arlington Chester never began construction of the development.

39. In October 2017, Plaintiff purchased The Greens from Arlington Chester for $12.17 million.

**C. Defendants' Discriminatory Attempts to Block Development of The Greens**

40. Immediately following the developer's purchase of The Greens, Town and County officials publicly discussed at recorded town meetings the religion of the developer's managing partners and the religion and family size of prospective residents, alongside strategies to halt the development.

41. As described below, the discussions became increasingly inflammatory with Town residents making disturbingly anti-Semitic statements at these meetings. Rather than express alarm at these statements, Defendants Town Supervisor Jamieson, Deputy Town Supervisor Valentine, and County Executive Neuhaus fanned the flames of this opposition, and openly committed to using their government authority to counter further development of The Greens.

42. Nearly every strategy discussed at the town meetings to block development of The Greens was later implemented by Town and County officials, including the passage and proposal of laws, imposition of special requests, exertion of pressure on the developer to re-zone The Greens for commercial development, and interference with building and water permits.

**1. Town's Action to Restrict the Sizes of Homes on The Greens**

43. Approximately four months after Plaintiff purchased The Greens, in January 24, 2018, Town officials introduced a "Floor to Area Ratio" ("FAR") law to apply to new construction, including The Greens.

44. The FAR law restricts the square footage of all newly constructed homes to a

maximum percentage of the square footage of the lot on which they sit. Upon information and belief, for The Greens, this law would require that a significant portion of the homes in the development would be restricted to no larger than 577.5 square feet, and would effectively make the units unmarketable to families.

45. The FAR Law is still in effect to date.

46. At the town meeting where the Town first introduced this law Defendant Deputy Town Supervisor Valentine stated that the purpose of the law was to “help preserve and enhance the rural character in the Town.” Town Meeting Minutes, p. 6 (January 24, 2018).

47. Prior to Plaintiff’s purchase of The Greens, the Town and its officials had not mentioned restriction of the sizes of homes as means to preserve the Town’s “rural character.”

48. Indeed, in 2015 and 2017, the Town assembled two committees, the Comprehensive Plan Committee and the Community Preservation Plan Committee, to create a forward-looking vision for the municipality. Neither of the plans created by either committee (the second of which was presented after the FAR law was enacted), mentioned restricting the sizes of homes to preserve the Town’s character.

49. Further, upon information and belief, shortly before introducing the FAR Law, Defendant Valentine requested that the developer re-zone The Greens for commercial use. This request undermines the Town’s purported desire to preserve its “rural character.”

50. Town officials made clear the true intent behind the FAR Law in publicly recorded town meetings in February and March 2018. During one meeting, Defendant Town Supervisor Valentine mentioned the religious background of Plaintiff’s managing partners and stated that “[i]f there were any way that like, you know, legally, we could, like choose who would live there

or pick who could live there or what size house they would do, we would love that. But we can't do it." Town Meeting Recording (February 28, 2018).

51. Defendant Town Supervisor Jamieson expanded upon Defendant Valentine's statements at the next town meeting, where he expressly stated that the Town could obstruct development at The Greens by limiting the number of bedrooms within the houses at the property. Town Meeting Minutes, p. 15 (March 14, 2018).

52. The next day, the Town enacted the FAR Law.

53. Weeks later, the Town attempted to enforce the FAR Law against The Greens. Defendant Building Inspector James Farr sent notices to Plaintiff directing it to comply with the law. The Town did so even though the 2010 Settlement Agreement prohibited it from enacting any "additional regulations affecting the property containing The Greens . . ."

54. Three days after receipt of the enforcement letter, Plaintiff responded with a letter citing to this provision of the 2010 Settlement Agreement, and concluded "[a]ccordingly, the Town does not have the legal authority to apply the regulations set forth in Local Law No. 2…We trust that you will review this matter with the Town Supervisor, Town Board, and Town Attorney before attempting to violate the clear and unambiguous terms of the Settlement Agreement."

55. Upon information and belief, the Town has not responded to the developer's letter.

56. Upon information and belief, Defendant Valentine subsequently referred to this enforcement of the FAR Law as a "nice try."

**2. Town's Further Action to Propose Laws Intended to Prevent Development of The Greens**

57. On April 25, 2018, the Town convened a meeting in which over three hundred Town residents attended, expressing their fear and outrage regarding The Greens and the anticipated increase in Hasidic families.

58. As part of the Town's relentless campaign to stall the development, Town officials publicly outlined more laws aimed at stopping The Greens. Town officials introduced three new measures: (1) the Purchase of Development Rights ("PDR") Tax; (2) the Ward System; and (3) the "No Solicitation" Law.

59. The proposed PDR tax is a transfer tax to be levied on all real estate purchases, including The Greens, within the Town of Chester to support the Town's purchase of private property. The Town passed the PDR tax through a ballot initiative. Enactment of the tax required signature from the Governor of the State of New York. On November 25, 2019, the Governor vetoed the PDR tax, citing the underlying lawsuit and the "well-documented tension between local elected officials and a specific population of Hasidic people in the community" as the reason. Governor's Veto 167, November 25, 2019.

60. The Town also proposed a Ward System. This proposal would result in separating the Town into wards and allotting each ward a vote for one member of the Town Board. The Ward System would change the current voting structure, which allows for election to the Town Board to be conducted through a popular vote.

61. This proposal was approved in a ballot initiative in November 2018 and is anticipated to be implemented after completion of the 2020 decennial Census.

62. Under the new ward system, the voting power of the residents of The Greens will be significantly diluted.

63. Lastly the Town proposed a "No Solicitation" Law, which prevents solicitation within the Town. At the April 25, 2018 meeting, Defendant Jamieson remarked that a similar law was adopted in the nearby Town of Monroe, where proposed homebuyers were members of the Hasidic community and tensions also existed between the community and that town. Defendant

Jamieson stated that the purpose of Monroe's law was to "stop harassment of home owners from people looking to buy their property." Town Meeting Recording (April 25, 2018).

64. Defendants Jamieson, Smith, Valentine and Wensley voted in favor and adopted this law at the July 11, 2018 Town Meeting.

65. Defendant Jamieson summarized the intent of these three proposed laws as follows:

> I think there's . . . collaboration between the ward system, the PDR, the no solicitation laws. But mostly I really think that the importance of doing the ward system, and the importance of the PDR are two things working together that…could do a lot of good for our community. We could preserve our community as best we can. Listen: You're not going to stop everybody from . . . moving in. But if we could stop 'em a little bit, that's better than nothing.

Town Meeting Recording (April 25, 2018).

**3. Town's Imposition of Costly Special Requests on Plaintiff**

66. During several town meetings, town residents expressed their concern about Hasidic families moving into The Greens. In response, Town officials pledged to its residents that they would do "everything we can" to stop it. Town Meeting Recording (April 25, 2018).

67. For example, during one meeting in April 2018, a resident asked officials: "Don't you think it is worth it to try to stop them?" *Id.* Defendant Town Supervisor Jamieson responded: "I never said I wasn't going to stop them." *Id.* He then agreed with the resident that The Greens would "destroy everything." *Id.*

68. Defendant Jamieson then went on to outline efforts by the Town to heavily scrutinize the development, including close monitoring of both water and sewer lines and building of the roads. Jamieson ended by forcefully pledging that"[he will] stay on top of [plaintiff]" to "prevent an overgrowth;" "We're going to be on them 24/7"; and "[W]e're trying to do everything we can." *Id.*

69. On May 9, 2018, Defendant Jamieson further described his position and used explicit, anti-Semitic rhetoric to frame his opposition to The Greens:

> Listen, we all know that [the developer doesn't] care about the communities that they're in and everywhere else. So, you know, they're not gonna all of a sudden say, "We really care about Chester; we'll make less money because we want to work with you guys…We're doing what we can to alleviate 432 [sic] Hasidic houses in the Town of Chester. We're trying…There's nobody on this Board, there's nobody on the Board, nobody who wants the developments to go through.

Town Meeting Recording (May 9, 2018).

70. As promised by Defendant Jamieson, over the course of 2018 the Town proceeded to impose special requests on the developer. These special requests included requiring the developer to purchase costly easements from private property owners to re-route the sewer waste line for The Greens from beneath a public roadway to beneath neighboring private property.

71. The Town further required the developer to double the quantity of subgrade material on the road which ran through The Greens and later required the developer to move the road by ten feet.

72. The Town also stationed an inspector at the site at all hours construction occurred, at developer's expense.

73. The developer complied with all of Defendants' special requests and revisions.

74. The Town then required revisions of model home plans previously submitted by the developer, which appeared to be directed at undermining Hasidic Jewish customs and families.

75. For example, Defendant Town Building Inspector Farr sent a letter to the developer requesting information about the number and location of sinks in each unit. This request appears directed at determining whether the homes would have multiple sinks as is required for kosher kitchens.

76. Defendant Farr's letter also requested information from the developer about the number of bedrooms in each unit. This request appears directed at determining how large the families would be who reside at The Greens.

**4. County's Simultaneous Action to Disrupt the Developer's Sewer and Water Permits for The Greens**

77. The County, like the Town, also participated in trying to stop The Greens.

78. Defendant County Executive Neuhaus explicitly outlined these strategies as follows:

> First of all, we can *pressure the developer*. We have a lot of influence here. Gentleman talked about the *building permits*, the County Health Department. *I don't know when the water was tested…There's a lot of stuff to revisit*…When was the traffic study done?...But we can *pressure them to either go commercial*, which I think we should do, or w*e can buy it*…You could also take it by eminent domain for the purposes of economic development…That's why I'm not talking about when they're going to start building…[turning to Defendant Jamieson], I know you're with me on this. I know you are too, [turning to Defendant Valentine] and Ryan [referring to Defendant Ryan Wensley, a Town Board member].

Town Meeting Recording (April 25, 2018)(emphasis added).

79. At a subsequent town meeting on May 9, 2018, Defendant Neuhaus defiantly stated that he would not authorize sewer permits at The Greens. After the Town Attorney interjected that the Town sewer capacity was in fact sufficient to absorb The Greens, Defendant Neuhaus stated, "I think that's BS…I'm telling you right now. I'm the County. I'm telling you, you don't have the capacity." Town Meeting Recording (May 9, 2018).

80. Defendant Neuhaus' statements and promises resulted in action in June 2018. The County had recently granted a five-year extension of the developer's water permit for The Greens. Shortly thereafter, the County's Department of Health contacted the State's DOH to request further

water testing at The Greens, which DOH granted. This request effectively undermined the County's prior five-year permit extension.

81. Notably, after DOH's grant of the County's request, Defendant Farr wrote to DOH on behalf of the Town and stated that the Town would also like to be "actively involved and have input" with respect to DOH re-opening The Greens application.

**5. Coordinated Town and County Actions to Buyout and Re-Zone The Greens**

82. As officials earlier promised, The Town and County took steps to assume ownership of The Greens. Upon information and belief, the Town in April 2018 offered to buy The Greens for $20 million, $8 million above the price the developer purchased The Greens, less than a year prior.

83. Upon information and belief, the developer rejected this offer, to which the Town countered with $30 million, which the developer also rejected.

84. Upon information and belief, after the developer rejected both buyout offers from the Town, the County then held a meeting at which Defendant Neuhaus and other County officials pressured the developer to re-zone The Greens for commercial development.

85. Town and County officials also engaged in a broader effort to re-zone properties surrounding The Greens to prevent members of the Hasidic community from moving into those properties.

86. At the April 25, 2018 town meeting, Defendant Jamieson described the reason for this re-zoning effort as follows: "[t]hey want all our open area that's undeveloped right now that can be developed…[w]e changed all the codes in the time. So, so if somebody does buy property, they got to build them according to our code…" Town Meeting Recording, (April 25, 2018).

**6. Town's Subsequent Denial of the Developer's Building Permits for The Greens**

87. In a continuation of its scorched-earth effort to halt development at The Greens, the Town, in letters signed by Defendant Farr, denied the developer's two building permit requests in November 2018 and June 2019.

88. The Town gave three reasons for the building permit denials; all of which were baseless.

89. First, the Town erroneously claimed that the 2010 Settlement Agreement restricted the size of the homes Plaintiff could build, and that Plaintiff's proposed plans exceeded those alleged restrictions.

90. Second, the Town claimed that the developer failed to provide certain infrastructure prerequisites, which, the previous owner, Arlington Chester had satisfied years earlier through payment of a performance security bond.

91. Third, the Town claimed that each home was required to contain a garage, which was not a requirement in the approved plans following the 2010 Settlement Agreement. The Town raised this requirement for the first time in June 2019.

92. To date, the Town has yet to approve a single building permit submitted by Plaintiff for the 431-unit Greens development.

**7. Town's Efforts to Restrict Development of The Greens *After* Commencement of The Underlying Action**

93. The Town's offensive against the developer continued even after the developer filed the underlying action on July 19, 2019. Two months later, on September 25, 2019, Town Board members proposed another set of laws which, if enacted, would directly encumber development of The Greens. Town Meeting Minutes, pp. 2-14 (September 25, 2019).

94. The first of these laws was Local Law No. 2, entitled "Noise Pollution Control," introduced by Defendant Town Board Members Perez and Wensley. This law would limit the hours continuous noise from construction activities can occur. Under the law, the Town could grant variances; however, applicants would be required to mail notice of their application to all property owners in the surrounding area, and a public hearing on the variance would be required. Violations of the law would subject an offender to a penalty ranging from $50.00 to $250.00 per offense and "a separate offense shall be deemed to be committed on each day during or on which a violation occurs or continues." *Id.* at 7.

95. Defendants Town Board Members Wensley, Smith, and Finizia, and Valentine voted in favor of public hearings on Noise Pollution Control law.

96. Upon information and belief, this law is still pending before the Town Board.

97. At the same September 25, 2019 town meeting, Local Law No. 3, entitled "LLC Disclosure" was introduced by Defendants Town Board Members Perez and Wensley. Under this law, all entities "applying for land use approvals or permission to [engage in] any construction activity within the Town of Chester" would be required to complete an entity disclosure statement. The disclosure statement is vaguely defined as a "form approved of from time to time by resolution of the Town Board." Penalties for failure to file the statement would be broad and would include authority for the Town to suspend processing for the underlying application in question, authority for the Building Inspector to issue a stop-work order on the development project, and a civil penalty of $3,000.00 with the potential for criminal sanctions. Town Meeting Minutes, p. 8 (September 25, 2019).

98. Defendants Wensley, Smith, and Finizia, and Valentine voted in favor of public hearings on the LLC Disclosure Law.

99. Upon information and belief, this law is still pending before the Town Board.

100. Because of the Town's and County's actions, Plaintiff has been unable to begin construction of a single home in The Greens, and hundreds of homes that should be available to New Yorkers, including members of the Hasidic community, have been denied.

## FIRST CAUSE OF ACTION

### Declaratory and Injunctive Relief Against Defendants for Intentional Discrimination in Violation of Section 3604(a) of the FHA

101. The NYAG re-alleges and incorporates by reference the allegations in the foregoing paragraphs of this complaint as fully set forth herein.

102. Section 3604(a) of the FHA makes it unlawful to "otherwise make unavailable" or deny a dwelling to persons because of religion and familial status.

103. Through their actions and inactions, as set forth above, Defendants discriminated against Plaintiff-developer on account of the religion of its managing partners in violation of Section 3604(a) of the FHA.

104. Defendants also, as set forth above, made dwellings unavailable or denied dwellings to prospective residents, because of their religion and familial status in violation of Section 3604(a) of the FHA.

## SECOND CAUSE OF ACTION

### Declaratory and Injunctive Relief Against Defendants for Interference in the Enjoyment of Rights in Violation of Section 3617 of the FHA

105. The NYAG re-alleges and incorporates by reference the allegations in the foregoing paragraphs of this complaint as fully set forth herein.

106. Section 3617 of the FHA prohibits conduct that interferes with a person in the exercise or enjoyment of rights granted or protected under the FHA.

107. Through actions and inactions, as set forth above, Defendants interfered with rights enjoyed by Plaintiff-developer and prospective residents under the FHA.

108. Also, as set forth above, Defendants retaliated against Plaintiff-developer for bringing the underlying action in violation of Section 3617 of the FHA.

## PRAYER FOR RELIEF

Wherefore, the NYAG prays that the Court:

a. Declare that Defendants' acts and omissions alleged herein violate the FHA;

b. Enjoin Defendants from enforcing any local laws proposed or enacted to prevent the development of The Greens or to otherwise discriminate based on religion and familial status as alleged herein;

c. Enjoin Defendants, their agents and successors in office, and all persons acting in concert with them from future non-compliance with the FHA.

d. Enter permanent injunctive relief, in the form of:

    i. An order requiring that Defendants immediately approve the development of the Greens at Chester without further administrative delay or obstruction.

    ii. An order requiring Defendants take all affirmative steps, including changing policies, conducting training, undergoing monitoring by this Court, among others, to ensure that defendants achieve compliance with the FHA, eliminate ongoing discrimination and its effects, and prevent discriminatory conduct in the future.

e. Grants any other relief the Court deems necessary and proper.

DATED: May 14, 2020
New York, New York

LETITIA JAMES
Attorney General of the State of New York

By: /s/ *Jessica Clarke*

Jessica Clarke, *Bureau Chief*
Sania W. Khan, *Assistant Attorney General*
Vinita Kamath, *Assistant Attorney General*
Clarence Okoh, *Intern*
Civil Rights Bureau
Office of the New York State Attorney General
28 Liberty Street, 20th Flr
New York, NY 10005
Jessica.Clarke@ag.ny.gov
Sania.Khan@ag.ny.gov
Vinita.Kamath@ag.ny.gov
Tel. (212) 416-8534
Fax (212) 416-8074